UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PLATINA BULK CARRIERS PTE LTD, | : | |
| | : | |
| Plaintiff, | : | 20 Civ. 4892 (NRB) |
| | : | |
| - against - | : | |
| | : | |
| PRAXIS ENERGY AGENTS DMCC, | : | |
| PRAXIS ENERGY AGENTS LLC, and | : | |
| PRAXIS ENERGY AGENTS PTE LTD. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT PRAXIS ENERGY
AGENTS LLC AND PRAXIS ENERGY AGENTS PTE LTD.'S MOTION TO DISMISS**

Attorneys for Plaintiff,
Platina Bulk Carriers Pte Ltd.,

Tisdale & Nast Law Offices, LLC
Thomas L. Tisdale (TT5263)
Austyn L. Carolin (439988)
200 Park Avenue, Suite 1700
New York, NY 10166
Tel:    212-354-0025
*ttisdale@tisdale-law.com*
*acarolin@tisdale-law.com*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.............................................................................i

PRELIMINARY STATEMENT.....................................................................1

FACTUAL BACKGROUND...........................................................................2

LEGAL ARGUMENT......................................................................................3

    I.     This Court has Personal Jurisdiction over all of the Defendants.....................3

    II.    Venue is proper in this Court.............................................................5

    III.   Plaintiff has properly alleged an alter ego claim against Defendants.................8

         A.     Standard of Review ................................................................8

         B.     Defendant's motion raises issues of fact, inappropriate
               for a motion to dismiss.........................................................10

         C.     Plaintiff has sufficiently plead and alter ego relationship....................12

    IV.   Plaintiff has a right to indemnity for the OCEANMASTER
        stem and declaratory relief for the OCEANBEAUTY stem..........................13

         A.     Defendants'' contention that based on US law,
               Al Arabia had no right of arrest is a red-herring.............................14

         B.     Plaintiff has properly plead a claim for Indemnity...........................15

         C.     Plaintiff seeks Declaratory Relief.............................................16

CONCLUSION...............................................................................................18

## TABLE OF AUTHORITIES

*Ace Arts, LLC v. Sony/ATV Music Pub., LLC,*
     56 F. Supp. 3d 436 (S.D.N.Y. 2014)............................................................10

*Aegean Bunkering (USA) LLC v. Amazon,*
     No. 14-CV-9447 (KBF),
     2016 WL 4471895 (S.D.N.Y. Aug. 24, 2016)..............................................14

*Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Am. Boat Co., LLC,*
     No. 11 CIV. 6804 PAE, 2012 WL 527209,
     (S.D.N.Y. Feb. 17, 2012)...........................................................................3

*Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd.,*
     622 F. Supp. 2d 46 (S.D.N.Y. 2009)....................................................11, 12

*Ashcroft v. Iqbal,*
     556 U.S. 662 (2009)..........................................................................*passim*

*Ball v. Metallurgie Hoboken-Overpelt, S.A.,*
     902 F.2d 194 (2d Cir. 1990).......................................................................3

*Bell Atl. Corp. v. Twombly,*
     550 U.S. 544 (2007)..........................................................................*passim*

*Cargo Partner AG v. Albatrans, Inc.,*
     352 F.3d 41 (2d Cir. 2003).......................................................................12

*Chambers v. Time Warner, Inc.,*
     282 F.3d 147, 153 (2d Cir. 2002)................................................................9

*China Nat. Chartering Corp. v. Pactrans Air & Sea, Inc.,*
     882 F. Supp. 2d 579 (S.D.N.Y. 2012).........................................................5

*Classic Mar. Inc. v. Limbungan Makmur SDN BHD,*
     646 F. Supp. 2d 364 (S.D.N.Y. 2009)......................................................10

*D'Amico Dry D.A.C. v. Primera Mar. (Hellas) Ltd.,*
     348 F. Supp. 3d 365 (S.D.N.Y. 2018)...................................................5, 12

*D.H. Blair & Co. v. Gottdiener,*
    462 F.3d 95 (2d Cir. 2006)............................................................3

*Dolco Inv., Ltd. v. Moonriver Dev., Ltd.,*
    486 F. Supp. 2d 261 (S.D.N.Y. 2007)........................................12

*Dow Jones & Co. v. Harrods Ltd.,*
    346 F.3d 357 (2d Cir. 2003)........................................................17

*Glory Wealth Shipping Pte Ltd. v. Indus. Carriers, Inc.,*
    590 F. Supp. 2d 562 (S.D.N.Y. 2008)..........................................5

*Golden v. Zwickler,*
    394 U.S. 103 (1969)...................................................................16

*Geldzahler v. New York Med. Coll.,*
    663 F. Supp. 2d 379 (S.D.N.Y. 2009)..........................................8

*Genger ex rel. AG Properties Co. v. Sharon,*
    910 F. Supp. 2d 581 (S.D.N.Y. 2012)........................................15

*Herod's Stone Design v. Mediterranean Shipping Co. S.A.,*
    434 F. Supp. 3d 142 (S.D.N.Y. 2020)......................................8, 9

*In re Refco Inc., Sec. Litig.,*
    No. 07-MDL 1902 (JSR),
    2009 WL 5548666 (S.D.N.Y. Nov. 16, 2009)...............................5

*Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,*
    982 F.2d 765 (2d Cir. 1992).......................................................14

*Leviton Mfg. Co. v. Reeve,*
    942 F. Supp. 2d 244 (E.D.N.Y. 2013)...................................3, 5, 7

*Licensed Practical Nurses, Technicians & Health Care Workers of New York, Inc. v.*
    *Ulysses Cruises, Inc.,*
    131 F. Supp. 2d 393 (S.D.N.Y. 2000)..........................................5

*Magi XXI, Inc. v. Stato Della Citta Del Vaticano,*
    818 F. Supp. 2d 597, 604 (E.D.N.Y. 2011)...................................6

*Martinez v. Bloomberg LP,*
    740 F.3d 211, 218 (2d Cir. 2014)...................................................................6

*Milestone Shipping, S.A. v. Estech Trading LLC,*
    764 F. Supp. 2d 632 (S.D.N.Y. 2011).........................................................11

*Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.,*
    415 F. App'x 264 (2d Cir. 2011)................................................................16

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S 614 (1985).......................................................................................6

*M/S Bremen v. Zapata Off-Shore Co.,*
    407 U.S. 1 (1972)..................................................................................5, 6, 7

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC,*
    537 F.3d 168 (2d Cir. 2008).......................................................................10

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,*
    709 F.3d 109 (2d Cir. 2013).........................................................................9

*Primiani v. Vintage 185 Inc.,*
    No. 218CV2237ADSAYS,
    2019 WL 486087 (E.D.N.Y. Feb. 6, 2019)................................................10

*REA Navigation, Inc. v. World Wide Shipping Ltd.,*
    No. 08 CIV. 9951(SAS),
    2009 WL 3334794 (S.D.N.Y. Oct. 14, 2009)............................................11

*Ramirez by Ramirez v. Nat'l R.R. Passenger Corp.,*
    576 F. Supp. 95 (S.D.N.Y. 1983)...............................................................16

*Roth v. Jennings,*
    489 F.3d 499 (2d Cir. 2007)..................................................................10, 13

*S.E.C. v. Montle,*
    65 F. App'x 749 (2d Cir. 2003).....................................................................5

*Scherk v. Alberto-Culver Co.,*
    417 U.S. 506 (1974).......................................................................................6

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,*
    *Kommanditgesellschaft v. Navimpex Centrala Navala,*
    989 F.2d 572 (2d Cir. 1993)...................................................................4

*Stephens Inc. v. Flexiti Fin. Inc.,*
    No. 18-CV-8185 (JPO),
    2019 WL 2725627 (S.D.N.Y. July 1, 2019)......................................................9

*Stewart Org., Inc. v. Ricoh Corp.,*
    487 U.S. 22 (1988)...........................................................................6

*Tide Line, Inc. v. Eastrade Commodities, Inc.,*
    No. 06 CV 1979,
    2006 WL 4459297 (S.D.N.Y. Aug. 15, 2006)....................................................11

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001)...................................................................10

*Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.,*
    465 F. Supp. 790 (S.D.N.Y. 1978)...........................................................15

*Tropp v. Corp. of Lloyd's,*
    385 F. App'x 36 (2d Cir. 2010)................................................................7

*Trump v. Vance,*
    977 F.3d 198 (2d Cir. 2020)...................................................................9

*United States v. Funds Held in the Name or for the Benefit of Wetterer,*
    210 F.3d 96 (2d Cir. 2000)...................................................................12

*United States v. Premises & Real Prop. at 4492 S. Livonia Rd., Livonia, N.Y.,*
    889 F.2d 1258 (2d Cir. 1989)................................................................12

*United States Underwriters Ins. Co. v. Image By J & K, LLC,*
    335 F. Supp. 3d 321 (E.D.N.Y. 2018)........................................................16

*Vestoil, Ltd. v. M/V M Pioneer,*
    148 F. App'x 898 (11th Cir. 2005)...........................................................14

iv

*Williamson v. Recovery Ltd. P'ship,*
    542 F.3d 43 (2d Cir. 2008)............................................................12

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995).................................................................17

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,*
    933 F.2d 131 (2d Cir. 1991).....................................................5, 12

28 U.S.C.A. § 2201.....................................................................16

Fed. R. Civ. P. Rule 12.........................................................*passim*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PLATINA BULK CARRIERS PTE LTD,   :

      Plaintiff,   :        20 Civ. 4892 (NRB)

  - against -   :

PRAXIS ENERGY AGENTS DMCC,   :
PRAXIS ENERGY AGENTS LLC, and   :
PRAXIS ENERGY AGENTS PTE LTD.   :

      Defendants.   :

---

### PLAINTIFF'S OPPOSITION TO DEFENDANT PRAXIS ENERGY AGENTS LLC AND PRAXIS ENERGY AGENTS PTE LTD.'S MOTION TO DISMISS

Plaintiff, Platina Bulk Carriers Pte Ltd. ("Plaintiff"), by its attorneys, Tisdale & Nast Law Offices, LLC, respectfully submits its Opposition to the Motion to Dismiss by the Defendants PRAXIS ENERGY AGENTS LLC ("Praxis (USA)"), and PRAXIS ENERGY AGENTS PTE LTD., ("Praxis (Singapore)") (collectively "Defendants"). (ECF 45). In addition to the two Praxis entities referred to above, Praxis Energy Agents DMCC ("Praxis (Dubai)") is not a party to the Defendants' motion and has not answered the Amended Verified Complaint. (ECF 13). Plaintiff requested a Certificate of Default (ECF 50) and a Certificate of Default has been issued by the Court. (ECF 52).

### PRELIMINARY STATEMENT

Under the guise of a motion to dismiss under Fed. R. Civ. P. Rule 12, Defendants have filed a motion rife with genuine issues of fact, about which no discovery has been had. Instead of focusing on the four corners of the Complaint and the documents which are specifically incorporated therein, Defendants rely on other, unrelated documents, creating factual issues that

1

the court can only decide at a later stage in the case after discovery.   Relying on inapposite Supplemental Admiralty Rule B cases, Defendants argue that Plaintiff has failed to sufficiently plead alter ego.   Defendants also skirt around the fact that the terms and conditions provided by Praxis (Dubia), with which Plaintiff contracted, are the only governing terms.   No other Praxis (Dubai) terms exist.   These were the terms on the Praxis website at the time the vessel was fueled.   These terms list all three Defendants as parties and clearly state that any claims arising between the Parties should be brought in this Court.   The purported terms and conditions on which Praxis (USA) and Praxis (Singapore) rely in support of this motion, in addition to being irrelevant, are suspect, even suspicious.

## **FACTUAL BACKGROUND**

This action arises out of the supply of fuel ("stem") to two vessels chartered by Plaintiff, in October 2019.   In both instances, Plaintiff contracted with Praxis (Dubai) for the fuel.   Praxis (Dubai) sub-contracted with Al Arabia Bunkering Company LLC ("Al Arabia") to supply the vessels.   Although Plaintiff paid Praxis (Dubai) in full for both stems, Praxis (Dubai) never paid Al Arabia.   As a result, Al Arabia arrested one of the vessels involved, the OCEANMASTER.   Plaintiff settled that claim, suffering damages of $315,807.90 as a result.   In the case of the other vessel, the OCEANBEAUTY, Al Arabia continues to threaten the arrest of that vessel, but to date has not done so.   In that case, Plaintiff brings this action against Praxis (Dubai) seeking a declaratory judgment of its liability for whatever settlement or damages Plaintiff sustains with regard to that stem.   In addition, Plaintiff seeks to hold Praxis (USA) and Praxis (Singapore) liable for the debts of Praxis (Dubai) as alter egos.   (ECF 13).

On October 15, 2020, the Court granted Plaintiff's motion for substitute service on the Defendants.   (ECF 28).   On October 20, 2020, a stipulation extending all of the Defendants' time

to answer or otherwise respond to the Amended Verified Complaint was filed. (ECF 29). Defendants' Motion to Dismiss fails to raise any arguments on behalf of Praxis ("Dubai"). Plaintiff requested a Certificate of Default (ECF 50) and a Certificate of Default has been issued by the Court. (ECF 52).

## LEGAL ARGUMENT

### I.    This Court has Personal Jurisdiction over all of the Defendants.

In this Circuit, when no discovery has yet occurred, plaintiffs need only make out a prima facie case of personal jurisdiction; they are not required to prove personal jurisdiction by a preponderance of the evidence. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F .2d 194, 197 (2d Cir.1990) ("prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's prima facie showing may be established solely by allegations.").

"Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *Leviton Mfg. Co. v. Reeve*, 942 F. Supp. 2d 244, 255 (E.D.N.Y. 2013), *amended* (Mar. 23, 2013)(citing *D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 103 (2d Cir.2006); *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964)). If the forum selection clause is both valid and applicable, "it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process." *Leviton Mfg. Co.,* 942 F. Supp. 2d at 255; (citing *Am. S.S. Owners Mut. Prot. and Indem. Ass'n, Inc. v. Am. Boat Co., LLC*, No. 11 Civ. 6804 PAE, 2012 WL 527209, at \*2 (S.D.N.Y. Feb. 17, 2012).

Clause 22.02 of the Praxis Terms provides:

> Without prejudice to the provisions of clause 22.03 here below [which is inapplicable], any disputes and/or claims arising in connection with these Conditions and/or any agreement governed by them, shall be submitted to the United States District Court for the Southern District of New York.

3

(ECF 26).

For the purposes of a pre-discovery 12(b)(2) motion, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *Seetransport Wiking Trader Schiffarhtsgellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir.1993). Plaintiff must submit affidavits to counter conflicts with defendants' affidavits; any such conflicts are then resolved in plaintiff's favor, "and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Id.*

Here, Defendants have filed no affidavits. For that reason alone, this motion should be denied. Moreover, the Plaintiff has submitted the Declaration of Mineshh D. Rathod who has declared under penalty of perjury that the only terms on the Praxis website (which made no distinction between the three Praxis entities) at the time of the stems and the arrest of the OCEAN BEAUTY (one month after the stem) are those that were attached to the Amended Verified Complaint. In addition, the accompanying Declaration of Thomas L. Tisdale declares that those same terms were on the joint Praxis website when the matter was first referred to his office in October 2019 and remained the only terms on that website until the website was taken down sometime thereafter. Curiously, the joint Praxis website remains down even at the time of filing this Memorandum.

In the governing terms and conditions, all of the Praxis entities surrender to the personal jurisdiction of this Court. That should end the inquiry. Praxis (USA) and Praxis (Singapore)'s claim that they had different terms and conditions at the time, even if true, (which is denied), is irrelevant. The stem was made by Praxis (Dubai).

Furthermore, the allegations here are that Praxis (Singapore) and Praxis (USA) are both alter egos of Praxis (Dubai). Alter egos are treated as one entity for purposes of jurisdiction. *d'Amico Dry D.A.C. v. Primera Mar. (Hellas) Ltd.*, 348 F. Supp. 3d 365, 390 (S.D.N.Y. 2018), *aff'd* 794 F. App'x. 127 (2d Cir. 2020) (citing *Wm. Passalacqua Builders Inc. v. Resnick Dev. So., Inc.*, 933 F.2d 131, 142–43 (2d Cir. 1991)). Where "personal jurisdiction exists over [a defendant], jurisdiction over his alter ego is proper as well." *China Nat. Chartering Corp. v. Pactrans Air & Sea, Inc.*, 882 F. Supp. 2d 579, 596 (S.D.N.Y. 2012); *SEC v. Montle,* 65 Fed.Appx. 749, 752 (2d Cir.2003); *see Glory Wealth Shipping Pte Ltd. v. Indus. Carriers, Inc.,* 590 F.Supp.2d 562, 564 (S.D.N.Y.2008) ("Where one defendant is subject to personal jurisdiction and service of process, its alter egos are subject to personal jurisdiction and may be served by serving it.")(citing *Wm. Passalacqua Builders, Inc.,* 933 F.2d at 142–43). Accordingly, because this Court has undisputed jurisdiction over Praxis (Dubai), it has jurisdiction over its alter egos, Praxis (USA) and Praxis (Singapore).

## II.    <u>Venue is proper in this Court</u>

"Forum selection clauses play a crucial role in ensuring predictability in contract formation." *Leviton Mfg. Co.*, 942 F. Supp. 2d at 256; *In re Refco Inc., Secs. Litig.*, No. 08 Civ. 3086, 2009 WL 5548666, at *5 (S.D.N.Y. Nov. 16, 2009) ("Both the Supreme Court and the Second Circuit have recognized that forum selection clauses have economic value and should be enforced in accordance with the expectations of the parties.").

In the federal courts, forum selection clauses are held to be "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances," *Arute v. Carnival Corp.*, No. CV055001407S, 2008 WL 4415796, at *3 (Conn. Super. Ct. Sept. 10, 2008) (citing *M/S Breman v. Zapata Off-Shore Co.,* 407 U.S. 1, 10 (1972); *see*

*also Licensed Practical Nurses, Technicians & Health Care Workers of New York, Inc. v. Ulysses Cruises, Inc.*, 131 F. Supp. 2d 393, 396 (S.D.N.Y. 2000). The burden is on the moving party to "rebut the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Magi XXI, Inc. v. Stato Della Citta Del Vaticano*, 818 F. Supp. 2d 597, 610 (E.D.N.Y. 2011), *aff'd,* 714 F.3d 714 (2d Cir. 2013).

> Federal law must govern the ultimate enforceability of a forum selection clause to ensure that a federal court may decline to enforce a clause if "trial in the contractual forum [would] be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court," or "if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision."

*Martinez v. Bloomberg LP*, 740 F.3d 211, 218 (2d Cir. 2014)

The Supreme Court has long recognized that the "the orderliness and predictability" promoted by forum selection clauses has value beyond the admiralty context. *Martinez*, 740 F.3d at 219; (citing *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 516 (1974)); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 631 (1985) (*Bremen* establishes "strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions"). Forum selection clauses "further vital interests of the justice system, including judicial economy and efficiency, ensure that parties will not be required to defend lawsuits in far-flung fora, and promote uniformity of result." *Martinez*, 740 F.3d at 219;(citing *Magi XXI, Inc.,* 714 F.3d at 722); *see also Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 33 (1988) (Kennedy, J., concurring) ("[E]nforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system.").

To enforce a forum selection clause, a party must show that: "(1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely

permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause*." Leviton Mfg. Co.*, 942 F. Supp. 2d at 256; (citing *Tropp v. Corp. of Lloyd's,* 385 F. App'x. 36, 37 (2d Cir.2010)). Even if all three criteria are met, the opposing party may "make a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Leviton Mfg. Co.,* 942 F. Supp. 2d at 256; (quoting *M/S Bremen,* 407 U.S. at 15).

Praxis (Dubai) has failed to appear or respond to Plaintiff's complaint.  The remaining Defendants have failed to provide any other terms or condition used by Praxis (Dubai), but claim that they are not a party to these terms and conditions at the time of the stems in question. Defendants' argument is preposterous.  They are specifically identified. The Terms and Conditions state as follows:

> 1.00 INTRODUCTORY These terms and conditions, which can be found also at www.praxisenergyagents.com are the general standard terms and conditions under which **each of the companies stated in the Schedule below** (each one hereinafter referred to herein as the "Company" is prepared to enter agreement (the "Agreement") with another party (the "Buyer") to supply to the Buyer marine bunkers, and/or lubricants and/or other products.
>
> **SCHEDULE** referred in clause 1.00
> - PRAXIS ENERGY AGENTS DMCC of Dubai, United Arab Emirates
> - PRAXIS ENERGY AGENTS (PTE) LTD. of Singapore
> - PRAXIS ENERGY AGENTS LLC of Houston U.S.A.

(ECF 26) (emphasis added).

As mentioned above, the terms and conditions on which Praxis (USA) and Praxis (Singapore) rely are suspicious.  When the stems were made in October 2019, the only terms and conditions found on the Praxis Energy website, *www.praxisenergyagents.com,* were those attached to the Complaint, which identify all three Defendants and submit to the jurisdiction of this Court. (Tisdale Decl., ¶ 6; Rathod Decl., ¶ 6).  Praxis (USA) asserts that it is not a party to these terms

and conditions and instead had its own terms dated September 30, 2019, (ECF 45, Ex. 2), which provide for jurisdiction in Houston, Texas. Praxis (Singapore) asserts that it is not a party to these terms and conditions and instead had its own terms dated August 30, 2019. (ECF 45, Ex. 1). Both of these assertions are false.

In an action pending in the United States District Court for the District of South Carolina entitled *Carl Schroter GmbH & Co KG v. Smooth Navigation SA,* docket number 2:20-cv-00334-RMG, Praxis (USA) averred that the terms and conditions, which governed those fuel orders in December 2019 and January 2020, were dated June 30, 2019. Those terms and conditions call for disputes against Praxis (USA) and Praxis (Singapore) to be resolved in the Southern District of New York. (Tisdale Decl., Ex. B). Here, Praxis (USA) and Praxis (Singapore) rely on terms which predate the stems in dispute in South Carolina, but postdate the contract terms relied on here. Either Praxis (USA)'s averments in South Carolina or the positions taken in this motion, are false (perhaps explaining the lack of a supporting affidavit). They cannot both be true.

In any event, the only terms and conditions which concern Praxis (Dubai) are those attached hereto which call for venue in this Court.

## III.     Plaintiff has properly alleged an alter ego claim against Defendants.

### A.     Standard of Review

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading. *Geldzahler v. New York Med. Coll.*, 663 F. Supp. 2d 379, 386 (S.D.N.Y. 2009). Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint. *Id.*

To survive a Rule 12(b)(6) motion to dismiss, a pleading "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Herod's Stone Design v. Mediterranean Shipping Co. S.A.*, 434 F. Supp. 3d 142, 155 (S.D.N.Y. 2020)(citing *Ashcroft v.*

8

*Iqbal,* 556 U.S. 662, 678 (2009)(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). To put it differently, the non-movant must allege facts that are "suggestive of," and not "merely consistent with," the elements of the claim. *Trump v. Vance,* 977 F.3d 198, 207 (2d Cir. 2020) (citing *New Jersey Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff is not required to provide "detailed factual allegations," but must assert "more than labels and conclusions." *Twombly,* 550 U.S. at 555. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Claims are facially plausible when a plaintiff "pleads factual content that allows the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 566).

When deciding a Rule 12(b)(6) motion, the court may consider only the pleading, documents attached to the pleading, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon in bringing suit. *Herod's Stone Design*, 434 F. Supp. 3d at 155; *see Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002). The court must accept the allegations in the pleading as true and draw all reasonable inferences in favor of the non-movant. *Herod's Stone Design* 434 F. Supp. at 155.

As the moving party, the Defendants have the burden of "demonstrating its entitlement to relief under Rule 12(b)(6)." *Stephens Inc. v. Flexiti Fin. Inc.*, No. 18-CV-8185 (JPO), 2019 WL 2725627, at *7 (S.D.N.Y. July 1, 2019). *Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. Rather, a court must take the allegations as true, no matter how skeptical the court may be. *See Twombly* 550 U.S. at 555-56 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)")("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable").

The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Primiani v. Vintage 185 Inc.,* No. 218CV2237ADSAYS, 2019 WL 486087, at *2 (E.D.N.Y. Feb. 6, 2019)(citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).

### B. Defendant's motion raises issues of fact, inappropriate for a motion to dismiss.

Defendant's motion to dismiss seeks to have the Court rule on additional facts outside the record to bolster its argument. Defendants argue at length that Plaintiff has failed to establish all if the factors necessary to establish the parties are alter egos.  This argument is improper and misplaced for a motion to dismiss, especially as no discovery has yet to be conducted.

It is rudimentary that findings of fact are inappropriate at the motion to dismiss stage. *Roth v. Jennings,* 489 F.3d 499, 515-16 (2d Cir. 2007)(vacating dismissal where the trial judge impermissibly made findings of fact and noting the record easily would have permitted a rational factfinder draw to factual inferences contrary to those drawn by the court).  As the Second Circuit has emphasized, "a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact." *Ace Arts, LLC v. Sony/ATV Music Pub., LLC,* 56 F. Supp. 3d 436, 442 (S.D.N.Y. 2014)(citing *Roth,* 489 F.3d at 509).

The determination of alter-ego liability is a fact-intensive inquiry, whose primary concerns are "(1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 177 (2d Cir.2008); *see also Classic Mar. Inc. v. Limbungan Makmur SDN BHD,* 646 F.Supp.2d 364, 371 (S.D.N.Y 2009) (listing factors for consideration in

determining alter-ego status). Here, without a fuller record aided by proper discovery, Defendants can neither extinguish all questions of fact nor defeat Plaintiff's claim against it as a matter of law. *Milestone Shipping, S.A. v. Estech Trading LLC*, 764 F. Supp. 2d 632, 636 (S.D.N.Y. 2011); *see REA Navigation, Inc. v. World Wide Shipping Ltd.,* No. 08 Civ. 9951 (SAS), 2009 WL 3334794, *2 (S.D.N.Y. Oct. 14, 2009).

Further, all of the Defendants' authorities apply the wrong legal standard. Defendants' authorities all relate to Rule B maritime attachments which require a more onerous pleading standard.   Generally, although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd.,* 622 F. Supp. 2d 46, 52–53 (S.D.N.Y. 2009). In the Rule B maritime attachment context, however, plaintiffs must additionally satisfy Rule E(2)(a)'s heightened pleading standard, which requires a complaint to "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed.R.Civ.P. Supp. R. E(2)(a); *Arctic Ocean Int'l, Ltd.*, 622 F. Supp. 2d at 52–53. Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims, however, requires that, in an action *in personam* with process of maritime attachment and garnishment, a complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed. R. Civ. P. Supp. R. E(2)(a); *Tide Line, Inc. v. Eastrade Commodities, Inc.*, No. 06 CV 1979, 2006 WL 4459297, at *8 (S.D.N.Y. Aug. 15, 2006). "This standard for the particularity

of complaints is more stringent than the pleading requirements of the Federal Rules of Civil Procedure." *Tide Line, Inc.*, 2006 WL 4459297, at *8; (citing *U.S. v. Premises and Real Property at 4492 South Livonia Road, Livonia, N.Y.*, 889 F.2d 1258, 1266 (2 Cir. 1989)).  This requirement is more demanding than Rule 8's pleading standard and is intended to prevent a plaintiff from "hold[ing], for a substantial period of time, property to which, in reality, it has no legitimate claim." *Arctic Ocean Int'l, Ltd.*, 622 F. Supp. 2d at 52–53; (citing *Premises & Real Prop. at 4492 South Livonia Road, Livonia, N.Y.,* 889 F.2d at 1266 (quotation marks omitted)).

"Veil-piercing claims are generally subject to the pleading requirements imposed by Fed.R.Civ.P.8(a), which requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.  *Dolco Inv., Ltd. v. Moonriver Dev., Ltd.,* 486 F. Supp. 2d 261, 272 (S.D.N.Y. 2007).

Here, Plaintiff's complaint sufficiently alleges an alter ego cause of action.

## C.     Plaintiff has sufficiently plead an alter ego relationship.

There is no rule about how many factors must be met to warrant piercing the corporate veil; rather, "the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." *d'Amico Dry D.A.C.* 348 F. Supp. 3d at 391; *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008). Disregarding corporate separateness is a remedy that "differs with the circumstances of each case." *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).  The question of alter ego is a uniquely fact sensitive. *United States v. Funds Held in the Name or for the Benefit of Wetterer,* 210 F.3d 96, 106 (2d Cir. 2000).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences

in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 43-44 (2d Cir. 2003); *see also Roth,* 489 F.3d at 510. To survive a motion to dismiss pursuant to Rule 12(b)(6), "a compliant must contain sufficient factual matter… to 'state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).

The Plaintiff has enumerated sufficient indicia of alter ego in its Amended Verified Complaint to properly state a cause of action. Among other allegations, Plaintiff has identified overlapping officers and directors (Theodosios Kyriazis), use of a single business name, "Praxis Energy Agents" as the trade name for all three Defendants, comingling of assets, and the depletion of the assets of the responsible defendant for the benefit of other related entities. The specificity of Plaintiff's alter ego allegations is more than adequate to state a cause of action.

**IV.** **Plaintiff has a right to indemnity for the OCEANMASTER stem and declaratory relief for the OCEANBEAUTY stem.**

Defendants argue that Plaintiff is not entitled to declaratory judgment because Platina has not yet paid the physical supplier for damages arising out of the threatened arrest of the M/V OCEANBEAUTY. Defendants also cite to the OW bunker cases to support its second contention that Plaintiff is not entitled to indemnity for the OCEANMASTER arrest or the threatened arrest because Al Arabia had no right to arrest the vessel. Defendants' reliance on US law for this proposition is misplaced since the arrest of the M/V OCEANMASTER occurred in Dubai, not in the US. The threatened arrest of the OCEANBEAUTY is also not in the US and US law has no bearing on either stem. Plaintiff seeks indemnity for the arrest which was valid under Dubai law

and declaratory judgment that Defendants will owe Plaintiff indemnity in the event the OCEANBEAUTY is arrested.

### A.      Defendants' contention that based on US law, Al Arabia had no right of arrest is a red-herring.

Defendants cite to the OW bunker cases specifically, *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511 (2d Cir. 2018), for the proposition that there is no right for a bunker fuel physical supplier like Al Arabia to arrest a vessel because they are a subcontractor retained by the general contractor to ... provide the supplies is generally not entitled to a maritime lien under (CIMLA).  However, *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, and its related cases, involved the plaintiff filing a complaint *in rem* in a United States District Court, asserting a maritime lien under US law.  Here, Al Arabia's arrest of the M/V OCEANMASTER in Dubai had no connection with the United States or US maritime law.

Defendants also cite to two cases from the Singapore Court to support their argument, but this too is misplaced.[1]  Both cases involve fuel supplied by Singapore bunker suppliers sued in Singapore courts which applied Singapore law to the dispute.  *See, The Xin Chang Shu*, [2015] SGHC 308 and *Precious Shipping Public Co Ltd and Others v. OW Bunker Far East (Singapore) Ltd and others and other matters*, [2015] SGHC 187.  Here, a court in Dubai applied local law to authorize the arrest of the OCEANMASTER in Dubai.  Singapore law is irrelevant to the case at hand.

It is expected that Defendants will again turn to their terms and argue that, contractually US law applies.  However, it is uniformly recognized that maritime liens may not be created by contract. *Aegean Bunkering (USA) LLC v. Amazon*, No. 14-CV-9447 (KBF), 2016 WL 4471895, at *11 (S.D.N.Y. Aug. 24, 2016), *aff'd sub nom. Aegean Bunkering (USA) LLC v.*

---

[1] Please see cases attached hereto.

*M/T AMAZON*, 730 F. App'x 87 (2d Cir. 2018); *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 982 F.2d 765, 768 (2d Cir. 1992); *Vestoil Ltd. v. M/V M Pioneer*, 148 Fed.Appx. 898, 900 (11th Cir. 2005) ("[I]t is settled law in the United States that a maritime lien can arise only by operation of law, regardless of any agreement by the parties."); *Valero Mktg. & Supply Co. v. M/V ALMI SUN, IMO No. 9579535*, No. 14-2712, 2015 WL 9459971, at *3 (E.D. La. Dec. 2, 2015)("L.4 is, at most, a contract, and cannot itself create a maritime lien."). Thus, Plaintiff's only claim against the Defendants is for indemnity.

Whether Praxis was obligated to satisfy Defendants' debt to Al Arabia is an element of Plaintiff's proof at trial. But Defendant' Rule 12 motion on that point, fails entirely.

**B.      Plaintiff has properly pled a claim for indemnity.**

"Under New York Law, indemnity is a restitution concept permitting shifting the loss to avoid the unjust enrichment of one party at the expense of the other." *Genger ex rel. AG Properties Co. v. Sharon*, 910 F. Supp. 2d 581, 587 (S.D.N.Y. 2012).  Although indemnification claims usually arise from an express agreement by which one party agrees to hold the other harmless for claims brought against it by a third-party, in the absence of an express contractual provision for indemnification, an implied right of indemnification can still be found. *Id.* at 587-88.  A person is entitled to implied indemnity when he, "in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other." *Id.*

Though not strictly termed such, implied indemnity is an equitable concept and turns on the degrees of responsibility between the party against whom the original judgment has been rendered and the party against whom indemnity is sought. *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 465 F. Supp. 790, 794 (S.D.N.Y. 1978).  The question of indemnity involves an essentially equitable inquiry of which party, in good conscience, should

15

ultimately be held responsible for the injury. *Id.* "The right to indemnity is predicated either on a duty assumed expressly by contract ..., or on the quasi-contract theory of unjust enrichment." *Ramirez by Ramirez v. Nat'l R.R. Passenger Corp.*, 576 F. Supp. 95, 99 (S.D.N.Y. 1983).

Here, Plaintiff seeks indemnity for its settlement with Al Arabia and for the losses it incurred due to Al Arabia's arrest of the OCEANMASTER, all because Defendants failed to pay Al Arabia despite the fact that Plaintiff paid Praxis (Dubai). That Praxis (Dubai) accepted Plaintiff's payment and then bugged-out of Dubai, transferring assets to Praxis (Singapore) along the way, (ECF 13), is simply unconscionable. Plaintiff has properly pleaded a claim for indemnity.

### C.      Plaintiff seeks declaratory relief.

The Declaratory Judgment Act provides, in pertinent part, that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). For the purposes of the Declaratory Judgment Act, "actual controversy" means "whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, or sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *United States Underwriters Ins. Co. v. Image By J & K, LLC*, 335 F. Supp. 3d 321, 329 (E.D.N.Y. 2018)(citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)). "'[A] mere demand for declaratory relief does not by itself establish a case or controversy necessary to confer subject matter jurisdiction....' '[Rather,] [w]here the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed.'" *United States Underwriters Ins. Co.*, 335 F. Supp. 3d at 329; (quoting *Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*, 415 F. App'x 264, 267 (2d Cir. 2011)).

Federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants" under the Declaratory Judgment Act. *United States Underwriters Ins. Co.*, 335 F. Supp. 3d at 329; (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995); *see also Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). The Second Circuit instructs district courts to consider certain prudential factors in determining whether to exercise their discretion to consider a declaratory judgment action:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; ... (2) whether a judgment would finalize the controversy and offer relief from uncertainty[;] ... (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (5) whether there is a better or more effective remedy.

*United States Underwriters Ins. Co.*, 335 F. Supp. 3d at 329–30; (quoting *Dow Jones & Co., Inc.*, 346 F.3d at 359–60).

A declaration that Praxis (USA) and Praxis (Singapore) owe Plaintiff indemnity for whatever reasonable sum it pays to Al Arabia will serve a very useful purpose. First, it will allow Plaintiff to negotiate a reasonable settlement with the assurance that, with little additional judicial assistance, it can obtain a final, enforceable judgment against Defendants for a sum certain. The same evidence used to support the OCEANMASTER indemnity claim will be used to secure the OCEANBEAUTY declaratory judgment claim. Furthermore, all of the discovery and evidence at trial relevant to alter ego issues will apply to both claims. By allowing this declaratory judgment to proceed, the Plaintiff and the Court will avoid further meritless motion practice. All of the legal issues will be resolved simultaneously. It will provide certainty moving forward, and possibly motivate the Defendants to pay their lawful debts. Declaratory judgment is the most efficient and effective remedy in this instance. The only other alternative is to wait for Al Arabia to arrest the

17

OCEANBEAUTY, resolve the claim and start a new duplicate case, a wasteful exercise by any measure.

## **CONCLUSION**

Plaintiff has properly pleaded a cause of action for losses suffered from the arrest of the OCEANMASTER in the amount of $315,807.90. Moreover, Plaintiff has properly alleged a cause of action for declaratory relief in regard to the OCEANBEAUTY stem. Plaintiff has properly alleged an alter ego cause of action against all of the Defendants. Defendants' motion must be denied.

Dated: January 29, 2021
      New York, NY

Respectfully submitted,
Attorneys for Plaintiff,


By:       /s/Thomas L. Tisdale
        Thomas L. Tisdale (TT5263)
        Austyn L. Carolin (439988)
        Tisdale & Nast Law Offices, LLC
        200 Park Avenue, Suite 1700
        New York, NY  10166
        Tel:   212-354-0025
        *ttisdale@tisdale-law.com*
        *acarolin@tisdale-law.com*

## CERTIFICATION OF SERVICE

I hereby certify that on January 29, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF system.

_____/s/_____

Austyn L. Carolin

# **CASES**

# Precious Shipping Public Co Ltd and others
v
# OW Bunker Far East (Singapore) Pte Ltd and others
and other matters

## [2015] SGHC 187

High Court — Originating Summonses Nos 1076, 1144, 1147, 1148, 1162, 1163, 1164, 1165, 1166, 1172, 1173, 1202 and 1205 of 2014
Steven Chong J
26 May; 21 July 2015

*Civil Procedure — Interpleader — Application — When granted — Applicants purchasing bunkers from sellers who purchased bunkers from physical suppliers under separate contract — Applicants receiving competing claims from sellers and from physical suppliers — Whether applicants need to show that competing claims haing prima facie basis — Whether competing claims need all be proprietary in nature — Powers of court upon finding that pre-conditions for interpleader relief not satisfied — Whether court having power to determine merits of competing claims upon dismissal of interpleader summons — Orders 17(1), 17(3), 17(5)(1) and 17(8) Rules of Court (Cap 322, R 5, 2014 Rev Ed)*

*Civil Procedure — Judgments and orders — Admissions of fact — Counsel in interpleader summonses informing court of clients' position on merits of competing claims — Whether such admission could be subject of judgment on admission — Whether judgment on admission available at stage 1 of interpleader summons — Order 27 r 3 Rules of Court (Cap 322, R 5, 2014 Rev Ed)*

*Insolvency Law — Administration of insolvent estates — Conduct of legal proceedings — Respondents in interpleader summonses insolvent — Whether leave of court required for commencement of interpleader proceedings — Section 299(2) Companies Act (Cap 50, 2006 Rev Ed)*

### Facts

Thirteen interpleader summonses were heard on a consolidated basis. Each summons involved three principal parties – (a) a purchaser; (b) a seller; and (c) a physical supplier – and two different contracts. Under the "Purchaser–Seller contract", the sellers agreed to supply bunkers to the purchasers for use in their vessels. Under the "Seller–Physical Supplier contract", which was concluded separately, the sellers contracted with the physical suppliers to have them deliver the requisite bunkers to the vessels. The bunkers were stemmed and had been consumed. The sellers had not paid the physical suppliers for the bunkers; and likewise, the purchasers had not paid the sellers.

Subsequently, all the sellers (save for one) entered voluntary liquidation. Soon after, many of the purchasers received two competing claims: (a) one from the sellers – for the contractual price under the Purchaser-Seller contract; (b) the other from the physical suppliers – for the contractual price under the Seller-Physical Supplier contract. The purchasers sought interpleader relief and named the sellers and physical suppliers as respondents.

The purchasers and physical suppliers argued that interpleader relief should be granted. It was not disputed that the physical suppliers had a contractual claim against the sellers. However, that was irrelevant because, for interpleader relief to lie, it had to be the applicants (*ie*, the purchasers) who faced the competing claims. Thus, they raised five possible causes of action which they argued the physical suppliers had against the purchasers. These ran the gamut from a claim in trust to the assertion that the physical suppliers could assert a maritime lien in their favour.

The sellers opposed the grant of interpleader relief and argued that the conditions precedent for the grant of interpleader relief had not been met. They gave two reasons: (a) the competing claims asserted by the physical suppliers did not disclose a *prima facie* case for relief; (b) the physical suppliers' claims were not "adverse" to the sellers'. The sellers further submitted that the court should determine and dismiss the physical suppliers' claims on the merits and order that the purchasers pay the sellers the sums due under the Purchaser-Seller contracts.

During the hearing, counsel for the purchasers, in response to a question from the bench on their clients' position on the competing claims, stated that their clients accepted that they were liable to the sellers and denied that they were liable to the physical suppliers. Relying on this, the sellers submitted, in the alternative, that the court ought to enter judgment on these "admissions" made by the purchasers and order that they pay the sellers the sums due under the Purchaser-Seller contracts.

**Held, dismissing the applications:**

(1)     The power of the High Court to grant interpleader relief was expressly conferred by s 18(2) of the Supreme Court of Judicature Act (Cap 322, 2007 Rev Ed) read with para 4 of the First Schedule, which set out the conditions under which interpleader relief might lie. These conditions were reproduced in O 17 r 1 of the Rules of Court (Cap 322, R 5, 2014 Rev Ed) ("ROC"). The power of the court to grant interpleader relief was statutorily conferred and was only available where the statutory conditions precedent had been met: at [17] and [18].

(2)     Leave of court under s 299(2) of the Companies Act (Cap 50, 2006 Rev Ed) was required for interpleader proceedings to be commenced if an insolvent company was named as a respondent. Interpleader proceedings were unique because the respondents were not defendants but were instead competing claimants who sought to gain if they prevailed in the interpleader. Thus, the insolvent companies' participation in the interpleader proceedings would not interfere with the *pari passu* distribution of the company's assets. That being the case, leave of court would usually be granted, as was done in this case: at [23], [24] and [26].

(3)     Order 17 r 1 of the ROC set out three pre-conditions for the grant of interpleader relief: (a) the applicant had to be under a liability for any debt, money, goods or chattels; (b) the applicant had to have an expectation that he would be sued by at least two persons; (c) there had to be adverse claims for the debt, moneys, goods or chattels from the persons whom the applicant expected would bring suit. The burden of proving the three conditions had been met fell on the applicant: at [27] and [28].

(4)    In order to show that he had an expectation that he would be sued by at least two persons, an applicant had to show that the competing claimants had a *prima facie* basis. The question was not whether the applicant had a genuine subjective apprehension that competing claims would be brought; rather, the inquiry was whether the competing claims had an objective basis in law and fact: at [30], [31], [33] and [34].

(5)    The competing claims were legally and factually unsustainable and did not disclose any *prima facie* case for relief: at [37], [38], [42], [44], [47], [52], [54] and [55].

(6)    The object of an interpleader was the determination of the incidence of an admitted liability. In order to be "adverse", the competing claims had to satisfy three requirements. First, they had to be "symmetrical" – the claims had to relate to the same subject matter (*ie*, the claimants had to have been calling on the enforcement of the same legal liability). Second, they had to be "mutually exclusive" – the resolution of the interpleader had to result in the extinction of the unsuccessful competing claims. Third, there had to be "actual disagreement" – there had to be a dispute as to what course of action should be taken. There was no requirement that all the competing claims had to be proprietary in nature: at [60], [62], [65], [67] and [78] to [80].

(7)    It was clear that the claims of the sellers and the physical suppliers were not adverse to one another. The sellers had advanced *in personam* claims for the recovery of contractual debts due under the Purchaser-Seller contracts. However, none of the competing claims asserted that the physical suppliers likewise had a contractual right to be paid the price of the bunkers under the Purchaser-Seller contracts. Thus, the requirement of symmetry had not been satisfied. Furthermore, the extinction of the physical suppliers' claims would not have any impact on the sellers' claims for the purchase price of the bunkers or *vice versa* so the requirement of mutual exclusivity was also not satisfied: at [81] and [83].

(8)    The scheme of O 17 contemplated that applications for interpleader relief would proceed in two stages. At "stage 1", the only issue was whether the conditions precedent for interpleader relief set out in O 17 rr 1 and 3 of the ROC had been satisfied. At "stage 2", which the court would only move to if "stage 1" had been satisfied, the court had the discretion whether or not to grant interpleader relief. If it elected to grant interpleader relief, it could order that the competing claimants be made defendants in the subsisting action, direct that the issue between the claimants be stated and tried, or determine the issue between the claimants summarily: at [20].

(9)    Having dismissed the application for interpleader relief on the basis that the conditions precedent had not been satisfied, the court did not have the power to determine the merits of the competing claims and order payment in the sellers' favour. At "stage 1" of an interpleader summons, the remit of the court's inquiry was limited to the question of whether the conditions precedent for interpleader relief had been satisfied and the court was limited only to allowing or dismissing the application for interpleader relief. It was only at "stage 2" that the court took cognisance of the merits of the competing claims and could exercise its powers to dispose of them. The powers granted to the

SINGAPORE LAW REPORTS

court under O 17 r 8, while wide, still had to cohere with the structure of the interpleader process and did not include the power to summarily dismiss the competing claims at "stage 1": at [89], [91] and [92].

(10)   The sellers only had a claim for the recovery for a contractual debt. In calling for payment to be made to them, they were effectively seeking summary judgment in their favour. The court did not have the power to grant summary judgment outside the framework set out in O 14 r 1 of the ROC. Furthermore, the scope of an interpleader summons was narrowly restricted to the determination of the incidence of liability. It was never intended to be and was unsuitable to function as a mechanism for the determination of liability: at [87], [88] and [94].

(11)   In order for judgment on admission to be available, there had to be a claim by one person against another in the context of a subsisting suit between the parties of which the court was seized of jurisdiction. However, at "stage 1" of an interpleader, the only question was whether the conditions precedent for interpleader relief had been satisfied. At this stage, no party had been impleaded and no legal liabilities lay for adjudication so judgment on admission was not available. In any event, in order for judgment on admission to lie, there had to be a clear admission of all the facts necessary to establish the cause of action. The purported "admissions" made by counsel were merely responses from the Bar to questions from the Bench as to their clients' legal positions. They did not relate to the question of whether the elements of the sellers' claims had been made out. Thus, judgment could not be entered on them: at [101] and [102].

[Observation: It was wrong to submit that a "light touch" should be employed when examining whether the requirements in O 17 r 1 had been satisfied. The powers of the court to grant interpleader relief were delimited by Parliament and these limits demanded scrupulous adherence. Adopting a liberal approach towards the grant of interpleader relief might open the floodgates and encourage claimants who did not legitimately believe that they had a sustainable cause of action to participate in the interpleader summons in order to gauge the court's assessment of their claims. This would not only be improper, it bordered on an abuse of process: at [18].]

**Case(s) referred to**

*Admiralty Commissioners v Valverda (Owners)* [1938] AC 173 (refd)

*Aluminium Industrie Vaassen BV v Romalpa Aluminium Ltd* [1976] 1 WLR 676 (refd)

*Andrabell Ltd, Re* [1984] BCLC 522 (refd)

*Ang Sin Hock v Khoo Eng Lim* [2010] 3 SLR 179 (refd)

*Australia and New Zealand Banking Group Ltd v Ding Pei Chai* [2004] 3 SLR(R) 489; [2004] 3 SLR 489 (distd)

*Bank of America National Trust and Savings Association v Herman Iskandar* [1998] 1 SLR(R) 848; [1998] 2 SLR 265 (refd)

*Bold Buccleugh, The* (1851) 7 Moo PC 267; 13 ER 884 (refd)

*BP Benzin und Petroleum AG v European-American Banking Corp* [1978] 1 Lloyd's Rep 364 (distd)

*Chan King Sheen v KC Tsang & Co* [2002] 3 HKC 209 (folld)

*Chatib bin Kari v Mosbert Bhd* [1984] 2 MLJ 67 (refd)

*Chin Leong Soon v Len Chee Omnibus Co Ltd* [1970] 2 MLJ 228 (refd)

*Clough Mill Ltd v Martin* [1985] 1 WLR 111 (refd)

*Compaq Computer Ltd v Abercorn Group Ltd* [1993] BCLC 602 (refd)

*Crawford v Fisher* (1842) 1 Hare 436; 66 ER 1103 (refd)

*De La Rue v Hernu, Peron & Stockwell Ltd* [1936] 2 KB 164 (refd)

*Development Bank of Singapore Ltd v Eng Keong Realty Pte Ltd* [1990]
    1 SLR(R) 265; [1990] SLR 357 (refd)

*DLA Piper Hong Kong v China Property Development (Holdings) Ltd* [2010]
    HKCU 154 (refd)

*Eastern Holdings Establishment of Vaduz v Singer & Friedlander Ltd* [1967]
    1 WLR 1017 (folld)

*Farr v Ward* (1837) 2 M & W 844; 150 ER 1000 (refd)

*FG Wilson (Engineering) Ltd v John Holt & Co (Liverpool) Ltd* [2014]
    1 WLR 2365 (refd)

*Glencore International AG v Shell International Trading and Shipping Co Ltd*
    [1999] 2 Lloyd's Rep 692 (refd)

*Greatorex v Shackle* [1895] 2 QB 249 (refd)

*Halcyon Isle, The* [1979–1980] SLR(R) 538; [1980–1981] SLR 14 (refd)

*Hendy Lennox (Industrial Engines) Ltd v Grahame Puttick Ltd* [1984] 1 WLR 485
    (refd)

*Henry v Hammond* [1913] 2 KB 515 (refd)

*Hong Leong Bank Bhd v Manducekap Hi-Tec Sdn Bhd* [2009] 7 MLJ 124 (distd)

*IMC Shipping Co Pte Ltd v Viking Offshore & Marine AS* [1998] SGHC 168
    (folld)

*Ingham v Walker* (1887) 3 TLR 448 (refd)

*Isaac v Spilsbury* (1833) 10 Bing 3; 131 ER 805 (refd)

*Meynell v Angell* (1862) 32 LJQB 14 (refd)

*Mycitydeal Ltd v Villas International Property Pte Ltd* [2014] 4 SLR 1077 (refd)

*Nanyang Commercial Bank Ltd v The Personal Representative of Vannee
    Nativivat, Deceased* [2013] HKCFI 485 (refd)

*Ng Wei Teck Michael v Oversea-Chinese Banking Corp Ltd* [1998] 1 SLR(R) 778;
    [1998] 2 SLR 1 (refd)

*Ohm Mariana, The; ex Peony* [1992] 1 SLR(R) 556; [1992] 2 SLR 623 (refd)

*Percy Attenborough v The London and St Katharine's Dock Co* (1878) 3 CPD 450
    (refd)

*Reading v School Board for London* (1886) 16 QBD 686 (refd)

*Relfo Ltd v Bhimji Velji Jadva Varsani* [2008] 4 SLR(R) 657; [2008] 4 SLR 657
    (refd)

*Republic of the Philippines, The v Maler Foundation* [2014] 1 SLR 1389 (refd)

*RHB Bank Bhd v Comax Sdn Bhd* [1999] 3 CLJ 552 (refd)

*Samsung Corp v Chinese Chamber Realty Pte Ltd* [2004] 1 SLR(R) 382; [2004]
    1 SLR 382 (refd)

*Skandinaviska Enskilda Banken AB (Publ), Singapore Branch v Asia Pacific
    Breweries (Singapore) Pte Ltd* [2011] 3 SLR 540 (refd)

*State of Perak, The v PRALMM Muthukaruppan Chettiar* [1938] MLJ 247 (refd)

*Tay Yok Swee v United Overseas Bank Ltd* [1994] 2 SLR(R) 36; [1994] 2 SLR 217 (distd)

*Tetuan Teh Kim Teh, Salina & Co v Tan Kau Tiah* [2013] 4 MLJ 313 (folld)

*Thahir Kartika Ratna v PT Pertambangan Minyak dan Gas Bumi Negara (Pertamina)* [1994] 3 SLR(R) 312; [1994] 3 SLR 257 (refd)

*Tito v Waddell (No 2)* [1977] Ch 106 (refd)

*Tong Lee Co Pte Ltd v Koh Chiow Meng* [1993] SGHC 69 (refd)

*UPT Pool Ltd v Dynamic Oil Trading (Singapore) Pte Ltd* 14-CV-9262 (VEC) (SDNY July 1, 2015) (distd)

*Watson v Park Royal (Caterers) Ltd* [1961] 1 WLR 727 (refd)

*Yinggao Resources Ltd v ECO Metal (Hong Kong) Ltd* [2014] HKCA 566 (refd)

**Legislation referred to**

Companies Act (Cap 50, 2006 Rev Ed) s 299(2) (consd);
    s 131

Rules of Court (Cap 322, R 5, 2014 Rev Ed) O 17 r 1, O 17 r 5, O 17 r 8, O 27 r 3 (consd);
    O 14 r 1, O 17, O 17 r 1(*a*), O 17 r 5(1)(*a*), O 17 r 5(1)(*b*), O 17 r 5(2), O 17 r 5(3)

Rules of the Supreme Court (Cap 322, R 5, 1990 Ed) O 17 r 1(1)

Sale of Goods Act (Cap 393, 1999 Rev Ed) s 49(1)

Supreme Court of Judicature Act (Cap 322, 2007 Rev Ed) s 18(2), First Schedule para 4

Common Law Procedure Act 1860 (c 126) (UK) s 12

Companies Act 1948 (c 38) (UK) s 231

Interpleader Act 1831 (c 58) (UK)

Judiciary and Judicial Procedure Act 28 USC (US) § 1335

Rules of the High Court 1980 (PU(A) 50/1980) (M'sia) O 17, O 28 r 7(1)

*Purchasers: Mohan s/o Ramamirtha Subbaraman, Thio Soon Heng Jonathan Mark and Yee Weng Wai Bernard (Incisive Law LLC) for the applicants in OS 1076/2014; Kuek Chong Yeow Richard, Cheng Jiankai Eugene, Dharinni Kesavan (Gurbani & Co LLC) for the applicants in the rest of the consolidated applications;*
*Sellers: Davinder Singh SC s/o Amar Singh, Jaikanth Shankar, Kok Chee Yeong Jared, Lee Xin Yi Cherrylene and Tham Yeying Melissa (Drew & Napier LLC) for ING Bank N.V. in the consolidated applications, as well as Goh Thien Phong and Chan Kheng Tek in all the consolidated applications save for OS 1076/2014;*
*Ong Tun Wei Danny and Ng Hui Ping Sheila (Rajah & Tann Singapore LLP) for Dynamic Oil Trading (S) Pte Ltd in OS 1144/2014, OS 1148/2014, OS 1162/2014, OS 1202/2014 and OS 1205/2014;*
*Nish Kumar Shetty, Darius Bragassam, Lim Shack Keong and Zhuo Wenzhao (Cavenagh Law LLP) for O.W. Bunker Far East in OS 1076/2014, OS 1147/2014, OS 1163/2014, OS 1164/2014, OS 1165/2014, OS 1166/2014, OS 1172/2014 and OS 1173/2014;*
*Yee Mun Howe Gerald and Nazirah d/o Kairo Din (Clasis LLC) for OceanConnect Marine Pte Ltd in OS 1202/2014;*

*Physical Suppliers: Chua Chok Wah, Muhammad Raffli bin Mohd Noor and Yeo
Wen Yi Brenna (Joseph Tan Jude Benny LLP) for Uni Petroleum Pte Ltd in
OS 1076/2014, OS 1163/2014 and OS 1165/2014 and Victory Supply Sdn Bhd in
OS 1173/2014;
Mohamed Ibrahim s/o Mohamed Yakub (Achievers LLC) for Sirius Marine Pte Ltd in
OS 1144/2014, OS 1163/2014, OS 1172/2014 and OS 1205/2014;
Loo Dip Seng, Ng Weiting and Tan Siew Chi (Ang & Partners) for Tankoil Marine
Services Pte Ltd in OS 1144/2014, Global Energy Trading Pte Ltd in OS 1162/2014
and Sentek Marine Pte Ltd in OS 1202/2014;
Navin Anand and Teo Ke-Wei Ian (Rajah & Tann Singapore LLP) for Golden Island
Diesel Oil Trading Pte Ltd in OS 1164/2014;
Lam Kuet Keng Steven John (Templars Law LLC) for Panoil Petroleum Pte Ltd in
OS 1166/2014;
Chew Sui Gek Magdalene and Leong Marnyi Wendy (AsiaLegal LLC) for Shell
Eastern Trading (Pte) Ltd in OS 1076/2014 and Universal Energy Pte Ltd in
OS 1147/2014;
Navinder Singh (KSCGP Juris LLP) for Transocean Oil Pte Ltd in OS 1076/2014 and
OS 1148/2014.*

[Editorial note: Sirius Marine Pte Ltd has filed appeals to this decision in Civil
Appeals Nos 159 to 162 of 2015. (As at 16 September 2015, the date of the Court of
Appeal hearing has not been fixed. For the most updated hearing dates, please refer
to www.supcourt.gov.sg.)]

21 July 2015                                    Judgment reserved.

**Steven Chong J:**

**Introduction**

1       On 7 November 2014, OW Bunker & Trading A/S ("OW Bunker"),
one of the world's largest bunker suppliers, announced that it (and some of
its related entities) had commenced proceedings in the Danish courts to
seek bankruptcy protection. In December 2013, OW Bunker and several of
its subsidiaries entered into an omnibus security agreement with a
syndicate of banks with ING Bank NV ("ING") appointed as the security
agent. As part of the agreement, OW Bunker assigned its rights, title, and
interest in its third party and inter-company receivables to ING which, in
turn, appointed PricewaterhouseCoopers LLP as the global receiver of the
secured assets. Two of its related entities in Singapore ("the OW entities") –
OW Bunker Far East (Singapore) Pte Ltd ("OW Far East") and Dynamic
Oil Trading (Singapore) Pte Ltd ("DOT") – were placed in creditor's
voluntary liquidation shortly thereafter.

2       The general *modus operandi* of the OW entities was to enter into
contracts with the end-users ("the purchasers") for the supply of bunkers to
vessels and separately contract with bunker traders ("the physical
suppliers") – at a lower price – to have them deliver the requisite bunkers,
making a small margin in the process. The bunkers were stemmed and have

been consumed but, in light of the liquidation, the physical suppliers have not received payment from the OW entities. The purchasers have also not paid the OW entities for the bunkers because some of the physical suppliers have written to the purchasers seeking to recover the price of the bunkers directly from them as they have not received any payment from the OW entities.

3      The purchasers accept that payments for the bunkers are due and owing but claim that they are unable to decide which party to pay. Under these circumstances, the purchasers decided that it would be prudent to seek interpleader relief from the court. This led the purchasers to file multiple interpleader summonses of which 13 came before me for hearing. As they generally relate to the same factual matrix and concern identical legal issues, it seemed eminently sensible to hear them on a consolidated basis ("the consolidated applications").

4      The consolidated applications are unusual in many respects, and they raise several questions about the scope and purpose of interpleader relief. Three stand out for mention. First, the purchasers have *all* taken the position, on the advice of their solicitors, that the purchase price is due to the OW entities and not the physical suppliers. In a typical interpleader summons, the applicant is faced with adverse claims and is genuinely in a legal dilemma as to which of the competing claimants to pay. Here, there seems to be no such predicament. In fact, some of the purchasers have explicitly written to the physical suppliers to deny their claims. Second, in spite of their threats, *none* of the physical suppliers (as at the date of the hearing) had actually commenced legal proceedings against the purchasers. This is perhaps because the physical suppliers appear to appreciate that, owing to the lack of privity of contract, their alleged claims against the purchasers are far from clear. They have therefore mounted a number of non-contractual arguments to justify their entitlement to recover the price of the bunkers directly from the purchasers. Third, the purchasers had received "competing claims" for *different amounts*. ING (as the assignees of the OW entities' receivables) claimed for the contractual price of the contracts the OW entities concluded with the purchasers whereas the physical suppliers claimed for the contractual price of the bunkers under the contracts they concluded with the OW entities, which was *always* for a lesser amount (see [8(b)] below).

5      Is interpleader necessary or even appropriate when the applicant appears to know exactly to whom he is liable? Is the mere assertion of "adverse claims", however remote or fanciful, sufficient? Can claims be adverse when they relate to different sums referable to different contracts? What are the court's powers upon a dismissal of an application for interpleader relief? These are some of the questions which will be addressed in the course of this judgment.

### Facts

6     The consolidated applications concern different contracts with different terms and governing laws. However, I need not discuss the detailed facts of each application since only the barest level of detail is required for present purposes. I will first set out the facts of a notional "paradigm case" (which applies to the majority of the applications) before going on to discuss the implications, if any, of two notable "variants".

### *The paradigm case*

7     In their essentials, the consolidated applications involve a tripartite relationship between (a) a purchaser; (b) a seller; and (c) a physical supplier. In the paradigm case, the purchaser contracted with an OW entity for the purchase of bunkers for delivery to a vessel ("the Purchaser–Seller contract"). The OW entity would, in turn, conclude a separate contract with a physical supplier which would stem the bunkers ("the Seller–Physical Supplier contract"). After the collapse of OW Bunker, many of the purchasers received two competing claims: (a) the first was from ING for the sum owing *under the Purchaser–Seller contract;* (b) the second was from the physical supplier for the sum owing *under the Seller-Physical Supplier contract.* The salient features of the paradigm case can be summarised in the following diagram:



8     I will highlight three features of the paradigm case.

    (a)    First, the relationships between the parties are governed by two separate contracts concluded at different prices: (i) the Purchaser–Seller contract (at price $x); (ii) the Seller–Physical Supplier contract (at price ($x-y). Each contract was concluded on separate terms and at different times. The Purchaser–Seller contract was concluded on the "General Terms and Conditions" ("GTCs") of the relevant OW entity whereas the Seller–Physical Supplier contract was governed by the physical supplier's GTCs. In *every* case, the

OW entity would purchase the bunkers from the physical supplier under the Seller–Physical Supplier contract at a price which was between 2 and 20 USD per metric ton lower (I have expressed this margin as "y") than the price which it charged under the Purchaser–Seller contract.

(b)    Second, there are only ever two competing claims in respect of each bunker delivery. In some of the applications (see, eg, Originating Summons No 1076 of 2014 ("OS 1076/2014")), several deliveries of bunkers were made. However, in respect of each delivery, there is never more than one set of competing claims: one from ING and the second from the relevant physical supplier which stemmed the bunkers. The smaller claim would be that from the physical supplier whereas the larger claim was ING's.

(c)    Third, *none* of the purchasers (save for the exception of the purchaser in OS 1076/2014) were the owners of the vessels in which the bunkers were stemmed.

### Variant 1

9    In Originating Summonses Nos 1144, 1166 and 1205 of 2014 (I will refer to each as "OS 1144/2014", "OS 1166/2014", *etc*), just as in the paradigm case, the OW entity was the immediate contractual seller and the three salient features of the paradigm case identified at [8] above are also present. The only difference is that an additional party – a bunker trader – was involved. In each of these summonses, the OW entity purchased the bunkers from a bunker trader which, in turn, separately ordered the bunkers from a physical supplier which would then stem the bunkers on the vessel. The only exception is OS 1166/2014, where three different types of bunkers were ordered of which one was physically stemmed by OW Far East itself.

10    In my view, the interposition of an additional party does not affect the legal analysis. It is interesting to note that none of the bunker traders in each of these OSes have elected to file submissions. One of them – TNS Bunkers (S) Pte Ltd, the bunker trader involved in both OS 1144/2014 and OS 1205/2014 – filed an affidavit stating that it supported the claim of Sirius Marine Pte Ltd, which was the physical supplier with whom it contracted.

### Variant 2

11    In Originating Summons No 1202 of 2014 ("OS 1202/2014"), the purchaser contracted with OceanConnect Marine Pte Ltd ("OCM"). OCM then purchased the requisite bunkers from DOT which, in turn, contracted with Sentek Marine & Trading Pte Ltd, the physical supplier, which delivered the bunkers. Therefore, it is OCM, instead of an OW entity, which occupies the position of immediate contractual seller of the bunkers.

The competing claims in this case are between OCM – as the immediate contractual seller – and Sentek Marine, the physical supplier. Neither ING nor any of the OW entities have asserted any claims against the purchaser in OS 1202/2014 and have argued that they ought not to have been added as respondents.

**The parties and their arguments**

12    For ease of reference, I will refer to the parties by their substantive capacities: *viz*, "purchaser", "seller", and "physical supplier" instead of their designations in the action (*ie*, "applicant", "respondent", *etc*). This is because some of the parties are named in several applications but have different designations in each (*eg*, ING is the fifth respondent in OS 1076/2014 but the second respondent in OS 1205/2014). Furthermore, I will attribute arguments to the particular counsel who advanced those submissions instead of attributing them to a particular party. This is because some of the parties have instructed the same counsel so there is substantial overlap in the legal arguments advanced by the parties in the consolidated applications.

*Arguments in favour of interpleader relief: purchasers and physical suppliers*

13    The purchasers and the physical suppliers' positions are aligned in so far as both of them argue that interpleader relief ought to be granted. The purchasers comprise a number of different companies, many of which belong to the "Stena" group. Only the purchasers in OS 1076/2014 own the vessels in which the bunkers were stemmed (see [8(c)] above). Mr Kuek, counsel for the rest of the purchasers in the consolidated applications, confirmed that none of his clients own the vessels in which the bunkers were stemmed. Similarly, the physical suppliers comprise a number of different companies, of which the most prominent are Uni Petroleum Pte Ltd ("Uni Petroleum") and Sirius Marine Pte Ltd ("Sirius Marine"), who are named as respondents in six out of the 13 applications. Collectively, the purchasers and physical suppliers have filed five sets of written submissions in support of the consolidated applications (though I should mention that a number of physical suppliers who were added as respondents to the consolidated applications did not make any submissions, whether written or oral). These are:

   (a)    Mr Mohan s/o Ramamirtha Subbaraman on behalf of the purchaser in OS 1076/2014.

   (b)    Mr Richard Kuek on behalf of the purchasers in the remaining summonses.

(c)   Mr Chua Chok Wah on behalf of Uni Petroleum, (the physical supplier in OS 1076/2014, OS 1163/2014 and OS 1165/2014) and Victory Supply Sdn Bhd (the physical supplier in OS 1173/2014).

(d)   Mr Mohamed Ibrahim on behalf of Sirius Marine (the physical supplier in OS 1144/2014, OS 1163/2014, OS 1172/2014 and OS 1205/2014).

(e)   Mr Loo Dip Seng on behalf of Global Energy Trading Pte Ltd, (the physical supplier in OS 1162/2014) and Sentek Marine Pte Ltd (the physical supplier in OS 1202/2014).

14    The principal difficulty they face is the absence of privity of contract between the purchasers and the physical suppliers (see [4] above). It is not disputed that the physical suppliers have a contractual claim against the *sellers*, but that is strictly irrelevant for the purposes of the consolidated applications. In order for interpleader relief to lie, it must be the *applicant* (*ie*, the purchaser) who faces competing claims. Fittingly, therefore, the submissions focused extensively on the alleged causes of action which the physical suppliers may have against the purchasers. I will delve into the details of their arguments more fully later but a brief synopsis will suffice for now.

(a)   All the physical suppliers rely on the existence of a retention of title clause ("ROT clause") in the Seller-Physical Supplier contract which specifies that title in the bunkers does not pass until the purchase price is paid. Given that the sellers have not paid them for the bunkers, they assert that they still hold title to the bunkers and one of the following two outcomes must follow:

(i)    First, they contend that pending payment for the bunkers (and the transfer of title which follows), the OW entities stand as "fiduciary agents" or "bailees" of the bunkers and consequently they now hold the *sale proceeds* on trust for the physical suppliers (the "fiduciary agent/bailee argument").

(ii)   Second, they assert that the purchasers are liable to the physical suppliers in the tort of conversion since they have consumed the bunkers (the "tort of conversion argument").

(b)   Mr Ibrahim advances two additional arguments on behalf of his client. One is that there exists a collateral contract between the purchasers and the physical suppliers which allows the physical suppliers to assert a direct contractual claim against the purchasers for the price of the bunkers (the "collateral contract argument"). The next is that the physical suppliers have a direct restitutionary claim against the purchasers on account of the fact that the latter have been unjustly enriched at the former's expense (the "unjust enrichment argument").

(c)     Finally, Mr Mohan argues that while no maritime lien may arise in respect of unpaid bunkers in Singapore, it is *possible* that the physical suppliers could bring suit in a jurisdiction which recognises such a lien, in which event the purchasers' vessels would be liable to arrest. He contends that this suffices as a "competing claim" in respect of which interpleader relief ought to lie.

### Arguments opposing interpleader relief: sellers

15    Opposing the application are the parties whom I shall refer to collectively as the "sellers". They comprise the OW entities, OCM, ING, Mr Chan Kheng Tek, and Mr Goh Thien Phong. Mr Chan and Mr Goh are both partners in PricewaterhouseCoopers Singapore, the receivers of the secured assets of the OW entities. The OW entities (through their liquidator, KPMG Services Pte Ltd) and OCM have both confirmed that their positions are aligned with that of ING. Nevertheless, each of the sellers has elected to file separate submissions in opposition to the consolidated applications. In total, the sellers have filed four sets of submissions:

(a)     Mr Davinder Singh on behalf of ING, Mr Chan, and Mr Goh.

(b)     Mr Lim Shack Keong on behalf of OW Far East.

(c)     Mr Danny Ong on behalf of DOT.

(d)     Mr Gerald Yee on behalf of OCM.

16    The sellers argue that the conditions precedent for the grant of interpleader relief have not been met because the competing claims asserted by the physical suppliers are factually and legally unsustainable and are, in any event, not "adverse" to the sellers' claims since they do not relate to the same subject matter.

### The law on interpleader

### The court's power to grant interpleader relief is conferred by statute

17    The power of the High Court to grant interpleader relief is expressly conferred by s 18(2) of the Supreme Court of Judicature Act (Cap 322, 2007 Rev Ed) ("SCJA") read with para 4 of the First Schedule. Paragraph 4 of the First Schedule to the SCJA provides that this court has the power to grant interpleader relief in two circumstances:

4.      Power to grant relief by way of interpleader —

(*a*)     where the person seeking relief is under liability for any debt, money, or goods or chattels, for or in respect of which he has been or expects to be, sued by 2 or more parties making adverse claims thereon; and

(*b*)     where a Sheriff, bailiff or other officer of court is charged with the execution of process of court, and claim is made to any money or

goods or chattels taken or intended to be taken in execution under any process, or to the proceeds or value of any such goods or chattels by any person other than the person against whom the process is issued,

and to order the sale of any property subject to interpleader proceedings.

The language of para 4 is reproduced in O 17 r 1 of the Rules of Court (Cap 322, R 5, 2014 Rev Ed) ("ROC").

18    It is important to appreciate the point which is being made here. The power of this court to grant interpleader relief is statutorily conferred and it is *only available* where the conditions precedent set out in para 4 of the SCJA are met. This court does not have the power to grant interpleader relief (or exercise any powers within the interpleader process) outside the parameters set out in statute. During the oral hearing, Mr Mohan submitted that the court should adopt a "light-touch, minimal evaluation" approach towards the requirements in O 17 in order that it can "'take the bull by its horns' to bring the dispute to an end once and for all". I do not think such a submission can be accepted. The powers of the court in this area have been delimited by Parliament and these limits demand scrupulous adherence. Adopting a liberal approach towards the grant of interpleader relief might open the floodgates, encouraging claimants who do not legitimately believe that they have a sustainable cause of action to participate in the interpleader summons in order to gauge the court's assessment of their claims. That would not only be improper, it borders on an abuse of process.

### The structure of Order 17

19    The relevant provisions of O 17 read:

**Entitlement to relief by way of interpleader (O. 17, r. 1)**

1.    Where —

    (*a*)    the person seeking relief is under liability for any debt, money or goods or chattels, for or in respect of which he has been or expects to be, sued by 2 or more parties making adverse claims thereon; or

    (*b*)    the Sheriff or other officer of the Court is charged with the execution of process of the Court, and claim is made to any money or goods or chattels taken or intended to be taken in execution under any process, or to the proceeds or value of any such goods or chattels by any person other than the person against whom the process is issued, and to order the sale of any property subject to interpleader proceedings,

the person under liability or (subject to Rule 2) the Sheriff, may apply to the Court for relief by way of interpleader.

    …

**Mode of application (O. 17, r. 3)**

**3.**—(1) An application for relief under this Order must be made by originating summons unless made in a pending action, in which case it must be made by summons in the action in one of the forms in Form 27.

…

(3)    Subject to paragraph (4), an originating summons or a summons under this Rule filed by the Sheriff or a person under liability must be supported by a statement in Form 25 or an affidavit in Form 26, as the case may be, stating that the applicant —

> (*a*)    claims no interest in the subject-matter in dispute other than for charges or costs;
>
> (*b*)    does not collude with any of the claimants to that subject-matter; and
>
> (*c*)    is willing to pay or transfer that subject-matter into Court or to dispose of it as the Court may direct.

…

**Powers of Court hearing originating summons or summons (O. 17, r. 5)**

**5.**—(1) Where on the hearing of an originating summons or a summons under this Order all the persons by whom adverse claims to the subject-matter in dispute (referred to in this Order as the claimants) appear, the Court may order —

> (*a*)    that any claimant be made a defendant in any action pending with respect to the subject-matter in dispute in substitution for or in addition to the applicant for relief under this Order; or
>
> (*b*)    that an issue between the claimants be stated and tried and may direct which of the claimants is to be plaintiff and which defendant.

(2)    Where —

> (*a*)    the applicant in an originating summons or a summons under this Order is the Sheriff;
>
> (*b*)    all the claimants consent or any of them so requests; or
>
> (*c*)    the question at issue between the claimants is a question of law and the facts are not in dispute,

the Court may summarily determine the question at issue between the claimants and make an order accordingly on such terms as may be just.

(3)    Where a claimant, having been duly served with an originating summons or a summons for relief under this Order, does not appear on the hearing or, having appeared, fails or refuses to comply with an order made in the proceedings, the Court may make an order declaring the claimant, and all persons claiming under him, forever barred from prosecuting his claim against the applicant for such relief and all persons claiming under him, but such an order shall not affect the rights of the claimants as between themselves.

20    The scheme of O 17 of the ROC contemplates that any application for interpleader relief will proceed in two stages:

> (a)    At "stage 1", the court will ascertain if the conditions precedent for the grant of interpleader relief have been satisfied (O 17 rr 1 and 3). The only issue before the court is whether interpleader relief can be granted (*ie*, whether the statutory preconditions have been satisfied). It is only if this court finds that the conditions precedent for interpleader relief have been met that we move to "stage 2".

> (b)    At "stage 2", the court will decide what consequential orders ought to follow. The court has the discretion whether or not to grant interpleader relief (see O 17 r 5). If the court elects to grant interpleader relief, it may (i) order that a claimant to the interpleader proceedings be made a defendant in a subsisting action (O 17 r 5(1)(*a*)); (ii) direct that the contest between the claimants be stated and tried (O 17 r 5(1)(*b*)); or (iii) determine the question at issue between the competing claimants summarily (O 17 r 5(2)).

21    As is clear from the foregoing, the two substantive issues which arise for determination are: (a) have the conditions precedent for interpleader relief been satisfied; and (b) what consequential orders should the court make?

**Is leave of court required?**

22    As a preliminary point, I will first deal with Mr Kuek's submission (with which Mr Mohan, Mr Chua and Mr Lim all agree) that leave of court is required since the OW entities are presently in liquidation. Mr Kuek pointed to s 299(2) of the Companies Act (Cap 50, 2006 Rev Ed) ("CA"), which provides:

> After the commencement of the winding up no action or proceeding shall be proceeded with or commenced against the company except by leave of the Court and subject to such terms as the Court imposes.

23    In the course of the oral hearing, I had offered the tentative observation that s 299(2) might not apply here since it did not appear that any action was being "proceeded with or commenced against" the OW Entities. However, upon further reflection, I agree with Mr Kuek that leave of court is necessary. To the best of my knowledge, no local case has considered this issue. However, the decision of the English High Court in *Eastern Holdings Establishment of Vaduz v Singer & Friedlander Ltd* [1967] 1 WLR 1017 ("*Eastern Holdings*") is squarely on point. In *Eastern Holdings*, the defendant advanced several loans to A (a company) upon the provision of some shares as security for the loans. After A entered liquidation, another company, E, repaid the loans and asked that the shares be transferred to it on the basis that it was entitled to them by subrogation. A (through its liquidators) also made a claim for the shares. The defendant

sought interpleader relief but its application was dismissed by Buckley J on the basis that leave was required under s 231 of the Companies Act 1948 (c 38) (UK) ("UK CA") (which is similar to s 299(2) of our CA) but had not been obtained. Buckley J reasoned as follows (at 1020G):

> In the present case, *the court might order that the issue between the plaintiff and the first claimant should be disposed of in this action, as between plaintiff and defendant, and that the first claimant be made a defendant accordingly*; and if it be the fact that there are issues to be tried between the first and second claimants the court would also direct such issues to be stated and tried between the two claimants. *As soon as this court had made such an order, it is manifest, I think, that proceedings would be on foot to which section 231 of the Companies Act, 1948, would apply, for those would be proceedings against the company in liquidation. In that way it would be impossible for anybody to proceed with those proceedings without leave of the court*, in the face of section 231, and if the companies court should conclude that, for some reason or other, the proceedings, as constituted by the directions given in this court, were unsatisfactory in the companies court, it would, it seems to me, be within its rights under section 231 to refuse leave to go on with those proceedings. … [emphasis added]

24     I respectfully agree. Even though interpleader proceedings "are not, in the strictest sense, proceedings against anybody" (see *Tong Lee Co Pte Ltd v Koh Chiow Meng* [1993] SGHC 69), as soon as this court is seized of its interpleader jurisdiction, it has the power to order the insolvent company to put forward its claims in a substantive interpleader hearing and to summarily determine the dispute (either to the benefit or detriment of the insolvent company). Either way, the insolvent company would be exposed to further liability in terms of costs and litigation expenses. Given that the purpose of the statutory moratorium is to prevent the value of the insolvent company's estate from being dissipated in litigation (see *Walter Woon on Company Law* (Tan Cheng Han gen ed) (Sweet & Maxwell, Rev 3rd Ed, 2009) at para 17.131), I am satisfied that the initiation of interpleader proceedings falls squarely within the scope of s 299(2) of the CA.

25     Furthermore, it is no answer to say that the insolvent company can avoid incurring litigation expenses by not entering an appearance. Order 17 r 5(3) provides that a claimant who – having been served with a summons for interpleader relief – either elects not to enter an appearance or, having entered appearance, refuses future participation in the hearing may be forever barred from prosecuting its claim against the applicant. In other words, an insolvent company who is named as a respondent in interpleader proceedings is *compelled* (perhaps against its will) to participate in the interpleader on pain of losing its claim to the subject matter of the interpleader. For example, if a bank seeks interpleader relief in respect of competing claims to money in the insolvent company's account, the company can choose not to enter an appearance (in which case it runs the risk of losing its claim to the money in the account to the detriment of

its creditors) or it can choose to enter an appearance, in which case it would be exposed to the attendant costs of litigation. Either way, it seems to me that this is precisely the sort of situation which falls within the ambit of s 299(2) of the CA.

26     Having considered the circumstances in their totality, I am of the view that the "balance of convenience and the demands of justice" (see *Chatib bin Kari v Mosbert Bhd (in liquidation)* [1984] 2 MLJ 67) favour the grant of leave. The present case is unique in that the insolvent companies are not defendants *per se* but, rather, they are competing claimants that stand to gain if they prevail in the interpleader. Therefore, win or lose, the company's participation in the interpleader proceedings will not interfere with the *pari passu* distribution of the company's assets in the insolvency process save for the possible diminution of the insolvent estate in the form of expenses and costs which may be incurred in the prosecution of the interpleader. However, such costs should not be too significant, given that interpleader proceedings are structured to favour expedition. This is perhaps why Buckley J remarked that he had "little doubt that in most cases where interpleader summons proceedings are contemplated, no difficulty whatever would be encountered in obtaining the necessary leave and with very little expense" (see *Eastern Holdings* at 1021H). That is perhaps also why the liquidators have indicated that they have no objections for leave to be granted for the present interpleader proceedings.

**Have the conditions precedent been satisfied?**

27     As observed at [19]–[20] above, the power of the High Court to grant interpleader relief is expressly governed by O 17 of the ROC. In *Tay Yok Swee v United Overseas Bank Ltd* [1994] 2 SLR(R) 36 ("*Tay Yok Swee*") at [10], the Court of Appeal held that O 17 r 1(1) of the Rules of the Supreme Court (Cap 322, R 5, 1990 Ed) (which is *in pari materia* with O 17 r 1(*a*) of the 2014 ROC) set out three pre-conditions for the grant of interpleader relief:

(a)    The applicant seeking interpleader relief must be "under a liability for any debt, money, goods or chattels".

(b)    There must be "an expectation that he [*ie*, the applicant] would be sued by at least two persons".

(c)    There must be "adverse claims for the debt, moneys, goods or chattels" from the persons whom the applicant expects will bring suit.

28     The burden of proving that the preconditions have been met fall on the applicant who is seeking relief (*ie*, the purchasers): see *Chin Leong Soon v Len Chee Omnibus Co Ltd* [1970] 2 MLJ 228 ("*Chin Leong Soon*") at 233G. It is not in dispute that condition (a) has been satisfied since the purchasers are clearly under a contractual obligation to make payment for

the bunkers under the Purchaser–Seller Contracts. However, the parties disagree on whether conditions (b) and (c) have been satisfied.

### An expectation of being sued by at least two persons

29    Mr Singh submitted that in order to satisfy condition (b), the purchasers have to show that the physical suppliers have "a *prima facie* case against the [purchasers] in respect of their claims". In support of his submission, he drew my attention to a number of authorities decided across the Commonwealth. Both Mr Mohan and Mr Chua agreed with this submission. However, Mr Kuek disagreed and instead submitted that it would suffice for the purchasers to establish that the competing claims are "not bound to fail".

### The competing claims must have a prima facie basis

30    In *Watson v Park Royal (Caterers) Ltd* [1961] 1 WLR 727 ("*Watson*") (applied in *Chin Leong Soon* at 231C), Edmund Davies J (as he then was) held at 734 that "the discretionary relief of interpleader will not be granted unless *there appears to be some real foundation for the expectation of a rival claim*" [emphasis added]. However this begs the question: when can it be said that such a "real foundation" exists?

31    In *Chan King Sheen v KC Tsang & Co* [2002] 3 HKC 209 ("*Chan King Sheen*"), the Hong Kong Court of Appeal opined, at [26], that "there can be no real foundation for any expectation to be sued unless a *prima facie* case exists". The gloss added in *Chan King Sheen* has since been applied in a number of other cases in Hong Kong (see, *eg*, *DLA Piper Hong Kong (a firm) v China Property Development (Holdings) Limited* [2010] HKCU 154 and *Nanyang Commercial Bank Limited v The Personal Representative of Vannee Nativivat, Deceased* [2013] HKCFI 485).

32    In *RHB Bank Bhd v Comax Sdn Bhd* [1999] 3 CLJ 552, the High Court of Johor Bahru, after citing *Watson*, put it in a slightly different way (at 557C–D):

> The conflict between the claimants *must be real in the sense that each claim, if proven, would give a good cause of action* against the applicant, so that where the applicant is not under any obligation to one of the claimants, or *where he can, without incurring any liability, pay the subject matter of the claim to one of the claimants, he is not entitled to relief* (of interpleader).
>
> Then again, *a mere pretext of conflicting claim is not enough and the court must be satisfied that there is a question to be tried* (*Sun Insurance Office v. Galinsky*) [1914] 2 KB 545, where in the circumstances it was doubtful whether there was any genuine adverse claim.
>
> [emphasis added in italics and bold italics]

33    In my view, the various expressions used – "*prima facie* case", "good cause of action", "real foundation" and "question to be tried" – all engage

the same inquiry: *viz*, does the applicant really face a *genuine* threat of multiple proceedings? I pause here to make a clarification. The question is *not* whether the applicant has a genuine *subjective* apprehension (however acutely felt) that competing claims will be brought against him; rather, the question is whether the competing claims have an *objective* basis in law and fact. This is an important point. Interpleader relief exists for the hapless and innocent; not the flighty and skittish. Nervous or overly cautious stakeholders cannot hide themselves behind the skirts of the courts at the slightest sign of controversy. The office of interpleader is neither a licence for applicants to abdicate their duty to conduct an independent legal assessment of the tenability of the potential claims they face nor can it be used as an "insurance policy" against potential litigation.

34    When presented in this way, the test is really not very far away from Mr Kuek's submission that the purchasers need only show that the competing claims are "not bound to fail". I consider the *prima facie* case test to be most apt and easy to apply especially since there is already a significant body of case law which has expounded on this test, albeit in different contexts. In *Relfo Ltd v Bhimji Velji Jadva Varsani* [2008] 4 SLR(R) 657 at [20], Judith Prakash J held that a "*prima facie* case is determined by assuming that the evidence led by the plaintiff is true, unless it is inherently incredible or out of all common sense or reason".

*Have the purchasers shown that they faced any* prima facie *claims from the physical suppliers?*

(1)    The fiduciary agent/bailee argument

35    The premise of the "fiduciary agent/bailee argument" is the assertion that the physical suppliers have title to the bunkers. Despite minor differences in the language of their respective contractual clauses, the argument takes the following basic form. First, the physical suppliers point out that a retention of title clause in the Seller-Physical Supplier contract provides that title does not pass until payment has been made (see, *eg*, cll 12.2 and 12.3 of Global Energy Trading's General Terms and Conditions of Sale ("GTCs")). Second, they argue that their GTCs have been incorporated into the Purchaser–Seller contract by virtue of cl L.4(*a*) of the OW Entity's GTCs, which provides that the purchasers are deemed to have read and accepted any terms and conditions imposed by the third party who physically supplies the bunkers (if any). Finally, they conclude that because payment has not been made, they retain title to the bunkers.

36    It is clear that this argument, alone, is a non-starter. Even assuming that the physical suppliers have title to the bunkers, they would not, without more, be entitled to the *proceeds of the sale* of the bunkers, which is what they now seek. As stated by the learned authors of *Benjamin's Sale of Goods* (M Bridge, gen ed) (Sweet & Maxwell, 9th Ed, 2014) at para 5-151, "a mere

retention of title provision will not, of itself, impose upon the buyer an obligation to account to the seller for the proceeds of sale of the goods in which property is retained". Perhaps recognising this, some of the physical suppliers have pointed to the fact that their GTCs specify that, pending payment, the buyers hold the bunkers as "fiduciary agent and bailee" (see, *eg*, cl 12.3 of Sirius Marine's GTCs). On the strength of this, they argue that the OW entities hold the proceeds of sale of the bunkers on trust for them.

37    However, this argument is plainly unsustainable. It is clear that the physical suppliers do not, at present, have a proprietary interest in any "proceeds of sale". The purchasers have not paid the sellers for the bunkers so the sellers have no title to any "proceeds of sale" which can be impressed with a trust. It is only when the sellers are paid that the trust can be constituted and the physical suppliers then acquire a proprietary interest in the moneys which have been received (see *FG Wilson (Engineering) Ltd v John Holt & Co (Liverpool) Ltd* [2014] 1 WLR 2365 ("*FG Wilson*") at 2383D–F *per* Patten LJ).

38    In any event, I find that there is simply no evidence to support their claim that a fiduciary relationship exists. Just as the use of the word "trust" is not determinative of the existence of an intention to create a trust (see *Tito v Waddell (No 2)* [1977] Ch 106) so, too, the use of the expression "fiduciary agent" or "bailee" is not conclusive of the existence of a fiduciary relationship (see *Clough Mill Ltd v Martin* [1985] 1 WLR 111 at 116 *per* Robert Goff LJ). Ultimately, "[o]ne therefore has to examine the relationship in each individual case, to see whether it is of a fiduciary nature" (see *Hendy Lennox (Industrial Engines) Ltd v Grahame Puttick Ltd* [1984] 1 WLR 485 at 498H *per* Staughton J). In my view, there appears to be at least two strong reasons which militate against such a conclusion:

(a)    First, the Physical Supplier-Seller contracts provided for a credit period of 30 days (see, *eg*, the Sales Confirmation from Universal Energy to OW Far East in OS 1147/2014). This is strong evidence that the relationship between the sellers and physical suppliers was a normal commercial relationship of buyer and seller, and not a fiduciary relationship in which there exists obligations of trust and confidence (see *Compaq Computer Ltd v Abercorn Group Ltd (t/a Osiris)* [1993] BCLC 602 at 612h *per* Mummery J).

(b)    Second, there was never any requirement that the sale proceeds be kept separate. If a buyer is not bound to keep the proceeds of sale separate but is entitled to mix it with his own money and deal with it as he pleases, then properly speaking, he is not a fiduciary of that sum but merely a debtor (see *Henry v Hammond* [1913] 2 KB 515 at 521). Given that the sellers were never required to keep the proceeds of sale separate, it appears that it was always intended that they could sell the bunkers on their own account and not as a fiduciary. This is unlike the situation in *Aluminium Industrie Vaassen BV v Romalpa*

*Aluminium Ltd* [1976] 1 WLR 676, ("*Romalpa*") where the receiver kept the proceeds from the sub-sales separate and never mixed them with his own money (see *Romalpa* at 687D *per* Roskill LJ).

39    Some of the sellers have also submitted that, at best, the operative clauses grant the physical suppliers a *charge* over the proceeds of sale which would be void against the insolvent companies (*ie*, the OW entities) for want of registration (see s 131 of the Companies Act (Cap 50, 2006 Rev Ed). I have reservations whether it can be said that, on an objective construction of the contract, the parties intended to create a charge. In the ordinary course of operations, the OW entities would have concluded many bunker contracts on a daily basis with counterparties in a large number of jurisdictions. It seems to me that it is unlikely that the parties would have intended the physical suppliers to go through the cumbersome process of registering a charge in Singapore *each time* they concluded a contract for the sale of bunkers. Such a construction of the contract would not comport with commercial reality.

40    The bailment point can be disposed of summarily. The essence of bailment is possession: it arises where there has been a transfer of possession of a chattel to the recipient (see Norman Palmer, *Palmer on Bailment* (Sweet & Maxwell, 3rd Ed, 2009) at para 1-001–2). That being the case, the only purchasers who can be said to be bailees would be the shipowner/applicant in OS 1076/2014 (see [8(c)] above). As the other purchasers do not own the vessels in question, they cannot be said to have been in possession. In any event, an action for breach of a bailee's duties will usually lie in *damages* (see *Palmer on Bailment* at para 37-002). It will not entitle the physical supplier to lay claim to the proceeds of sale of the bunkers *unless* the bailment was overlaid with a fiduciary relationship to account for the sale proceeds (see *Re Andrabell Ltd (in liq)* [1984] BCLC 522 at 529i–530f *per* Peter Gibson J), which I have found to be otherwise.

(2)    The tort of conversion argument

41    The "tort of conversion argument" is similarly premised on the physical suppliers having title to the bunkers. The argument is that the purchasers, in consuming the bunkers, have interfered with the physical suppliers' possessory rights and are therefore liable in the tort of conversion. I do not agree.

42    A claim in conversion lies where there has been an unauthorised dealing with a chattel in a manner which deprives the claimant of the use and the possession of the same (see *Clerk & Lindsell on Torts* (Michael Jones, gen ed) (Sweet & Maxwell, 21st Ed, 2014) ("*Clerk & Lindsell*") at para 17-07). It necessarily follows, therefore, that acts which are performed within the scope of the actual owner's permission cannot attract liability in the tort of conversion (see *Clerk & Lindsell* at para 17-08). In the present case, the physical suppliers *delivered* the bunkers to the vessels and

must plainly have intended (or at least must be taken to have intended) for the bunkers to be consumed. This is consistent with cl H.2 of the OW entities' GTCs which permitted the bunkers to be used in the propulsion of the vessel even before payment. This being the case, it is clear that no claim in conversion may lie.

43     In any event, any claim in conversion, even if it does exist, will lie only in *damages*. It does not follow that the physical suppliers have a legitimate claim to the *contractual price* of the bunkers under the Purchaser–Seller contract.

(3)    The collateral contract argument

44     Mr Ibrahim submits that, at the time the Purchaser–Seller Contract was concluded, there was also a *separate collateral* contract that the purchasers would make *direct* payment of the price of the bunkers in the event of the seller's insolvency. However, Mr Ibrahim has not made any attempt to particularise the alleged collateral contract: it is not clear *when* the offer was made, the *terms* upon which the offer was made, *when the offer was accepted* and on *what terms*. As the Court of Appeal in *Ang Sin Hock v Khoo Eng Lim* [2010] 3 SLR 179 cautioned at [80], "fresh contracts – and even collateral contracts, for that matter – cannot, as it were, be 'conjured' out of 'thin air'. Indeed, where the relevant legal criteria are *not* satisfied, the court concerned will certainly *reject* the argument in favour of a collateral (and/or fresh) contract in no uncertain terms …" [emphasis in original]. There is simply no evidence to support Mr Ibrahim's assertion that a collateral contract exists.

45     Mr Ibrahim had also submitted, for good measure, that "fairness and justice" demanded such an outcome to allow the physical supplier to recover the sum owed to them. In my view, this appeal to "fairness and justice" rings hollow. The fact that the OW entities are now insolvent does not extinguish the physical suppliers' contractual claims since their debts may still be provable in insolvency. What Mr Ibrahim is effectively seeking is for the physical suppliers to be allowed to side-step the insolvency process entirely and instead seek recovery of its claim directly from a *third party*, to the detriment of the OW entities' other creditors. This, it seems to me, is both unfair and unjust.

(4)    The unjust enrichment argument

46     In order for a claim in unjust enrichment to succeed, a plaintiff has to show: (a) the defendant has received a benefit (*ie*, he has been enriched); (b) the enrichment is at the plaintiff's expense; (c) it is unjust to allow the defendant to retain the enrichment; and (d) there are no defences available to the defendant (see *Skandinaviska Enskilda Banken AB (Publ), Singapore Branch v Asia Pacific Breweries (Singapore) Pte Ltd* [2011] 3 SLR 540 at [110]). Citing this passage, Mr Ibrahim submitted:

> On the facts of the present case, the [purchaser] has a legal compulsion (being the unjust factor) to *return* the [contractual price of the bunkers] to the [physical supplier] and it would be manifestly unjust if the [purchaser] does not do so. … Justice demand therefore demands [*sic*] that this Honourable Court should allows [*sic*] the [physical supplier's] claim by reversing the windfall obtained by the [purchaser], which in turn ensures certainty in the Bunker trade. [emphasis added]

47     This argument is plainly question-begging. What Mr Ibrahim seems to be saying is that the purchaser is legally liable to make restitution of the contractual price of the bunkers because it would be unjust of the purchaser not to when he is legally obliged to do so. This argument makes little sense. If the purchaser were legally obliged to pay the physical supplier, then there would be no need to appeal to the doctrine of unjust enrichment – the obligation to pay would stem from the primary obligation, be it in contract or otherwise. However, the question of whether the purchaser has a legal obligation to pay the contractual price of the bunkers to the physical supplier is *precisely the question which is in dispute*. In any case, the argument is simply factually unsustainable. The purchasers have admitted that they are liable to make payment for the bunkers so there is no question of them withholding payment and thereby being unjustly enriched. The only question is *to whom* they should make payment.

(5)     The maritime lien argument

48     This argument is only relevant to the purchasers in OS 1076/2014 (see [8(c)] above) since they own the vessels in which the bunkers were stemmed (and whose vessels therefore face the threat of arrest). The argument is premised on the existence of a clause in some of the physical suppliers' GTCs which provides for the creation of a lien for the price of unpaid bunkers. For example, cl 5 of Uni Petroleum's GTCs provides that "[a]ll amounts due shall operate as a lien/s against such vessel/s".

49     As a starting point, maritime liens give rise to proprietary interests and their creation is therefore subject to the *numerus clausus* principle. This gives rise to two important consequences: (a) the circumstances under which they may arise in Singapore are limited and do not include liabilities arising out of unpaid bunkers (see *The Ohm Mariana ex Peony* [1992] 1 SLR(R) 556 at [18]); (b) they cannot be created by contract (see *Admiralty Commissioners v Valverda (Owners)* [1938] AC 173 at 186 *per* Lord Wright). In *The Halcyon Isle* [1979–1980] SLR(R) 538, the Privy Council (on appeal from a decision of the Court of Appeal of Singapore), held that the recognition of a maritime lien was a matter that fell to be determined according to the *lex fori*.

50     Mr Mohan accepts that the foregoing represents the law in Singapore. However, he argues that there are jurisdictions which recognise the creation of maritime liens in respect of unpaid bunkers (*eg*, the United States of

America). While the mere recognition of the existence of a maritime lien does not give the physical suppliers a direct cause of action against the purchasers for the price of the bunkers under the Seller-Physical Supplier contracts, he argues that it is always open to the physical suppliers to arrest the vessel in such a foreign jurisdiction in order to enforce their claims. The possibility of arrest, he argues, suffices to establish the existence of a "competing claim" in respect of which interpleader relief is available.

51    It is not clear to me how this can be a "competing claim". A maritime lien is an encumbrance on the vessel which accrues simultaneously with the cause of action but lies inchoate until it is carried into effect by an action in rem (see *The Bold Buccleugh* (1851) 7 Moo PC 267; *The Halcyon Isle* at [9]). In other words, a maritime lien exists as a form of security for an underlying claim which is *enforceable* through an action *in rem* and entitles the claimant to be paid out of the proceeds of sale of the vessel in priority to other classes of creditors (see *The Halcyon Isle* at [10] and [21]). It is not a separate claim *per se*.

52    Furthermore, it is clear that a right of arrest not recognised by the *lex fori* (ie, Singapore) cannot be a competing claim. An application for interpleader relief is not a claim for a substantive right, but for relief of a procedural nature: what the applicant is asking for is to be released from proceedings and to have the court compel the competing claimants to put forward their claims for adjudication (see *Glencore International AG v Shell International Trading and Shipping Co Ltd and Metro Oil Corporation* [1999] 2 Lloyd's Rep 692 at 697). In other words, the competing claimants are being asked to assert their claims *in Singapore*. However, the Singapore courts would never decide in favour of the party asserting a maritime lien over unpaid bunkers simply because such a lien (which is subject to the *lex fori*) does not exist under Singapore law. That is not to say that no foreign cause of action can be a competing claim for interpleader relief in Singapore. A distinction must be drawn between a right which is subject to the *lex fori* and a cause of action which is recognised by its proper law. Here the court is concerned with a right (*ie*, a maritime lien) which is subject to the *lex fori* and not the proper law of the Seller–Physical Supplier contract.

53    By way of a letter dated 14 July 2015, Mr Kuek brought the decision of the United States District Court for the Southern District of New York in *UPT Pool Ltd v Dynamic Oil Trading (Singapore) Pte Ltd* 14-CV-9262 (VEC) (SDNY July 1, 2015) ("*UPT*") to my attention without explaining its relevance to the issues before me other than to state that it involved "a factual matrix which is significantly similar to the facts" in the consolidated applications. It is clear to me that the decision is of little relevance. Apart from the fact that the US statutory requirements (see 28 USC § 1335) are different from O 17, both the physical suppliers and the sellers in that case were asserting a maritime lien in respect of the supply of bunkers against the vessels, thereby satisfying the symmetry requirement (see *UPT* at pp 11

and 18). More significantly, United States law, unlike Singapore law, recognises the existence of maritime liens in respect of "necessaries" (*eg*, bunkers). Therefore, the case of *UPT* is of no assistance to the question of whether interpleader relief is appropriate on our facts.

54     In any event, there is *no* evidence before this court that any of the physical suppliers intend to or have *any* basis to assert a claim in a jurisdiction which recognises a maritime lien in respect of unpaid bunkers. Indeed, *none* of the parties (not even the purchasers in OS 1076/2014, which Mr Mohan represent) has adduced any evidence that its vessels face any real threat of arrest. To do so, I would expect the purchasers to state at least the following matters in their supporting affidavits: (a) the trading pattern of the vessels; (b) the fact that the law of the jurisdiction where the vessels regularly trade recognises the existence of a maritime lien for unpaid bunkers; (c) that the physical suppliers have intimated or asserted a maritime lien against its vessels in the relevant jurisdiction; and (d) an opinion on foreign law that the court of the relevant jurisdiction would exercise its power of arrest to enforce the maritime lien in the circumstances of this case. None of this was placed before me. This court cannot recognise the existence of a *prima facie* competing (foreign) claim founded upon the speculative existence of a maritime lien in respect of the unpaid bunkers. The interpleader jurisdiction of this court can only be invoked against real and actual claims and not hypothetical and speculative claims of the sort articulated by Mr Mohan (see *Isaac v Spilsbury* (1833) 10 Bing 3).

55     In summary, I find that interpleader relief cannot be granted because the competing claims raised do not disclose any *prima facie* case for relief. This finding is sufficient to dispose of the consolidated applications. However, for completeness, I will go on to examine whether the competing claims raised are truly "adverse".

### Are there adverse claims?

56     A point which divided the parties during the hearing was the applicable test to determine whether the competing claims are "adverse". The parties disagreed on whether the competing claims had to be proprietary in nature. This dispute cuts across battle lines and there was no consensus, within any of the three groups (purchasers, physical suppliers, and sellers), as to what the correct legal position should be.

       (a)     Mr Chua, Mr Ibrahim, and Mr Ong all submitted that in order for the competing claims to be "adverse", the competing claims must be *proprietary in nature* and they must be asserted over the same subject matter. In support of this proposition, Mr Ong cited three decisions of the Court of Appeal: *Tay Yok Swee* ([27] *supra*), *Thahir Kartika Ratna v PT Pertambangan Minyak dan Gas Bumi Negara (Pertamina)* [1994] 3 SLR(R) 312 ("*Thahir*"), and *The Republic of the*

*Philippines v Maler Foundation* [2014] 1 SLR 1389 ("*Maler Foundation*"). At [84] of *Maler Foundation*, Chao Hick Tin JA stated,

> … The only question that the court is concerned with in an interpleader proceeding is the resolution of adverse claims to the *res* that forms the subject matter of the interpleader, and the entitlement must be founded on a title or proprietary interest … Interpleader proceedings are not concerned with a relative *in personam* entitlement to property, or an oblique *jus ad rem* in the form of a right relating to another person's right to the property.

(b)    Mr Mohan, Mr Singh, Mr Lim, and Mr Kuek all appeared to accept that the competing claims need not be proprietary in nature. Mr Mohan argued that *Tay Yok Swee* and *Thahir* may be distinguished on the basis that each involved competing claims in respect of a specific fund in a bank account. He argued that it was only in such situations that the competing claims had to be proprietary in order to be "adverse". In support, Mr Mohan cited the decision of this court in *IMC Shipping Co Pte Ltd v Viking Offshore & Marine AS* [1998] SGHC 168 ("*IMC Shipping*") wherein Lai Siu Chiu J stated at [9]:

> … Debts give rise to personal claims and there can be no requirement under O 17 r 1(a) that the 'adverse claims' to a debt must somehow be proprietary.

57    It is important to appreciate the importance of this point. The sellers have advanced *in personam* claims for the recovery of contractual debts due under the Purchaser–Seller contracts. Therefore, if the competing claims must be proprietary in nature, then it is clear that interpleader relief cannot lie. For that reason, I found it rather curious that Mr Chua and Mr Ibrahim – both of whom support the grant of interpleader relief – have advanced this submission.

*The essence of interpleader proceedings*

58    Before examining the cases which were cited in argument, I think it is useful to first take a step back to understand the history and purpose behind the grant of interpleader relief. The genesis of interpleader may be traced to the practice of the Court of Common Pleas in the fourteenth and fifteenth centuries (see Ralph V Rogers, "*Historical Origins of Interpleader*" (1924) 51 Yale LJ 924; Geoffrey C Hazard Jr and Myron Moskovitz, "An Historical and Critical Analysis of Interpleader" (1964) 52 Cal L Rev 706). However, the modern form of the interpleader as we now know it was developed in the Courts of Equity in the eighteenth and nineteenth centuries before it was reintroduced into the Common Law Courts with the passage of the Interpleader Act 1831 (c 58) (UK) and further refined by the Common Law Procedure Act 1860 (c 126) (UK). Section 12 of the Common Law Procedure Act 1860 empowered the "courts of law to give

relief against adverse claims made upon persons having no interest in the subject of such claims" so long as the claims faced were "adverse to and independent of one another". In *De La Rue v Hernu, Peron & Stockwell, Limited* [1936] 2 KB 164) ("*De La Rue*"), Greene LJ wrote (at 170–173):

> Interpleader proceedings originated in Courts of equity, and the appropriate procedure where a person found himself harassed by claims made on behalf of two or more persons was by way of a Bill of Interpleader. It is interesting to observe what the nature of that proceeding was. I read a passage from the Fourth Edition of Daniell's Chancery Practice, vol. ii., p. 1418, published in 1867, because it is from this practice in equity that the whole modern law of interpleader is ultimately derived. The learned author says this: '*Where two or more persons claim the same thing, by different or separate interests, and another person, **not knowing to which of the claimants he ought of right to render a debt or duty, or to deliver property** in his custody, fears he may be hurt by some of them, he may exhibit a Bill of Interpleader against them.*' …
>
> …
>
> In substance, when an interpleader issue is tried, two actions against the person interpleading are being dealt with. Interpleader proceedings are the method of compelling the parties—either one, or both, or neither of whom may have actually issued a writ—to prosecute their claims. *As it is the essence of interpleader proceedings that **the person who has interpleaded has no title himself he naturally drops out of the suit.*** But in effect the entire matter is tried out in the presence of all the parties concerned, and ***the real claimants are compelled to put forward their claims and have them adjudicated upon. The reason for that is not their own benefit, it is for the relief of the person interpleading.***

[emphasis added in italics, bold and bold italics]

59    In other words, interpleader proceedings exist to assist applicants who want to discharge their legal obligations (to pay a debt, deliver up property, *etc*) but do not know *to whom* they should do so. The essence of interpleader was eloquently summarised by Sir James Wigram VC in *Crawford v Fisher* (1842) 1 Hare 436 more than half a century before *De La Rue* (at 441 and 442):

> ***The office of an interpleading suit is not to protect a party against a double liability, but against double vexation in respect of one liability.*** If the circumstances of a case shew that the Plaintiff is liable to both claimants, that is no case for interpleader. *It is of the essence of an interpleading suit, that the Plaintiff shall be liable to one only of the claimants*; and the relief which the Court affords him is against the vexation of two proceedings on a matter which may be settled in a single suit. [emphasis added in italics and bold italics]

60    The applicant in an interpleader summons is caught between the devil and the deep blue sea – if he discharges his obligation to one claimant, he exposes himself to suit from the other. In such a situation, the relief of interpleader comes to his aid by compelling the real claimants to present

their cases in order that the court can determine which one of the competing claimants has the legal entitlement to call on the enforcement of the applicant's admitted liability. The applicant, having disclaimed any interest in the subject matter of the dispute, "drops out" and is released from the proceedings (see *De La Rue* at 173). In other words, the object of an interpleader is the determination of the *incidence of liability*: *ie*, it serves to identify the person to whom the applicant is liable. It follows from this that interpleader relief is not available where the applicant is separately liable to both claimants (see *Farr v Ward* (1837) 2 M & W 844; 150 ER 1000) because there is no controversy in such a case: there are two obligations both of which the applicant is legally bound to discharge.

61     From my review of the cases, I have distilled three features that competing claims in an interpleader proceeding must possess in order to be considered "adverse".

62     The first is the requirement of "symmetry": the competing claims must be made in respect of *same subject matter*. This proposition is supported by a long and unbroken line of authority (see *Chin Leong Soon* ([28] *supra*) at 229B–230I) and the parties do not dispute that this represents the law. However, it is important to understand what the expression "subject matter" refers to. The "subject matter" of an interpleader is not, strictly speaking, the *res* which is in the possession of the applicant (*ie*, the goods or chattel or the debt). In some cases, there is no "*res*" to speak of (for example, in *Meynell v Angell* (1862) 32 LJQB 14 ("*Meynell*"), the applicant received competing claims for a debt due under a contract for building works). It is more accurate to describe the "subject matter" of the interpleader as the *legal obligation which the applicant has admitted to*. Looking at it from another perspective, both competing claimants must be calling on the enforcement of the same legal liability. The following two examples are instructive.

63     In *Ingham v Walker* (1887) 3 TLR 448 ("*Ingham*"), the defendant faced two competing claims for the purchase price of a horse: the first was from the plaintiff, on whose behalf he sold the horse; the second was from the buyer of the horse, who claimed damages for misrepresentation (he claimed that the horse did not conform to the description in the catalogue). The English Court of Appeal, in rejecting the defendant's application for interpleader relief, held that "[a] claim on the one side to a specific sum of money and a claim on the other side for unliquidated damages could not be the subject of interpleader proceedings". In other words, the claims, though both referable to the same horse, did not relate to the same legal liability. The first was a claim that the defendant was liable, *in the law of agency*, to account for the *purchase price of the horse* to his principal. The second was a claim that the defendant was liable *in contract* to the purchaser for *damages arising from misrepresentation*.

64     In *Greatorex v Shackle* [1895] 2 QB 249 ("*Greatorex*"), the defendant arranged for her house to be sold at auction. Following that, she received competing claims from two auctioneers, both of whom claimed a commission for the sale of the house. The first claim was for 35*l* and 12s while the second was for 25*l*. The defendant argued that since commission was being claimed by two different parties in respect of the sale of the same house, the subject matter of the claims was the same. The English Court of Appeal disagreed. On the facts, it was clear that the claims asserted by the competing parties were founded on two separate contracts (generating *two different sets of contractual obligations*) and giving rise to two separate causes of action. Thus, the claims, though both referable to the same house, were "not adverse, in the sense of being claims to the same money, but were entirely different claims" (at 252 *per* Wright J).

65     The second feature is mutual exclusivity: the resolution of the interpleader *must* result in the extinction of the unsuccessful competing claims. This is a corollary of the fact that interpleader proceedings serve to decide who is entitled to call on the applicant to discharge the specified liability. Once the court rules in favour of one of the competing claimants, it must follow, as a consequence, that the other competing claims *to the same subject matter* fall away. If it were not the case, then the interpleader proceedings would offer the applicant no way out from the quandary he finds himself in. For example, in both *Ingham* and *Greatorex*, it was clear that interpleader relief was not appropriate because the extinction of any one of the claims would have absolutely no effect on the remaining claims.

66     As a clarification, I do not mean to suggest that it is a prerequisite to interpleader relief that the competing claims must be co-extensive. It has been clear, since the decision in *Percy Attenborough v The London and St Katharine's Dock Company* (1878) 3 CPD 450, that there is no such requirement. For example, in *Reading v School Board for London* (1886) 16 QBD 686, the plaintiff sued the defendants for a sum of 977*l*. The defendants admitted liability to the extent of 861*l* but disputed the balance sum. Subsequently, a third party also demanded the sum of 861*l* from the defendant, claiming to have been assigned the right to the money by the plaintiff. The court granted interpleader relief in respect of the disputed debt of 861*l*. In that case, the determination of the interpleader resulted in the extinction of one of the competing claims to a sum of 861*l*, *which was the subject matter of the interpleader*. However, the resolution of the interpleader did not affect the third party's claim to the balance sum.

67     The third key feature is that there must be actual disagreement: *ie*, the applicant must face an actual dilemma as to how he should act. As noted at [60] above, interpleader relief exists to extricate the applicant from a genuine practical difficulty. If the competing claimants are *ad idem* as to what should be done but disagree on their rights and entitlements *inter se*, then interpleader relief will not lie. The decision of the Hong Kong Court of

Appeal in *Yinggao Resources Ltd v ECO Metal (Hong Kong) Ltd* [2014] HKCA 566 ("*Yinggao*"), which was cited in argument by Mr Mohan, is on point.

68     In *Yinggao*, the plaintiff entered into an agreement for the purchase of copper from Eco and, pursuant to this agreement, transferred a sum of $28m HKD to the latter. Subsequently, Eco came under investigation by the authorities so the parties agreed that this agreement should be terminated and the money repaid. The plaintiff wrote to the bank to ask that the sum be repaid on the basis that Eco was holding the sums *on trust* for its benefit. Eco wrote to the bank separately to state that it specifically denied that the funds were held on trust for the plaintiff but nevertheless informed the bank that, as the named account holder, it was.asserting its right to direct that the funds be transferred to the plaintiff. The bank then sought interpleader relief, arguing that although both claims sought the same outcome (*ie*, the transfer of the money to Yinggao), they were nevertheless "adverse" since they put forward different (and inconsistent) bases for their instructions. This argument was accepted at first instance but overturned on appeal. The Hong Kong Court of Appeal held that the claims were not adverse since they did not seek different outcomes. Hon Barma JA observed:

> 13.     ... *Given that both Yinggao and Eco are in agreement that the two sums should be paid to Yinggao, their claims in respect of the two sums cannot be said to be 'adverse' to one another. **They seek the same, and not different outcomes**, albeit for different reasons. ...*
>
> ...
>
> 15.     *Here, it cannot be said that the Bank does not know to which of Yinggao or Eco it should pay the two sums. By 10 October 2012 at the latest, it was clear that it was being called upon by both to pay the two sums to Yinggao. **Where there is no dispute as to which of two parties should receive payment or delivery of the sums or goods held by a third party, there is no practical need for interpleader relief.***
>
> [emphasis added in italics and bold italics]

*Must the competing claims be proprietary?*

69     With those points in mind, I now turn to the cases cited in argument. In *Tay Yok Swee* ([27] *supra*), the competing claimants (which included the appellant) were parties to a joint-venture agreement ("the JV") for the purchase and development of a piece of property, which was mortgaged to the bank as security for a loan. Under the indenture of mortgage, the appellant was named the proprietor of a one-third share in the property whereas the remaining competing claimants ("the second and third respondents") were each stated as the owners of the remaining shares. The parties failed to service their loan repayments and the bank exercised its powers of sale. The surplus proceeds of sale amounted to $2.1m and the

appellant argued that he was entitled to a one-third share. The second and third respondents, who had brought suit against the appellant for an account of profits and damages for the breach of the JV, argued that the appellant's one third share ought to be reduced to reflect the damages it owed them. The bank sought interpleader relief.

70     The appellant's claim to a one-third share of the sale proceeds was grounded on *the bank's liability* (as a mortgagee who had exercised the power of sale) to hold the surplus proceeds of sale on trust for the mortgagor who is entitled to the residue. On the other hand, the second and third respondents founded their claims on *the appellant's liability for breach of contract*. It is clear that the competing claims were not in respect of the same *subject matter*: they differed both in terms of the identity of the liable party (the bank or the appellant) as well as in kind (in trust or in contract). In the circumstances, it is clear that the Court of Appeal dismissed the application because the competing claims were not made *in respect of the same subject matter* (*ie*, the requirement of symmetry was not satisfied). The Court of Appeal held (at [15] and [25]):

> 15     … The facts show that, *although the second and third respondents have claimed an entitlement to the remaining one-third surplus, the claim is not a direct one; it is not a proprietary claim on the fund.* According to the statement of claim in Suit No 239 of 1992, they claim for under-contribution by the appellant to the costs of development of the project and also an account of profits arising from the appellant's management of the project. It is essentially a claim under the joint venture agreement.
>
> …
>
> 25     In our opinion, on the material before us, the second and third respondents have no claim on the remaining one-third surplus; that surplus belongs to the appellant. *They may have a claim against the appellant in contract and for an account; that is a personal claim and has yet to be determined. Such a claim is not adverse to the appellant's claim to the fund.*
>
> [emphasis added in italics and bold italics]

71     The other competing claimants never asserted that they had any direct claim to the one-third share of the balance sale proceeds. It was always clear that the bank, as mortgagee, was liable to render one-third of the surplus sale proceeds to the appellant and that the claims mounted by the second and third respondents did not affect the appellant's entitlement. This was not a situation in which there were adverse claims which amounted to "double vexation in respect of one liability". The Court of Appeal only stressed that the second and third respondents did not have a "proprietary claim to the fund" in order to highlight that they, in contradistinction to the appellant, were not making any claim *against the bank*.

72    In *Thahir* ([56] *supra*), the Court of Appeal had to consider several competing claims over sums of money in 19 fixed deposit accounts ("the accounts") which were in the joint names of General Thahir and his wife, the appellant. Upon the death of General Thahir, the appellant demanded that certain sums in the accounts be paid out to her. However, the bank received a competing claim from Pertamina, General Thahir's former employer. Pertamina claimed to be beneficially entitled to the money in the accounts on the ground that General Thahir had received the sums therein by way of bribes while he was an employee of Pertamina so he – and the appellant, by reason of her complicity in the bribes – were constructive trustees of the sums in the accounts. Before the Court of Appeal, it was argued that Pertamina had to show that it had a proprietary claim to the deposits in order for interpleader relief to lie. LP Thean JA held (at [14]):

> The essential question is, therefore, which of the claimants is entitled to the moneys. … As we see it, the *appellant and Pertamina are competing claimants to the ACU deposits. As the amended first issue recognises, the essence of it is 'entitlement' to the moneys*. Hence, even if what Pertamina maintain is the essential issue, their 'entitlement' to the deposits must still be founded on some title or proprietary interest they have in the deposits. *It is not enough for Pertamina to show that they have a personal claim* against Gen Thahir and/or the appellant for recovery of the bribes. *They must show that, on one or more of the grounds stated in the amended first issue, they have some title or proprietary interest in the deposit*. … [emphasis added]

73    As a customer of the bank, the appellant was its creditor (see *Bank of America National Trust and Savings Association v Herman Iskandar* [1998] 1 SLR(R) 848 at [31]) and, as a corollary, the owner of a chose in action constituted by the indebtedness of the bank to her (see *Ng Wei Teck Michael v Oversea-Chinese Banking Corp Ltd* [1998] 1 SLR(R) 778 at [38]). It was in this capacity – *qua* the owner of a chose of action – that the appellant asserted a claim that the bank, as a debtor, was liable to her in the amount of the funds in the account. Thus, when the court held that "[Pertamina's] 'entitlement' to the deposits must still be founded on some title or proprietary interest they have in the deposits", what it meant was that in order for Pertamina's claim to be "adverse" to that of the appellant's, it likewise had to be a claim which pertained to the bank's liability *qua* debtor in the context of the banker-customer relationship. This required proof that Pertamina had a (proprietary) right to call on the debt (the chose in action) which was the subject matter of the competing claims.

74    Finally, I turn to *Maler Foundation* ([56] *supra*). Following the overthrow of President Ferdinand E Marcos of the Philippines, the Republic of the Philippines ("the Republic") took steps to recover the ill-gotten wealth which Mr Marcos and his wife had accumulated. *Maler Foundation* concerned competing claims to a portion of this wealth, which was kept in an account with a bank in Singapore opened in the name of the Philippine National Bank ("PNB"). Several parties laid claim to this sum of

money, including the Republic (pointing to a decision of the Philippines Supreme Court ordering that all of the Marcos' assets be forfeited to the State), PNB (as account-holders), several Swiss foundations set up by the Marcoses (from whom the money had been seized in Switzerland), and the plaintiffs in a human rights class action suit filed in the United States District Court of Hawaii ("the HR Victims"). The bank then sought interpleader relief.

75    In that section of the judgment which was quoted by Mr Ong (see [56(a)] above), the court was considering the competing claim of the HR Victims. The HR Victims had prevailed in their class action suit in the United States and had obtained judgment for a sum of about US$2b. Pursuant to this, a Clerk of the District Court of Hawaii, one Walter A Y Chinn, executed a deed of assignment of the assets of the Marcos Estate in favour of the HR Victims ("the Chinn Assignment"). The HR Victims argued that, by virtue of the Chinn Assignment, they had acquired title to the sums in the Singapore accounts. Given that their argument involved a foreign law element, the first issue which the court had to deal with was the characterisation of the relevant legal issue, as this was a prerequisite to determine the appropriate governing law of the dispute (see *Maler Foundation* at [81]). The HR Victims submitted that the issue ought to be characterised as one concerning the validity of the Chinn Assignment *vis-à-vis* the assignor (the Marcos Estate) and the assignee (the HR Victims) *only*, and not whether the Chinn Assignment validly granted them title to the sums in the Singapore accounts. The court disagreed and held:

> 84    … As the Human Rights Victims seemed to be saying that the formulation of their claim to the Funds did not involve any assertion that they had obtained proprietary rights to the Funds at the time the Chinn Assignment was executed, then in the context of the present Interpleader Proceedings, their claim would be seriously undermined. The only question that the court is concerned with in an interpleader proceeding is the resolution of adverse claims to the *res* that forms the subject matter of the interpleader, and the entitlement must be founded on a title or proprietary interest: see the decision of this court in *Tay Yok Swee v United Overseas Bank* [1994] 2 SLR(R) 36 at [12]–[15], followed in *Thahir Kartika Ratna v PT Pertambangan Minyak dan Gas Bumi Negara (Pertamina)* [1994] 3 SLR(R) 312 at [14]–[16]; Singapore Civil Procedure 2013 (Sweet & Maxwell Asia, 2013) at para 17/1/6. Interpleader proceedings are not concerned with a relative *in personam* entitlement to property, or an oblique *jus ad rem* in the form of a right relating to another person's right to the property.

> 85    *While the Human Rights Victims chose to frame their cause of action based on a hierarchy of relative entitlement to the Funds, we consider that the **defining element of the claims of all the parties to the Interpleader Proceedings is the question of title to property** – the correct characterisation of **the substance of the issue before this court is the effect of the Chinn Assignment on the title to the Swiss Deposits** at the time that the judicial*

assignment allegedly took place, and this falls most appropriately within a proprietary rubric.

[emphasis added in italics and bold italics]

76    It is essential to bear in mind that *Maler Foundation* was an appeal from the *substantive* interpleader proceeding which was held in the court below (*ie*, it was a "stage 2" case: see [20] above). Thus, the court was not concerned with the test to be applied in determining whether a claim is "adverse" (that being a "stage 1" issue). Rather, the court had to decide on the most appropriate characterisation of the claim that was *consistent with the premise that it was an adverse claim*. In *Maler Foundation* (like in *Tay Yok Swee* ([27] *supra*) and *Thahir*), all the competing claimants were asserting proprietary claims ("… the defining element of the claims of all the parties … is the question of title to property …") over funds in a bank account. So what the court was saying was that in the context of this "stage 2" analysis, one *had* to understand the legal relevance of the Chinn Assignment as being an assertion that it had conferred title on the HR Victims to the deposits. If this were not the case, interpleader relief would not have been appropriate to begin with since the competing claims would not even relate to the same subject matter.

77    It is also worth highlighting that para 17/1/6 of *Singapore Civil Procedure 2013* vol 1 (G P Selvam gen ed) (Sweet & Maxwell, 2013), which the Court of Appeal cited in *Maler Foundation*, states that the competing claims need not be proprietary in nature. It reads:

> In *IMC Shipping v. Viking Offshore & Anor.* (unreported, delivered on May 18, 1998) Lai Siu Chiu J. held that where the adverse claims were in respect of a debt within the meaning of O. 17, r.1(a), such debts give rise to personal claims and there can be no requirement under O.17, r.1(a) that the adverse claims to a debt must somehow be proprietary. …

78    In *IMC* ([56] *supra*), two companies (Viking and BELMI) entered into an agreement to set up a joint-venture company in which Viking would contribute a sum of US$450,000 in return for a 30% shareholding. This sum was duly transferred from the bank account of a Norwegian individual, Ohna, on Viking's behalf. Subsequently, it was decided that the share capital of the new company would be reduced to US$10,000, which meant that Viking would only have to contribute a sum of US$3,000. Following this decision, a sum of US$372,000 (after deductions) was to be refunded to Viking. Both Viking and Ohna laid claim to this sum of US$372,000. The applicant (BELMI's parent company) then sought interpleader relief. Viking resisted the application on the basis that Ohna did not have a proprietary claim (citing *Tay Yok Swee* and *Thahir* ([56] *supra*)). Lai J wrote (at [9]):

> Viking's submission that Ohna's claim had to be a proprietary claim was, in my view, relevant only if IMC was, in the alternative, alleged to be under a liability for 'money' within the meaning of O17 r 1(a) RSC. If the parties were

proceeding on this footing, I would agree that the two Court of Appeal cases cited above do suggest that the claims concerned must be proprietary, i.e. must relate to a specific fund. To satisfy this, both defendants here would probably have to argue that the money with IMC was being held under some kind of trust, either express or implied; otherwise any claim for payment by either defendant would appear to be personal and not proprietary. … But as stated above, I was of the view that *Ohna and Viking were making adverse claims to a 'debt' within the meaning of O17 r 1(a). Debts give rise to personal claims and there can be no requirement under O17 r 1(a) that the 'adverse claims' to a debt must somehow be proprietary.* [emphasis added]

79     As Lai J pointed out, the competing claims in *Tay Yok Swee* and *Thahir* both pertained to competing claims to a sum of money in a bank account. In such a situation, the competing claims had to be proprietary (*ie*, relate to title to the chose in action constituted by the sum of money in the bank account) to satisfy the symmetry requirement. However, it did not mean that this had to be so in *every* case. In summary, the decisions cited – *Tay Yok Swee*, *Thahir*, and *Maler Foundation* – do not stand for the proposition that competing claims in an application for interpleader relief had to be proprietary.

80     This also appears to be consistent with the decided cases. In *Meynell* ([62] *supra*), it was held that interpleader relief was available in a situation where the applicant faced competing claims from A on the one hand and a person claiming to be A's undisclosed principal on the other. In *Development Bank of Singapore Ltd v Eng Keong Realty Pte Ltd* [1990] 1 SLR(R) 265, this court granted interpleader relief in respect of a dispute as to whom the applicant-bank ought to pay a sum of $170,000 under a banker's guarantee. In *Australia and New Zealand Banking Group Ltd v Ding Pei Chai* [2004] 3 SLR(R) 489 ("*Ding Pei Chai*"), this court granted interpleader relief in respect of competing claims to manage a deposit account opened in the name of a company. None of these cases involved an adjudication of competing *proprietary* claims. Instead, the common denominator is all these cases involved an admitted liability (the payment of a contractual debt, the bank's obligation to its customers, *etc*) and a dispute over the identity of the party to whom the liability is owed. With that, I will now examine whether the competing claims satisfy the three requirements of symmetry, mutual exclusivity, and actual disagreement identified at [61]–[67] above.

*Are the competing claims "adverse"?*

81     On the facts, the seller's claim appears to be a simple claim for a contractual debt: *viz*, the contractual price for the bunkers due under the Purchaser–Seller contract. However, Mr Loo disputed this. He submitted that, owing to the presence of the retention of title clause in the Purchaser–Seller contracts, title in the bunkers was never transferred from the Sellers to the Purchasers. That being the case, he argues, on the authority of

*FG Wilson* ([37] *supra*), that s 49(1) of the Sale of Goods Act (Cap 393, 1999 Rev Ed) ("SOGA") precludes the Sellers from maintaining an action for the price of the bunkers. In response, Mr Singh submitted that the SOGA did not apply because the Purchaser-Seller contracts were not contracts for the transfer of property in the bunkers but were instead contracts for the transfer of bunkers for immediate consumption. Ultimately, I do not have to decide this point. If Mr Loo is correct and the sellers cannot maintain an action for the price of the bunkers then, *ipso facto*, there are no competing claims and hence interpleader relief would not be available (which is why I find it rather odd that Mr Loo has raised this argument). However, for the purposes of evaluating whether the competing claims are adverse to each other, I will proceed on the basis that the sellers can maintain an action for the price of the bunkers.

82     I now turn to the appropriate characterisation of the potpourri of claims put forward by the physical suppliers:

> (a)     The "fiduciary agent/bailee argument" (see [35]–[40] above) amounts to a proprietary claim for the *proceeds of sale of the bunkers*.

> (b)     The "tort of conversion argument" (see [42]–[44] above) amounts to an *in personam* claim against *the purchaser* for *damages*.

> (c)     The "collateral contract argument" (see [44] above) amounts to an *in personam* claim against the *purchasers* for the *price of the bunkers (as set out in the Seller-Physical Supplier contract)* under a *separate contract*.

> (d)     The "unjust enrichment argument" (see [46] and [47] above) amounts to a *restitutionary claim* against the *purchaser*.

> (e)     The "maritime lien argument" (see [48]–[54] above), amounts to a claim that the physical suppliers have a *right to proceed in rem* against the vessels in satisfaction of their claim for the unpaid bunkers *and*, further, that they ought to be accorded *priority in the distribution of the sale proceeds of the vessel* (see *The Halcyon Isle* ([49] *supra*) at 235D *per* Lord Diplock).

83     It is clear that none of the competing claims listed above assert that the physical supplier has a *contractual right to be paid the price of the bunkers* under the *Purchaser-Seller contract*. Therefore, the requirement of symmetry has clearly not been satisfied. Furthermore, the extinction of these competing claims will not have *any* impact on the sellers' claim for the purchase price of the bunkers or *vice versa* so the requirement of mutual exclusivity is also not satisfied. By way of illustration, even if I were to accept that the physical suppliers have a maritime lien against the vessel, a holding by this court that the purchasers are liable to the sellers would not extinguish the maritime lien which arises by operation of law in the relevant jurisdiction regardless of *in personam* liability. The claims of the sellers and

the physical suppliers are not adverse to one another and are therefore not suitable for interpleader relief.

84    In summary, the conditions precedent for interpleader relief have not been satisfied since the competing claims of the physical suppliers neither disclose any *prima facie* case for relief nor are they "adverse" to the sellers' claims within the meaning of O 17 of the ROC.

**What consequential orders should follow?**

85    The sellers submitted that even if I were to find that interpleader relief is unsuitable, I may nevertheless "summarily determine, and dismiss, the physical suppliers' claims on the merits" and then order "payment out" in their favour. In support, they cite O 17 r 8 of the ROC, which reads:

> Subject to Rules 1 to 7, the Court may in or for the purposes of any interpleader proceedings make such order as to costs or any other matter as it thinks just.

86    In oral argument, to Mr Mohan's credit, he expressed some reservations whether the court could do so. He pointed out that the powers of the court under O 17 r 8, though wide, are expressly circumscribed by the requirement that they are "[s]ubject to Rules 1 to 7". Under O 17 r 5, the court has the power to summarily determine the question at issue between the competing claimants *if* it finds that interpleader relief is appropriate. By implication, Mr Mohan suggested, this court does not have the power to do so if it finds that interpleader relief is not available.

87    Before I proceed further, it is important to appreciate exactly what the sellers want this court to do. During the oral hearing, Mr Singh consistently used the expression "payment out" when describing the process of the court ordering payment in their favour. The expression "payment out" typically refers to an order of court made at the end of a trial directing that a sum of money paid into court be applied in satisfaction of the claim of the successful party. In the instant case, no sum has been paid into court. More importantly, there has yet to be a determination of the merits of the claims. The only question which the court has considered thus far is the "stage 1" inquiry of whether the conditions precedents for interpleader relief have been satisfied. That being the case, what the sellers presently have is a *claim* (and that is all it is for the moment, a claim) for the recovery of a contractual debt. In calling for payment to be made to them, they are effectively seeking *summary judgment* in their favour. The question is whether this court has, *upon the dismissal of an interpleader summons*, the power to summarily determine the merits of the competing claims and to grant judgment pursuant to that determination. I do not think so.

### The statutory scheme

88     Order 14 r 1 of the ROC governs the grant of summary judgment and it provides that four conditions precedent must be met before such an application can be brought (see *Singapore Civil Procedure 2015* vol 1 (G P Selvam gen ed) (Sweet & Maxwell, 2015) at para 14/1/4). It is not disputed that none of these requirements have been met – for example, neither a statement of claim nor a defence has been served, as required under O 14 r 1. It is also no answer to point to the inherent jurisdiction of this court as has been suggested since it is well established that this court does not have the inherent power to order summary judgment outside the circumstances set out in the ROC (see *Samsung Corp v Chinese Chamber Realty Pte Ltd* [2004] 1 SLR(R) 382 at [12]).

89     Ordinarily, that would be the end of the matter. However, the sellers have invoked O 17 r 8 to seek judgment in light of the arguments and evidence presented during the hearing. As a starting point, I accept Mr Mohan's submission that the generality of O 17 r 8 is constrained by the proviso that it is "[s]ubject to Rules 1 to 7". In order to fall within the scope of O 17 r 8, any contemplated order has to cohere with the structure of the interpleader process and must be connected with its central purpose, which is the determination of the incidence of an *admitted* liability (see [60] above). With that in mind, I am of the view that there are two reasons why O 17 r 8 cannot be interpreted to grant this court the power to order summary judgment.

90     The first is that it would offend the structure of O 17. In *Tetuan Teh Kim Teh, Salina & Co (a firm) v Tan Kau Tiah @ Tan Ching Hai* [2013] 4 MLJ 313 ("*Tetuan*"), the Federal Court of Malaysia considered the structure of O 17 of the Malaysian RHC 1980 (which is *in pari materia* with O 17 of our ROC) and held at [50]:

> On hearing the interpleader summons, ***if the preconditions under O 17 r 1 of the RHC and O 17 r 3 of the RHC are not satisfied, the court should dismiss the summons. On the other hand if the preconditions under O 17 rr 1 and 3 of the RHC are satisfied, then the court may make any of the orders provided under O 17 r 5 of the RHC as appropriate.*** The court may order that an issue (in this case the issue relating to the 18 documents of title) be stated and tried, and may direct which of the claimants is to be plaintiff and which defendant. For this purpose provisions for discovery and inspection of documents as well as interrogatories, and for trial of interpleader issue are provided under O 17 of the RHC. Where all the claimants consent or any of them so requests, or the question at issue between the claimants is a question of law and the facts are not in dispute, the court may 'summarily determine the question at issue between the claimants' and make an order accordingly on terms as may be just. It is ***important to note that the summary determination provided is for 'the question at issue between the claimants' not between the claimants or any of them with the interpleader applicant.*** … [emphasis added in italics, bold and bold italics]

91     I respectfully agree with the Federal Court's analysis of the nature and structure of O 17. At "stage 1" of an interpleader summons, the remit of the court's inquiry is whether the conditions precedent for interpleader relief have been satisfied (see [19] above). Consequently, the court is limited only to allowing or dismissing the application for interpleader relief. It is only at "stage 2" that the court takes cognisance of the merits of the competing claims and may exercise its power to dispose of them. Having dismissed the application for interpleader relief on the basis that the conditions precedent have not been satisfied, I find that I do not have the power to summarily determine the claim and/or order payment in the sellers' favour.

92     Furthermore, it is worth noting that the power of this court to summarily determine the relative merits of the competing claims in the interpleader process is specifically provided for under O 17 r 5(2) of the ROC. However, this power is tightly circumscribed. It only applies to cases where the conditions for interpleader relief have already been satisfied (*ie*, "stage 2" cases) where either (a) the applicant is the sheriff; *or* (b) all the parties consent or any of them so requests; *or* (c) it involves a pure question of law. In other words, the statutory scheme itself imposes specific and clear constraints on the court's power of summary determination. This, I find, is a further reason why I am precluded from reading in a general power of summary determination into O 17 r 8, particularly for "stage 1" cases, where the merits of the competing claims do not even fall to be determined.

93     The second reason is that such a power would fall outside the scope of the interpleader process. At [50] of *Tetuan*, the court emphasised that the power of summary determination provided under O 17 r 5 of the Malaysian RHC 1980 is limited to the "question at issue *between* the claimants" and not an issue "between the claimants or any of them with the interpleader applicant". In *Tetuan*, the application for interpleader relief was granted at first instance. The second defendant then appealed to the Malaysian Court of Appeal which, in addition to reversing the decision of the High Court, allowed a counterclaim for damages arising from wrongful detention. In doing so, the Court of Appeal held that O 28 r 7(1) of the Malaysian RHC 1980 permitted defendants in originating summonses to bring counterclaims in the same matter without the necessity of initiating a separate action. The Federal Court affirmed the dismissal of the interpleader summons but held that interpleader proceedings, though initiated by originating summons, was a class of summonses that fell outside the scope of O 28 so the counterclaim ought properly to have been the subject of a separate action. At [49], the Federal Court explained:

> … [A]n interpleader summons is a type of originating summons excepted under O 28 r 1 of the RHC from the originating summons procedure under O 28 of the RHC. The *plaintiff came to the High Court seeking for interpleader relief, seeking decision of the court as to whom he should account for the 18 documents of title. All that the court had to determine was whether or not*

> *it was necessary, for the purpose of assisting by means of interpleader, to make an order which would enable the plaintiff to know to whom he had to account for the documents of titles* (applying *De La Rue*). For this purpose the interpleader summons called upon the first and the second defendants to come out and state their claims so that the court could decide to whom the plaintiff should account for the documents of titles. That was where the affidavits filed by the first and second defendants came into play. They should contain the particulars of their respective claims to the documents of titles. [emphasis added in italics and bold italics]

94     Although the specific issue in *Tetuan* concerned a counterclaim made in an affidavit opposing an application for interpleader relief, the more general point that the Federal Court was making is that the scope of an interpleader summons is a narrow one: it exists to allow the court to determine the incidence of liability. It was never intended as (and, indeed, it is manifestly unsuited to function as) a mechanism for the *determination of liability*, which is the raison d'être of the summary judgment procedure. Therefore, I find that I am precluded from construing O 17 r 8 as providing this court with a general power of summary determination.

### The cases cited in argument

95     The sellers cited four cases in support of their submission that this court has the power to order payment in their favour: *BP Benzin und Petroleum AG v European-American Banking Corporation* [1978] 1 Lloyd's Rep 364 ("*BP Benzin*"), *Ding Pei Chai* ([80] *supra*), *Hong Leong Bank Bhd v Manducekap Hi-Tec Sdn Bhd* [2009] 7 MLJ 124 ("*Hong Leong Bank*"), and *Tay Yok Swee* ([27] *supra*). In my view, none of the cases are of assistance.

96     *BP Benzin* and *Ding Pei Chai* can both be distinguished as they were both "stage 2" cases where the court had found that the conditions precedent for interpleader relief had been satisfied. Once the court is seized of its interpleader jurisdiction, it has full access to the powers afforded by O 17, including the power to summarily determine the merits of the competing claims (see O 17 r 5). *BP Benzin* concerned competing claims to the charter hire of a vessel. Before the substantive interpleader hearing was held, Goff J made an interlocutory order that a portion of the sum paid into court be disbursed to defray the expenses incurred in the upkeep of the vessels until the matter could be definitively decided. *Ding Pei Chai* concerned the question of who had the lawful authority to deal with a set of funds in a company account. At the end of the substantive interpleader hearing, Belinda Ang Saw Ean J ordered that the sum of money remain in the bank account until further order with the successful claimants being granted general liberty to apply. Neither of these two cases lends support to the argument that summary judgment may be ordered upon the dismissal of the interpleader summons.

97     Neither *Hong Leong Bank* nor *Tay Yok Swee*, though "stage 1" cases, involved the entry of summary judgment. In *Hong Leong Bank*, the applicant seeking relief was a bank with whom the first claimant (a company) had an account. The bank received competing claims for control of the account from, *inter alia*, the company's former board of directors and the company's shareholders, so it sought interpleader relief. The High Court of Kuala Lumpur held that interpleader relief was not available since there was no real foundation for the applicant's avowed expectation that it would be sued by the competing claimants. The court held that it was clear that the company was the legal owner of the money in the account: not only was it the named account holder, there were also several court orders which had affirmed this fact (see *Hong Leong Bank* at [13]). Having dismissed the interpleader summons, the court, on the application of the bank, went to make a further order under O 17 r 8 for the bank to issue a banker's cheque for the full amount in the account in favour of the company. In *Tay Yok Swee*, the Court of Appeal, having found that interpleader relief was unavailable (see [71] above), held that the one-third share of the surplus proceeds of sale belonged to the appellant and that this sum should be paid to the Official Assignee since the appellant was a bankrupt.

98     There are two important points to note about *Hong Leong Bank* and *Tay Yok Swee*. First, both concerned the issue of title: in the case of the former, it was title to the money in a bank account; in the latter, it was the beneficial interest to the surplus proceeds of sale. Second, the courts dismissed the applications for interpleader relief because there were *no serious disputes on the question of title*. In *Hong Leong Bank*, the company was the named account holder and therefore was the full legal owner of the money. In *Tay Yok Swee*, the appellant was named as the proprietor of a one-third share in the indenture of mortgage and the competing claims did not relate to his proprietary entitlement to the proceeds of sale (see [69] above). When these two points are considered, it is clear that the court merely recognised the consequences of its findings on the question of title. In *Hong Leong Bank*, the company, as the full legal owner of the money in the account, was entitled to have a banker's cheque for the funds in the account made out in its favour, with or without the assistance of an order of court. Similarly, in *Tay Yok Swee*, once the court found that the one-third share of the surplus proceeds of sale belonged to the appellant, it followed, as a consequence, that it was part of his estate and should be made available for distribution to all his creditors in the bankruptcy process.

### Should judgment on admission be granted?

99     During the oral hearing, I separately asked Mr Mohan and Mr Kuek of their respective clients' positions on the merits of the competing claims. Both of them confirmed that their clients accepted that they were liable to the respective OW entities with whom they had contracted and denied that they were liable to the physical suppliers. Seizing on this, Mr Singh made an

oral application for judgment on admission to be entered against the
purchasers under O 27 r 3 of the ROC, which reads:

> Where admissions of fact are made by a party to a cause or matter either by
> his pleadings or otherwise, any other party to the cause or matter may apply
> to the Court for such judgment or order as upon those admissions he may be
> entitled to, without waiting for the determination of any other question
> between the parties, and the Court may give such judgment, or make such
> order, on the application as it thinks just.

Understandably, Mr Mohan and Mr Kuek both balked and immediately
sought to clarify that their responses were premised on a common
understanding that the Purchaser-Seller contracts were contracts for the
sale of goods under the SOGA. They clarified that, given Mr Singh's
submission that the SOGA did not apply (see [81] above), their clients no
longer accepted that they were liable to the OW entities. They also
reiterated that they might have possible counterclaims against the sellers,
though they did not specify what these counterclaims might be.

100    While these eleventh hour developments raise interesting questions as
to the extent to which parties may be permitted to qualify or resile from
their earlier "admissions", I do not have to decide this point. Ultimately, I
am of the view that the grant of judgment on admission is unavailable
because there is no "cause or matter" within the meaning of O 27 r 3 upon
which judgment may be granted. The expression "cause or matter" in O 27
r 3 contemplates that there is a claim by one person against another in the
context of a subsisting suit or action *between the parties* of which the court
is seized of jurisdiction. However, as noted at [20] above, the only question
which arises for determination at "stage 1" is whether the conditions
precedent for interpleader relief have been satisfied. At this stage, no party
has been impleaded and no legal liabilities fall for adjudication, these being
"stage 2" concerns. Given that I have already held that this court does not
have the power of summary judgment at "stage 1", it would be anomalous
to now grant judgment on admission on the legal merits of the competing
claims.

101    Furthermore, it does not appear to me that Mr Kuek or Mr Mohan
had made any admissions of fact which are relevant to the sellers' claim for
the purchase price of the bunkers. While the admissions relied on in an
O 27 r 3 application can be made by counsel at proceedings (see *The State of
Perak v PRALMM Muthukaruppan Chettiar* [1938] MLJ 247 at 255 and
256), the statement must still constitute "a clear admission of *all* the facts
necessary to establish the cause of action and not merely evidence of some
of the facts" [emphasis in original] (see *Mycitydeal Ltd v Villas
International Property Pte Ltd* [2014] 4 SLR 1077 at [69]). The purported
"admissions" made by Mr Kuek and Mr Mohan were responses from the
Bar to questions from the Bench as regards the *legal positions* of their
respective clients. They have no bearing on the question of whether the

elements of the sellers' claims have been made out and are therefore not suitable for judgment on admission. Having said that, given that the purchasers do not appear to be disputing the sellers' claims and this court's finding that the claims by the physical suppliers do not even satisfy the *prima facie* case test, any resistance by the purchasers to pay the sellers' claims will inevitably engender the commencement of fresh legal proceedings with obvious costs consequences.

## Conclusion

102    In the result, the consolidated applications are dismissed because the conditions precedent for interpleader relief have not been satisfied and I decline to make any order in relation to the sellers' substantive claims for the purchase price of the bunkers.

## Costs

103    Costs should follow the event. The physical suppliers who supported the unsuccessful applications will bear their own costs save for the physical supplier in OS 1164/2014, Golden Island Diesel Oil Trading Pte Ltd ("Golden Island"). Golden Island never brought a claim against the purchaser and had objected to the initiation of interpleader proceedings from the outset but Mr Kuek only indicated his clients' intention to withdraw OS 1164/2014 one week before the oral hearing. Even though no submissions were filed, Golden Island is still entitled to be indemnified for the costs it incurred in the filing of affidavits, which I fix at $1,500 (inclusive of disbursements) to be paid by the purchaser in OS 1164/2014, Stena Weco A/S.

104    The purchasers should bear the costs of the sellers as well as the disbursements they have incurred. Before turning to the quantum, I first observe that the sellers each prepared a single compendious set of submissions in opposition to the consolidated applications (save for ING, which prepared supplemental submissions for each summons in addition to a single set of submissions which addressed the legal principles applicable to all). These submissions addressed the points raised in support of interpleader relief, irrespective of whether they were raised by Mr Mohan's clients or by Mr Kuek's. Thus, the costs incurred by the sellers should be apportioned. During the hearing on costs, Mr Mohan and Mr Eugene Cheng both helpfully agreed that the costs, in so far as ING and OW Far East are concerned, should be apportioned as follows: (a) 25% of the costs are to be borne by Mr Mohan's clients, the purchasers in OS 1076/2014; (b) the remaining 75% are to be borne by the purchasers in the remaining applications. This apportionment does not apply to DOT and OCM as they were not named as respondents in OS 1076/2014.

105    With that in mind, my costs orders (inclusive of disbursements) are as follows:

(a)   ING, Mr Goh, and Mr Chan (who were all represented by Mr Singh) are awarded one set of costs which I fix at $36,000. In so doing, I am mindful that there was no necessity for ING to have been added as a respondent in OS 1166/2014 and OS 1202/2014 and that ING had been awarded costs of $18,000 for dismissal of a related interpleader summons in OS 1120/2014. $9,000 is to be borne by the purchasers in OS 1076/2014. The remaining $27,000 is to be borne jointly by the purchasers in the remaining applications.

(b)   OW Far East is awarded costs which I fix at $10,000. $2,500 is to be borne by the purchasers in OS 1076/2014. The remaining $7,500 is to be borne jointly by the purchasers in OS 1147/2014, OS 1163/2014, OS 1164/2014, OS 1165/2014, OS 1166/2014, OS 1172/2014 and OS 1173/2014.

(c)   DOT is awarded costs which I also fix at $10,000. These costs are to be borne jointly by the purchasers in OS 1144/2014, OS 1148/2014, OS 1162/2014, OS 1202/2014 and OS 1205/2014.

(d)   As OCM was only involved in one application, I fix costs at $5,000 to be paid by the purchaser in OS 1202 of 2014.

Reported by Scott Tan.

# The "Xin Chang Shu"

## [2015] SGHC 308

High Court — Admiralty in Rem No 239 of 2014 (Registrar's Appeal No 226 of 2015)
Steven Chong J
23, 25 September; 4 December 2015

*Admiralty and Shipping* — *Admiralty jurisdiction and arrest* — *Wrongful arrest* — *Damages for wrongful arrest* — *Contract between bunker supplier and bunker trader* — *Bunker supplier claiming bunker trader was agent for shipowner* — *Bunker supplier suing shipowner for price of bunkers* — *Chain of contracts between parties* — *False facts in affidavit supporting warrant of arrest* — *Failure to sufficiently disclose shipowner's defences* — *Failure to disclose intention to arbitrate* — *Whether there was material non-disclosure* — *Whether damages for wrongful arrest should be awarded*

## Facts

Following the insolvency of OW Bunker Far East (Singapore) Pte Ltd ("OW Singapore"), the plaintiff commenced admiralty *in rem* proceedings against the defendant claiming US$1,768,000 for the supply of 4,000mt of marine bunker fuel to the vessel, *Xin Chang Shu* ("the Vessel"). The claim was based on a contract for the supply of bunker fuel entered into between the plaintiff and OW Singapore ("the Contract"). The plaintiff claimed that OW Singapore was the defendant's agent and entered into the Contract on the defendant's behalf. When negotiations on the provision of alternative security fell through, on 9 December 2014, the plaintiff obtained a warrant of arrest and proceeded to arrest the Vessel on 10 December 2014. On 12 December 2014, the Vessel was released from arrest pursuant to an agreement that the defendant would furnish security by way of payment into court in the sum of US$2.6m. Thereafter, the plaintiff applied for a stay of proceedings in favour of arbitration under ss 6 and 7 of the International Arbitration Act (Cap 143A, 2002 Rev Ed) ("the IAA"). The defendant applied to strike out the proceedings, set aside the warrant of arrest, and applied for damages for wrongful arrest. The applications were heard together. The assistant registrar ("the AR") allowed the defendant's application to strike out the writ, but declined to set aside the warrant of arrest and dismissed the defendant's claim for damages for wrongful arrest. The AR also dismissed the plaintiff's application for a stay of proceedings. Both parties appealed. On appeal, the High Court affirmed the AR's decision to strike out the writ and to refuse the stay application. The question of damages for wrongful arrest remained to be determined.

## Held, allowing the defendant's appeal:

(1)    Damages for wrongful arrest could be awarded even if the warrant of arrest was not set aside. However, a warrant of arrest could not exist without an issuance of a valid *in rem* writ. Once the *in rem* writ was set aside, it followed that the warrant of arrest had to be set aside as well: at [20], [23] and [25].

(2)    Damages for wrongful arrest were awarded where there was malice, or where the action was so unwarrantably brought or brought with so little colour or so little foundation that it implied malice on the part of the arresting party. The test was ultimately premised on a finding of malice: at [27] and [31].

(3)    Malice could be inferred from the fact that a claim lacked merit. However, something more than a lack of reasonable or probable cause was required. The court would pay particular attention to what the arresting party knew, or must have known, at the time of the arrest. Where facts which clearly undermined the plaintiff's claim, and consequently, its right of arrest were known or must have been known to the plaintiff at the time of the arrest, or if the plaintiff knew at the time of the arrest that it had no reasonable or probable cause to arrest the vessel, the court would be more inclined to award damages for wrongful arrest. A finding of malice was ultimately a fact-sensitive exercise: at [32], [37], [39] and [42].

(4)    Material non-disclosure was a ground for awarding damages for wrongful arrest if the non-disclosure was deliberate, calculated to mislead, or if it was caused by gross negligence or recklessness. The duty of disclosure required the applicant for a warrant of arrest to draw the court's attention to material documents, even if they were exhibited in the supporting affidavit. An arresting party was not obliged to disclose all the defences which a defendant may reasonably raise at trial. It was only obliged to disclose, *inter alia*, defences which were of such weight as to deliver a "knock out blow": at [43], [44] and [48].

(5)    Given that s 7(1) of the IAA specifically granted the court the power to allow an arresting party to retain the arrested vessel as security for arbitration proceedings, the existence of an arbitration agreement was now far less relevant to the court's exercise of its *in rem* jurisdiction to issue a warrant of arrest. Therefore, the existence of an arbitration agreement was not always a material fact which had to be disclosed when applying for a warrant of arrest. An assessment of materiality should be made on a case by case basis. In this case, the plaintiff's omission to state its intention to proceed to arbitration did not constitute material non-disclosure: at [52], [54], [55] and [90].

(6)    Based on the correspondence prior to the arrest of the Vessel, the plaintiff must have known that it neither had a factual nor legal basis to assert that OW Singapore had acted as the defendant's agent in respect of the supply of the bunkers. It knew that the defendant had contracted with OW China for the supply of the bunkers at a higher price and on a different date, and it knew that there was a chain of contracts between itself, OW Singapore, OW China and the defendant. It also knew that it had never dealt with the defendant or delivered any of its invoices to the defendant for payment. Additionally, the fact that the plaintiff had contrived its case based on agency was borne out by the fact that the plaintiff did not raise the agency allegation in its initial two letters of demand to the defendant, and the fact that the plaintiff had filed a proof of debt against OW Singapore, the purported agent, for the same claim: at [61], [62], [66], [68], [69], [78] and [88(c)].

(7)    Factually, the plaintiff's case for obtaining the warrant of arrest was largely premised on the alleged transmission of "important commercial details" by the defendant to the plaintiff via OW Singapore. However, the plaintiff admitted

that this assertion was false as those commercial details in fact emanated from the plaintiff. The plaintiff's case was therefore not simply one with "so little foundation", or even a case with "no foundation", but was instead a case which the plaintiff knew or ought to have known was based on a false foundation: at [76], [77] and [83].

(8)    When applying for the warrant of arrest, the plaintiff drew the court's attention to the defendant's position that it was contractually obliged to pay OW China for the bunkers under a separate contract. However, it described the defendant's position as irrelevant to the plaintiff's contractual claim and made no attempt to surmount the challenges posed to its agency argument. This dismissive and cavalier attitude towards the defendant's position, which the plaintiff knew was effectively a "knock out blow" to its claim, was deserving of opprobrium: at [81] and [89].

(9)    The plaintiff was liable to pay the defendant damages for the wrongful arrest of the Vessel because it knew or must have known at the time of the arrest that its claim was entirely without factual or legal basis, and because it was, at the very least, grossly negligent and reckless in not sufficiently disclosing the defendant's position when applying for leave to issue the warrant of arrest: at [89].

[Observation: Damages for wrongful arrest could be pursued in at least three ways. Most commonly, it was sought in conjunction with an interlocutory application to strike out the writ. Next, due to non-disclosure of material facts, the shipowner could apply only to set aside the warrant of arrest and seek damages for wrongful arrest. The third mode which was less common was for the shipowner to provide security and defend the merits of the claim at the trial, and to seek damages for wrongful arrest as a counterclaim. There could be a fourth way, as seen from the decision in *The Trade Resolve* [1999] 2 SLR(R) 107, but such instances were rare: at [24].]

**Case(s) referred to**

*AA V, The* [1999] 3 SLR(R) 664; [2001] 1 SLR 207 (refd)

*Bunga Melati 5, The* [2012] 4 SLR 546 (refd)

*Catur Samudra, The* [2010] 2 SLR 518 (refd)

*Damavand, The* [1993] 2 SLR(R) 136; [1993] 2 SLR 717 (refd)

*Dilmun Fulmar, The* [2004] 1 SLR(R) 140; [2004] 1 SLR 140 (refd)

*Eagle Prestige, The* [2010] 3 SLR 294 (folld)

*Egyptian International Foreign Trade Co v Soplex Wholesale Supplies Ltd (The Raffaella)* [1985] 2 Lloyd's Rep 36 (distd)

*Evangelismos, The* (1858) 12 Moo PC 352; 14 ER 945 (folld)

*Evmar, The* [1989] 1 SLR(R) 433; [1989] SLR 474 (folld)

*Fal Energy Co Ltd v Owners of the Ship or Vessel "Kiku Pacific"* [1998] SGHC 370 (refd)

*Fierbinti, The* [1994] 3 SLR(R) 574; [1994] 3 SLR 864 (refd)

*First Energy (UK) Ltd v Hungarian International Bank Ltd* [1993] 2 Lloyd's Rep 194 (distd)

*Halcyon Isle, The* [1979–1980] SLR(R) 538; [1980–1981] SLR 14 (refd)

*Inai Selasih, The* [2005] 4 SLR(R) 1; [2005] 4 SLR 1, HC (refd)

*Inai Selasih, The* [2006] 2 SLR(R) 181; [2006] 2 SLR 181, CA (refd)

*Kiku Pacific, The* [1999] 2 SLR(R) 91; [1999] 2 SLR 595 (refd)

*Rena K, The* [1979] QB 377; [1978] 1 Lloyd's Rep 545 (refd)

*Skandinaviska Enskilda Banken AB (Publ), Singapore Branch v Asia Pacific
    Breweries (Singapore) Pte Ltd* [2011] 3 SLR 540 (folld)

*Trade Resolve, The* [1999] 2 SLR(R) 107; [1999] 4 SLR 424 (refd)

*Treasure Valley Group Ltd v Saputra Teddy* [2006] 1 SLR(R) 358; [2006]
    1 SLR 358 (refd)

*Vasiliy Golovnin, The* [2008] 4 SLR(R) 994; [2008] 4 SLR 994 (folld)

*Vasso, The* [1984] QB 477; [1984] 1 Lloyd's Rep 235 (refd)

*Yongnam Development Pte Ltd v Somerset Development Pte Ltd* [2004] SGCA 35
    (refd)

**Legislation referred to**

    High Court (Admiralty Jurisdiction) Act (Cap 123, 2001 Rev Ed) s 4(4)

    International Arbitration Act (Cap 143A, 2002 Rev Ed) ss 6, 7, 7(1)

    Rules of Court (Cap 322, R 5, 2014 Rev Ed) O 18 r 19(1)

*Lawrence Teh and Khoo Eu Shen (Rodyk & Davidson LLP) for the plaintiff;
Toh Kian Sing SC, Koh See Bin and Tan Yong Jin Jonathan (Rajah & Tann
Singapore LLP) for the defendant.*

[Editorial note: The plaintiff has filed an appeal to this decision in Civil Appeal No 2
of 2016 respectively. (As at 1 February 2016, the date of the Court of Appeal hearing
has not been fixed. For the most updated hearing dates, please refer to
www.supcourt.gov.sg.)]

4 December 2015                                    Judgment reserved.

**Steven Chong J:**

**Introduction**

1    The law on wrongful arrest was developed to protect shipowners
against malicious arrests or arrests brought with "so little colour" or "so
little foundation" that implies malice on the part of the arresting party.

2    Proof of actual malice is often difficult to establish, especially at the
interlocutory stage, where most applications for wrongful arrest are
pursued. However, the malice threshold can be satisfied by inference in
circumstances where the case is so hopelessly bereft of merit that it warrants
a finding that the claim is seriously lacking in "*colour*" or "*foundation*".

3    Ship arrest is an extremely draconian remedy. It can be very
disruptive and may inflict severe economic hardship on the shipowner's
trade and operations. In order for the protection against this draconian
measure to be meaningful and effective, the judicial threshold should not be
set too high so as to render the right to damages practically illusory.

4      In appropriate cases, where the threshold has been crossed, the court should express its opprobrium towards the arresting party's conduct by ordering it to be accountable for the damages occasioned by its wrongful arrest. Indeed, our courts have in a number of cases held the arresting party accountable for wrongful arrest.

5      After considering the facts and the arguments presented by the parties, I am satisfied that the line was crossed in this case. Not only was the arrest pursued, *inter alia*, on a *false* and/or factually and legally misconceived premise, there was also non-disclosure of material facts at the *ex parte* stage where the warrant of arrest was sought. The plaintiff must therefore bear the damages arising from the wrongful arrest of the vessel, *Xin Chang Shu* ("the Vessel").

**Factual background**

6      On 19 November 2014, the plaintiff commenced admiralty *in rem* proceedings against the defendant claiming US$1,768,000 for the supply of 4,000mt of marine bunker fuel to the Vessel. The claim was based on a contract for the supply of bunker fuel entered into between the plaintiff and OW Bunker Far East (Singapore) Pte Ltd ("OW Singapore") ("the Contract"). The plaintiff claims that OW Singapore was the defendant's agent and entered into the Contract on the defendant's behalf.

7      Prior to the arrest of the Vessel (on 10 December 2014), the parties exchanged a series of correspondence in which the defendant made its position and defence clear. Specifically, the defendant clearly informed the plaintiff of the following:

(a)    OW Singapore was not the defendant's agent and did not contract with the plaintiff in that capacity.

(b)    The defendant only dealt and contracted with OW Bunker China Limited ("OW China"), not OW Singapore or the plaintiff.

(c)    The plaintiff was not only one, but two layers removed from the defendant in the chain of bunker supply contracts. The defendant had contracted with OW China who had in turn contracted with OW Singapore and who eventually contracted with the plaintiff in respect of the same bunker supply but on different terms.

8      In the same chain of correspondence, the parties also negotiated the provision of alternative security to the plaintiff. No agreement was, however, reached prior to the arrest of the Vessel. The plaintiff insisted that the terms of the security should answer to any judgment "by any court or arbitral tribunal of competent jurisdiction", but the defendant was willing to furnish security that would answer only to a judgment of the Singapore court. Thus, on 9 December 2014, the plaintiff obtained a warrant of arrest and proceeded on 10 December 2014 to arrest the Vessel. On 12 December

2014, the parties agreed that the defendant would furnish security by way of payment into court in the sum of US$2.6m to secure the release of the Vessel, and the Vessel was duly released on the same day. The Vessel was thus arrested for approximately three days.

9       Shortly after, on 15 December 2014, the plaintiff filed Summons No 6218 of 2014 ("SUM 6218/2014") for a stay of proceedings in favour of arbitration under ss 6 and 7 of the International Arbitration Act (Cap 143A, 2002 Rev Ed) ("the IAA"). On 29 December 2014, in Summons No 6364 of 2014 ("SUM 6364/2014"), the defendant applied to strike out the proceedings, set aside the warrant of arrest, and applied for damages for wrongful arrest.

**The decision below and the appeals before me**

10       The plaintiff's application for a stay of proceedings in favour of arbitration (*ie*, SUM 6218/2014) and the defendant's application to strike out the proceedings, to set aside the warrant of arrest and for damages for wrongful arrest (*ie*, SUM 6364/2014) were heard together by the assistant registrar ("the AR"). In *The Xin Chang Shu* [2015] SGHCR 17 ("the AR's judgment"), the AR decided as follows:

(a)     the writ was struck out for being frivolous and/or vexatious pursuant to O 18 r 19(1) of the Rules of Court (Cap 322, R 5, 2014 Rev Ed) but not on the basis that s 4(4) of the High Court Admiralty Jurisdiction Act (Cap 123, 2001 Rev Ed) ("the HC(AJ)A") had not been complied with;

(b)     the security provided to the plaintiff by way of payment into court be returned to the defendant;

(c)     the stay application was dismissed;

(d)     there was no material non-disclosure on the plaintiff's part, and therefore, the warrant of arrest was not set aside; and

(e)     damages for wrongful arrest were not awarded.

11       Dissatisfied with the AR's decision, both the plaintiff and the defendant appealed. In Registrar's Appeals No 224 and 225 of 2015 ("RA 224/2015" and "RA 225/2015" respectively), the plaintiff appealed against the AR's decision in striking out its writ and in dismissing its stay application. In Registrar's Appeal No 226 of 2015 ("RA 226/2015"), the defendant appealed against the AR's decision in not awarding damages for wrongful arrest, and in not setting aside the writ and warrant of arrest on the basis of lack of admiralty jurisdiction and material non-disclosure respectively. At the appeal hearing, the defendant withdrew their appeal against the AR's finding that the court had admiralty jurisdiction.

12    After hearing the parties on 23 September 2015, I dismissed the plaintiff's appeals in RA 224/2015 and RA 225/2015 while I reserved judgment in relation to RA 226/2015.

13    I shall briefly explain my grounds for dismissing RA 224/2015 and RA 225/2015 because it has a material bearing on my present decision in RA 226/2015. In dismissing the plaintiff's appeals in RA 224/2015 and RA 225/2015, I agreed with the AR's reasoning, which I found to be commendably clear. In brief, the AR found that the plaintiff's claim, premised on the agency of OW Singapore, was *both* legally and factually unsustainable:

(a)    Based on the authority of *Yongnam Development Pte Ltd v Somerset Development Pte Ltd* [2004] SGCA 35, the defendant had to be aware of the plaintiff's mistaken belief for acquiescence on the defendant's part to constitute estoppel by representation (the AR's judgment at [50]–[52]).

(b)    No representation could be inferred from the defendant's silence or omission to disabuse the plaintiff of its mistaken belief unless the defendant was aware of the plaintiff's mistaken beliefs and had a duty to disclose certain facts (the AR's judgment at [53] and [57]).

(c)    The uncontroverted evidence was that there was no direct communication between the plaintiff and the defendant until the plaintiff sent its letter of demand dated 12 November 2014 to the defendant (the AR's judgment at [65]).

(d)    Even taking the plaintiff's evidence at its highest, there was nothing to show that the defendant was aware of the involvement of OW Singapore and the plaintiff in the supply of the bunkers (the AR's judgment at [68] and [69]).

(e)    The evidence on the chain of back-to-back sale and purchase agreements for the bunkers was not challenged by the plaintiff. The AR found that there was no overarching agreement between the plaintiff and defendant *via* the agency of OW Singapore. First, under the back-to-back contracts, the bunkers were sold at different prices; under the Contract *dated 30 September 2014* (US$442 per metric tonne), the agreement between OW Singapore and OW China *dated 30 September 2014* (US$445 per metric tonne) and the agreement between OW China and the defendant *dated 26 September 2014* (US$469 per metric tonne). Second, there is no evidence that the sales documentation issued by the plaintiff were ever transmitted to the defendant before the plaintiff's 12 November 2014 letter of demand. Third, none of the sales documentation issued by OW Singapore referred to the defendant as the buyer of the bunkers (the AR's judgment at [72]–[74]).

14    To this, I would add that based on the affidavit of John Kevin Phillips ("Mr Phillips") dated 8 December 2014 filed in support of the application for a warrant of arrest ("the arrest affidavit"), the plaintiff relied on two key facts to support its agency claim:

(a)    Its General Terms and Conditions for Sale and Delivery of Marine Bunkers from Big Port Service DMCC (incorporated by reference into the "Bunker Sales Confirmation" dated 25 September 2014 issued by the plaintiff and accepted by OW Singapore) ("GTC") which asserted that OW Singapore was contracting as agent on behalf of the shipowner (*ie*, the defendant).

(b)    The alleged supply of certain commercial details by OW Singapore, which purportedly gave the plaintiff the appearance that OW Singapore was fully authorised to conclude the Contract on the defendant's behalf.

This position was maintained on appeal. Notably, the plaintiff never asserted that the *defendant* did or said anything to lead the plaintiff to believe that OW Singapore was acting as its agent. As the AR noted, the plaintiff relied solely on the defendant's *omission* to act (see the AR's Judgment at [55]–[56]).

15    At the hearing before me, the defendant's counsel, Mr Toh Kian Sing SC ("Mr Toh"), pointed out that the commercial details referred to in the arrest affidavit were in fact supplied by the plaintiff, not OW Singapore. Having considered the evidence before me, in particular, the e-mail sent by the plaintiff's Mr Maxim Verbin to Ms Daria Kuznetsova of OW Singapore on 24 September 2014 at 4.07pm, I agree that the objective evidence suggests, contrary to the plaintiff's repeated assertions, that the commercial details were in fact supplied by the plaintiff, rather than OW Singapore. The plaintiff's reliance on OW Singapore's alleged supply of important commercial details is therefore based on a false premise, the consequences of which will be elaborated below.

16    Regarding the plaintiff's GTC, it is crucial to note that at its highest, the terms of the GTC only prove that OW Singapore *held itself out* to be an agent of the defendant. It is well established that the law does not recognise the notion of a "self-authorising" agent. As the Court of Appeal held in *Skandinaviska Enskilda Banken AB (Publ), Singapore Branch v Asia Pacific Breweries (Singapore) Pte Ltd* [2011] 3 SLR 540 ("*Skandinaviska*") at [38], "an agent who has no authority, whether actual or ostensible, to perform a certain act cannot confer upon himself authority to do that act by representing that he has such authority".

17    The plaintiff's counsel, Mr Lawrence Teh ("Mr Teh"), sought to rely on *Egyptian International Foreign Trade Co v Soplex Wholesale Supplies Ltd and PS Refson & Co Ltd (The Raffaella)* [1985] 2 Lloyd's Rep 36 ("*The Raffaella*") and *First Energy (UK) Ltd v Hungarian International*

*Bank Ltd* [1993] 2 Lloyd's Rep 194 ("*First Energy*") as exceptions to the self-authorising agent rule. These cases, however, were of no assistance to the plaintiff. As the Court of Appeal held in *Skandinaviska* at [51], both *First Energy* and *The Raffaella* were:

> … based on a specific finding of fact that the principal concerned had held out its agent as having authority to make, in relation to the transaction in question, representations of the class or kind of representations that the agent actually made, even though the agent knew he had no actual authority to enter into the transaction itself.

In the present case, there was no evidence, or even an assertion by the plaintiff, that the *defendant* (the purported principal) had held out OW Singapore as having authority to make representations relating to the bunker transaction on its behalf. The plaintiff had no reason to believe that OW Singapore was authorised to make representations about its authority to act on behalf of the defendant. In fact, as explained at [78] below, the defendant was not even aware of OW Singapore's involvement in the bunker transaction prior to this action. There was therefore no basis for the court to find that the defendant was bound by the Contract via the agency of OW Singapore.

**Setting aside the warrant of arrest**

18    Although the AR struck out the writ, he declined to set aside the warrant of arrest. It appears to me that the AR's decision on this score was in part the product of the manner in which the defendant's application and arguments were framed in the court below. The defendant applied to set aside the warrant of arrest on the basis of non-disclosure of material facts. Given the AR's finding that there was no material non-disclosure, he ruled as a consequence that the warrant of arrest should not be set aside. No submissions were made before the AR on whether the warrant of arrest should nevertheless be set aside as a consequence of the striking out of the *in rem* writ.

19    Before dealing with the merits of the defendant's arguments in support of its claim for damages for wrongful arrest, it is perhaps useful to begin by examining whether a warrant of arrest can exist independently of the *in rem* writ under which it was issued, and whether damages for wrongful arrest can be awarded if the warrant of arrest was not first set aside. It is necessary to embark on this analysis because it has an impact on the AR's decision in not setting aside the warrant of arrest notwithstanding the striking out of the *in rem* writ.

20    Although damages for wrongful arrest are typically awarded in cases where the warrants of arrest are also set aside, the setting aside of the warrant of arrest is strictly not an invariable requirement at law. It is correct that in a number of local cases where damages for wrongful arrest were awarded, the warrants of arrest were also expressly set aside (see *The*

*Dilmun Fulmar* [2004] 1 SLR(R) 140, *The Inai Selasih* [2005] 4 SLR(R) 1 (though the award of damages was reversed on appeal in *The Inai Selasih* [2006] 2 SLR(R) 181 ("*The Inai Selasih*")) and *The Vasiliy Golovnin* [2008] 4 SLR(R) 994 ). Further, *dicta* in cases such as *The Evmar* [1989] 1 SLR(R) 433 and *Treasure Valley Group Ltd v Saputra Teddy* [2006] 1 SLR(R) 358 ("*Treasure Valley*") may, *prima facie*, give the impression that the warrant of arrest must first be set aside before damages for wrongful arrest may be awarded. However, in my view, these decisions do not require the setting aside of the warrant of arrest as a *precondition* to an award of damages.

21    In *The Evmar* at [27], Chao Hick Tin JC (as he then was) held that the question of damages for wrongful arrest did not arise *at that stage* because there were no grounds to set aside the warrant of arrest. However, Chao JC's observation in the subsequent sentence makes it clear that he did not intend to lay down any principle that damages could only be awarded if and when the warrant of arrest was set aside. Chao JC stated "[w]hether any damages are due *eventually* to the defendants on account of that arrest would have to await the outcome of the substantive claim" [emphasis added]. The court therefore did not foreclose the possibility that damages for wrongful arrest may be *subsequently* awarded notwithstanding the fact that the warrant of arrest was not set aside.

22    Similarly, the court's observation in *Treasure Valley* at [32] that "there is no legal basis for a claim for an inquiry for damages for wrongful arrest to be assessed without the arrest being set aside" was made in the context of the defendant's failure to set aside the warrant of arrest at the *interlocutory* stage. In fact, the court went on to state explicitly at [33] that "a dismissal of the appeal does not bar the defendants and Ultramarine (if so advised) from pleading and contending at the trial that there was malice in bringing this action for possession".

23    There is therefore no rule that precludes an award of damages for wrongful arrest just because the warrant of arrest is not set aside. Clearly, in an interlocutory setting, if an application to set aside the warrant of arrest does not succeed, it would follow that there is some legal and/or factual basis to support the arrest of the vessel. That being the case, the underlying claim will have to be determined at the trial of the action. At the trial, it is open to the defendant to pursue a claim for wrongful arrest as a counterclaim in the action if so advised. This course of action was adopted by the defendant/shipowner in *Fal Energy Co Ltd v Owners of the Ship or Vessel "Kiku Pacific"* [1998] SGHC 370 ("*The Kiku Pacific (HC)*"). At the trial of the action, Choo Han Teck JC (as he then was) dismissed the plaintiff's *in rem* claim entirely and proceeded to consider the defendant's counterclaim for wrongful arrest even though there was no application to set aside the warrant of arrest. In that case, damages for wrongful arrest were *eventually* not awarded because the court found that there was no malice in the arrest. On appeal, the Court of Appeal affirmed Choo JC's

decision without commenting on the propriety of awarding damages for wrongful arrest where the warrant of arrest was not expressly set aside – see *The Kiku Pacific* [1999] 2 SLR(R) 91 ("*The Kiku Pacific*"). It is also worth mentioning that in *The Trade Resolve* [1999] 2 SLR(R) 107, Chan Seng Onn JC (as he then was) awarded damages for wrongful arrest even though he held that the *in rem* writ and warrant of arrest were both validly *issued* (see [17]). On the facts, damages for wrongful arrest were awarded because the court's *in rem* jurisdiction was not validly *invoked* when the plaintiff arrested the vessel outside the port limits of Singapore, which it *knew* it had no authority to do under the warrant of arrest (at [78]). The significance of the arresting party's *prior knowledge* on matters relating to its right of arrest to the question of malice will be expounded on below.

24     Based on the above discussion, damages for wrongful arrest can be pursued in at least three ways. Typically and most commonly, it is brought in conjunction with an interlocutory application to strike out the writ and as a consequence of the successful striking out, the warrant of arrest would fall away as well. By adopting this course of action, the shipowner seeks to convince the court that arising from the striking out, the claim is so lacking in merit that an inference of malice can and should be drawn. Next, there are instances where the shipowner does not seek to strike out the *in rem* writ because the claim is brought within the HC(AJ)A. However, due to non-disclosure of material facts which led to the issuance of the warrant of arrest, the shipowner applies *only* to set aside the warrant of arrest and seeks damages for wrongful arrest. This was done in *The Eagle Prestige* [2010] 3 SLR 294 albeit unsuccessfully on the merits. Proceeding by this mode, the *in rem* writ remains alive and if the shipowner is successful in setting aside the warrant of arrest, the arresting party would be at liberty to proceed with the claim *without security*. Depending on whether the malice threshold has been crossed, an award of damages may be made against the arresting party. The third mode which is less common is for the shipowner to provide security and defend the merits of the claim at the trial (as was done in *The Kiku Pacific (HC)*) and to seek damages for wrongful arrest as a counterclaim following the dismissal of the claim. In this way, neither the writ nor the warrant of arrest is set aside. A plaintiff is fully entitled to proceed with its claim for wrongful arrest in this manner. In fact, *The Trade Resolve* suggests that there could perhaps be a fourth way to pursue a claim for damages for wrongful arrest at the interlocutory stage without first applying to strike out the writ or even set aside the warrant of arrest. Such instances are rare given that damages were awarded in that case due to the unique circumstances of the court's finding that the arrest was effected knowingly and unlawfully outside the territorial jurisdiction of the courts.

25     In my judgment, it is clear that the setting aside of a warrant of arrest is not a prerequisite to pursuing a claim for damages for wrongful arrest. As stated in *The Evmar* ([20] *supra*) at [10] citing *The Vasso* [1984] 1 Lloyd's

Rep 235 at 241 with approval, "[t]he only prerequisite to the court's jurisdiction to issue a warrant of arrest is that a writ must have been filed in an action *in rem*". Following from this, it is clear that a warrant of arrest cannot exist without an issuance of a valid *in rem* writ. As such, once the *in rem* writ is set aside as was ordered by the AR and affirmed on appeal, it must follow that the warrant of arrest must be set aside as well. However, it does not follow that damages for wrongful arrest would be awarded as a matter of course. It remains for the court to examine whether the arrest was actuated by malice, express or inferred.

### Wrongful arrest of the Vessel

26    I now turn to the crux of the present judgment, which is the issue of damages for wrongful arrest raised by the defendant in RA 226/2015.

### *Principles governing the law on wrongful arrest*

27    In *The Vasiliy Golovnin* ([20] *supra*) at [134], the Court of Appeal affirmed the long-standing test set out in *The Evangelismos* (1858) 12 Moo PC 352; 14 ER 945 ("*The Evangelismos*") (at 359; 948):

> Undoubtedly there may be cases in which there is either *mala fides, or that crassa negligentia, which implies malice*, which would justify a Court of Admiralty giving damages, as in an action brought at Common law damages may be obtained. …

> The real question in this case … comes to this: is there or is there not, reason to say, that the action was *so unwarrantably brought, or brought with so little colour, or so little foundation, that it rather implies malice on the part of the Plaintiff, or that gross negligence which is equivalent to it?*

> [emphasis added]

28    Elaborating on the "focus or emphasis" of the inquiry under the two parts to *The Evangelismos* test, the Court of Appeal held at [137]:

> … Focusing on the *first part* of the passage … would mean that the inquiry would be *both an objective and a subjective one* into the *plaintiff's state of mind at the time of the arrest* as there would be a need to establish if the *plaintiff had a genuine and honest belief that the arrest was legitimate* then. On the other hand, if the focus is on the *second part* of the passage, this would mean *a more objective inquiry* into the circumstances prevailing and the evidence available at the time of the arrest, so as to *determine if the action and the arrest were so unwarrantably brought, or brought with so little colour, or so little foundation, as to imply that they were brought with malice or gross negligence* … [emphasis added]

29    The court then held that the inquiry should generally be focused on the second part of *The Evangelismos* test, *ie*, "whether the action and the arrest were so unwarrantably brought, or brought with so little colour, or so little foundation, as to imply malice or gross negligence on the plaintiff's part" (*The Vasiliy Golovnin* at [137]).

30    It thus appears that the test is ultimately premised on a finding of *malice* (see also, *The Kiku Pacific* ([23] *supra*) at [30]). Malice may be found on the basis of direct evidence of the plaintiff's state of mind at the time of the arrest, or it can be inferred if the claim is so unmeritorious that the arresting party could not have honestly believed that he had an entitlement to arrest the vessel (or at least recklessly disregarded whether he had grounds to do so).

31    Specifically, the action or arrest may be considered to have been brought "unwarrantably" or with "little colour" or with "little foundation" where, *inter alia*, there is "material non-disclosure in the affidavit in support of the warrant of arrest", or where "the writ of summons does not disclose a reasonable cause of action" (*The Vasiliy Golovnin* at [138]). Given that the defendant has, in the present case, relied on both these grounds to seek damages for wrongful arrest, it is helpful to consider them in some detail.

*No reasonable cause of action*

32    Malice may be inferred from the fact that a claim *lacks merit*. How weak, however, must the claim be before malice may be inferred? In *The Kiku Pacific* at [29], the Court of Appeal rejected the notion that malice may be inferred on the sole ground that there is no "reasonable or probable cause" for the arrest because it "dilute[s] the threshold required for an action in wrongful arrest to succeed". This explains why damages for wrongful arrest are not *always* awarded whenever the court strikes out the plaintiff's writ for lacking a reasonable cause of action and/or for being frivolous and vexatious (*eg*, *The Catur Samudra* [2010] 2 SLR 518). Instead, something *more* than a lack of reasonable or probable cause is required before damages for wrongful arrest may be awarded – the claim must have been brought with *so little colour or foundation that it implies malice*. In this regard, it is useful to examine how previous decisions have approached this issue when awarding damages for wrongful arrest.

33    In *The Dilmun Fulmar* ([20] *supra*), the plaintiff brought a claim against the shipowner for unpaid repairs and arrested the vessel. The plaintiff subsequently reached a settlement with the shipowner under which the shipowner agreed to pay for the repairs in instalments. Pursuant to this settlement agreement, the vessel was released. When the shipowner defaulted on the instalment payments under the settlement agreement, the plaintiff re-arrested the vessel. The plaintiff claimed that the settlement agreement entitled it to revive its original claim in the event of the defendant's default of any of the instalment payments, and it was therefore entitled to re-arrest the vessel. However, the sum claimed in the statement of claim, the affidavit leading the arrest, and the plaintiff's submissions, was the sum due and owing *under the settlement agreement* (at [9] and [10]). The High Court found that despite the non-payment of the instalments, the

plaintiff had affirmed the settlement agreement by electing to enforce it in the proceedings. The original cause of action had therefore been superseded, and the court had no jurisdiction in respect of the original claim (at [16]). The settlement agreement gave rise to a new cause of action which clearly did not fall under the court's admiralty jurisdiction. On this basis, Belinda Ang Saw Ean J concluded that the re-arrest of the vessel was *mala fide* and an abuse of the court process, and awarded damages for wrongful arrest (at [17] and [18]).

34    In *The AA V* [1999] 3 SLR(R) 664, which will be considered in greater detail below, damages were also awarded, *inter alia*, on the ground that the plaintiffs' claim lacked merit. The claim against the defendants for unpaid bunkers was premised on the case theory that New Acmes Trading Pte Ltd ("New Acmes") were the defendants' agent and had contracted with the plaintiffs on behalf of the defendants. Judith Prakash J awarded the defendant damages for wrongful arrest, and held that the plaintiffs had acted recklessly in arresting the defendants' vessel without investigating into whether the defendants were in fact contractually liable to them (at [50]). The learned judge found that the plaintiffs *knew* when arresting the vessel that they had dealt solely with New Acmes, and had no contact with the defendants (at [49]). By neglecting the information which would have caused doubt as to whether the defendants were the parties liable *in personam*, the plaintiffs had acted recklessly.

35    Finally, in *The Vasiliy Golovnin* ([20] *supra*), the plaintiffs, Crédit Agricole (Suisse) SA ("Crédit Agricole") and Banque Cantonale de Genève SA ("BCG"), arrested Far Eastern Shipping Co plc's ("FESCO") vessel, the *Vasiliy Golovnin*, in respect of a claim against FESCO arising out of a contract of carriage relating to a sister ship, the *Chelyabinsk*, and for damage to their goods. FESCO had chartered out the *Chelyabinsk* to Sea Transport Contractors Ltd ("STC"), which, in turn, sub-chartered the vessel to Rustal SA ("Rustal"). Five bills of lading were issued in respect of some Indian rice cargo, and the port of discharge was stipulated in each of the bills of lading to be Lomé, Togo. Crédit Agricole and BCG provided financing to Rustal, and held the bills of lading as security. The parties had initially agreed to effect a change of the port of discharge from Lomé to Douala in Cameroon. The agreed switch of the bills of lading, however, did not ultimately take place because there was a breakdown in the arrangement. Following the breakdown, STC informed FESCO not to switch the bills of lading and not to enter the port of Douala unless further instructions were given. It transpired that STC was embroiled in a dispute with Rustal over unpaid hire for the chartered vessel. Subsequently, STC instructed FESCO to discharge the cargo at the port of Lomé, in accordance with the bills of lading. Soon after, FESCO received conflicting requests from Crédit Agricole and BCG insisting that the cargo be discharged at Douala. FESCO informed the banks that it could not discharge the cargo at

Douala without STC's approval, and thereafter, discharged the cargo at Lomé. There were allegations that part of the cargo was damaged upon the discharge of the cargo, but security for this claim was provided by way of a letter of undertaking from the vessel's protection and indemnity club. After the cargo was discharged, the banks arrested the *Chelyabinsk* in Lomé in connection with their claims for the damage to the cargo as well as for FESCO's refusal to effect discharge of the cargo at Douala. FESCO successfully applied to set aside the arrest. The Lomé court found, *inter alia*, that FESCO was not at fault for acting on the instructions of STC, the charterers, as it was bound to do so. Further, sufficient security had already been provided for the damaged cargo claim. The banks did not appeal against this order.

36      Subsequently, the banks arrested the sister ship of the *Chelyabinsk*, the *Vasiliy Golovnin*, in Singapore. FESCO applied to strike out the writ, set aside the arrest and sought damages for wrongful arrest. The writ was struck out by the assistant registrar and the striking out was affirmed on appeal, but both the assistant registrar and the High Court on appeal declined to award damages for wrongful arrest. On further appeal by both parties, in addition to affirming the decision to strike out the writ and to set aside the warrant of arrest, the Court of Appeal also awarded FESCO damages for wrongful arrest. Not only did the court find that material facts were not disclosed when obtaining the warrant of arrest, the court also found that the arrest was without any reasonable basis. Given the merits of the banks' claims had already been considered and dismissed by the Lomé court, the banks *must have been aware* that they had no basis to arrest the *Vasiliy Golovnin* in Singapore (at [145]). In fact, the Court of Appeal found that "there was no foundation" (at [146]) and further found that the "[b]anks' claims against FESCO for failing to comply with their instructions to discharge the cargo at a port other than Lomé were, politely put, absurd" (at [148]).

37      Notwithstanding the high threshold of *The Evangelismos* test, it can be seen that our courts would not be slow to find wrongful arrest and to award damages in appropriate circumstances. Indeed, this sentiment was expressed by the Court of Appeal in *The Vasiliy Golovnin* at [135]. From the above cases, it is clear that the court will pay particular attention to *what the arresting party knew, or must have known, at the time of the arrest* (see [34] and [36] above). Where facts which *clearly* undermine the plaintiff's claim, and consequently, its right of arrest are known or must have been known to the plaintiff at the time of the arrest, the courts will be more inclined to award damages for wrongful arrest.

38      In this regard, the question as to how weak a claim must be before malice can be inferred is perhaps a question that cannot be comprehensively answered in every case by a single threshold test. While the courts have held that malice may be inferred if the claim is *without*

*colour or foundation*, what that means in practice is inevitably a matter of judgment, and can only be determined by the court on the facts of each case.

39    I would add at this juncture that because the focus of the inquiry is on malice of the arresting party, special attention should be paid to *what the arresting party knew or must have known at the time of the arrest*. While this is not the only factor the court should consider, it is certainly an important one in evaluating the merits of the claim for wrongful arrest. If, based on the information available, the court finds that the arresting party knew or must have known that it had no reasonable or probable cause to arrest the vessel, the court may well be justified in awarding damages for wrongful arrest. By contrast, if the court only arrives at the finding that the arresting party had no reasonable or probable cause to arrest the vessel after a legal analysis of the jurisdictional basis of the claim (as in the case of *The Inai Selasih* ([20] *supra*)), or based on documents or information which were not available to the arresting party at the time of the arrest, the judicial finding in such circumstances *may* not be a sufficient basis for an award of damages.

40    While *The Kiku Pacific* ([23] *supra*) did reject the use of the phrase "reasonable or probable cause" (see [32] above), it did so, in my view, in the context of counsel's submission that an absence of a reasonable or probable cause *alone* can be sufficient to give rise to an inference of malice (see *The Kiku Pacific* at [18]). I accept that the absence of a reasonable or probable cause *alone* would not normally be sufficient to give rise to a finding of malice. However, if the court finds not only that there was no reasonable or probable cause for the arrest, but also that the arresting party knew or must have known that it did not have reasonable or probable cause at the time of the arrest, malice may be inferred and damages for wrongful arrest accordingly awarded.

41    The critical difference between cases where the arresting party knows or must have known that it had no reasonable cause of action at the time of the arrest, and cases where no such finding on the knowledge of the arresting party is made, may explain in part why the courts award damages for wrongful arrest only in *some* cases where the admiralty *in rem* writ is struck out. The fact that an arrest is made on the basis of a plainly and obviously unsustainable claim may not *always* justify an award of damages. In *The Inai Selasih*, while the appellant's writ and warrant of arrest were set aside summarily, the Court of Appeal was satisfied that "the appellant genuinely thought that it had a claim in admiralty"; the court found that the appellant was merely "wrong in its interpretation or perception of the entire arrangement" (at [32]). In other words, the arresting party did not know *at the time of the arrest* that it did not have a reasonable cause of action to arrest the vessel. As the Court of Appeal observed at [32], the correct inquiry is whether:

> ... the appellant applied for the Warrant of Arrest *knowing or honestly believing* that it could not legitimately arrest the ship or *failing to apply its mind* as to whether it could legitimately arrest the vessel and nevertheless proceeding to do so. [emphasis added]

42     Thus, to conclude, a claim that is "so unwarrantably brought, or brought with so little colour, or so little foundation" may *alone* be sufficient to justify a finding of malice, regardless of the arresting party's subjective state of mind at the time of the arrest. The finding of malice would be made even more compelling in circumstances where the court determines that the arresting party knew or must have known that it had no reasonable cause of action when arresting the vessel. Malice, however, remains the centrepiece of the inquiry, and a finding of malice is ultimately a fact-sensitive exercise.

*Material non-disclosure*

43     Material non-disclosure is a ground for setting aside a warrant of arrest and consequently, for awarding damages for wrongful arrest if the non-disclosure is deliberate, calculated to mislead, or if it was caused by gross negligence or recklessness (*The Vasiliy Golovnin* ([20] *supra*) at [140], *The AA V* ([34] *supra*) at [50]). The test of materiality for non-disclosure was summarised in *The Damavand* [1993] 2 SLR(R) 136 at [30] (cited with approval in *The Vasiliy Golovnin* at [85]):

> [T]he test of materiality is whether the fact is relevant to the making of the decision whether or not to issue the warrant of arrest, that is, a fact which should properly be taken into consideration when weighing all the circumstances of the case, though it need not have the effect of leading to a different decision being made. ...

44     The duty of disclosure requires the applicant for a warrant of arrest to draw the court's attention to material provided, even if they are exhibited in the supporting affidavit. As observed in *The Vasiliy Golovnin* at [94], "it is not open to a plaintiff to say that it has fulfilled its duty to make full and frank disclosure because the relevant facts can be distilled somewhat from somewhere in the voluminous exhibits filed".

45     In the present case, the defendant relies on the plaintiff's failure to sufficiently disclose the defences available to the defendant and the fact that security was sought in aid of arbitration. It is thus important to clarify the extent of an arresting party's duty to disclose the defences available to the defendant and the existence of and reliance on any arbitration agreement.

(1)     Disclosure of defences

46     In *The Vasiliy Golovnin* at [87], the Court of Appeal held that the arresting party had a duty to disclose "defences that might be reasonably raised by the defendant", but that the duty only extended to "plausible, and not all conceivable or theoretical, defences". In the immediate aftermath of

*The Vasiliy Golovnin*, there was some uncertainty as to whether the Court of Appeal had expanded the scope of disclosure to include all the defences a defendant may reasonably raise to the plaintiff's claim (see Chan Leng Sun, Teo Cheng Chuah Jack & Toh Kian Sing, "Admiralty, Shipping and Aviation Law" (2008) 9 SAL Ann Rev 54 at paras 2.13 and 2.21).

47    The question about the meaning and scope of "plausible defences" was subsequently considered in *The Eagle Prestige* ([24] *supra*). In that case, the defendant had applied to set aside the warrant of arrest on the ground of material non-disclosure. In particular, the defendant argued on the strength of *The Vasiliy Golovnin* that the plaintiff had failed to disclose the defences available to the defendant when obtaining the warrant of arrest. In discussing the scope of the duty to disclose "plausible defences", Ang J held that it was "*not* generally directed at defences to the claim that may be raised at the trial in answer to the plaintiff's claim" [emphasis in original] (at [73]). Instead, "plausible defences" are (at [75]):

> *matters that show up the claim as an abuse of process, or one that it is so obviously frivolous and vexatious as to be open to summary dismissal and, on any reasonable view, their omission, at the application stage, is tantamount to or constitutes an abuse of process.* [emphasis in original]

These objections were further described as matters "of such weight as to deliver the 'knock out blow' to the claim summarily" (at [73] and [84]).

48    I agree with Ang J's interpretation of *The Vasiliy Golovnin* ([20] *supra*). In my view, an arresting party is not obliged to disclose all the defences which a defendant may reasonably raise at trial. It is only obliged to disclose, *inter alia*, defences which are of such weight as to deliver, in Ang J's words, a "knock out blow".

49    This understanding of the duty of disclosure is consistent with the underlying principle governing material non-disclosure – which is that only facts which are *relevant* to the *ex parte* application need to be disclosed. Commenting on the process of obtaining a warrant of arrest, Ang J observed that (*The Eagle Prestige* at [74]):

> *The concerns of the court at the application stage are firstly, with considerations of jurisdiction in rem (and generally not the merits of the claim) and secondly, disclosure of material facts which are germane to considerations of jurisdiction in rem and overlaying that is the absence of facts and circumstances suggesting an abuse of the arrest process.* [emphasis in original]

Given that the merits of the arresting party's claim are *not generally relevant* when obtaining a warrant of arrest, it must follow that there is generally no duty to disclose defences which only affect the merits of the underlying claim (as opposed to the admiralty jurisdiction of the court). As Ang J opined, "[e]nlarging the duty to disclose plausible defences would effectively let in an aspect of considering the merits of the claim by the backdoor" (*The Eagle Prestige* at [75]).

50     Indeed, the Court of Appeal in *The Bunga Melati 5* [2012] 4 SLR 546 at [94] confirmed that *The Vasiliy Golovnin* "did not intend to introduce a new merits requirement for the invoking of admiralty jurisdiction". As was opined in Chan Leng Sun, Teo Cheng Chuah Jack & Toh Kian Sing, "Admiralty, Shipping and Aviation Law" (2012) 13 SAL Ann Rev 46, by endorsing Ang J's view that "the strength of the plaintiff's claim on the merits did not go to jurisdiction", the Court of Appeal (at para 2.14):

> ... appears to have also endorsed Ang J's observation in the court below as well as in *The Eagle Prestige* that a plaintiff is not required to disclose defences to the claim at the stage of applying for a warrant of arrest, unless those defence [*sic*] are of a nature that may potentially result in the action being struck out ...

(2)    Disclosure of arbitration clauses

51     Is the existence of an arbitration agreement between the parties a material fact that must be disclosed when obtaining a warrant of arrest? In *The Evmar* ([20] *supra*) at [13]–[14], Chao JC held that the omission to disclose the arbitration clause in the bill of lading and the failure to depose that the defendants were not able to satisfy the arbitration award did not constitute material non-disclosure. It should be noted that Chao JC came to this conclusion even though there was no equivalent of s 7 of the IAA in force then. When *The Evmar* was decided, a party could only arrest a vessel in aid of an arbitration if it satisfied the court that the defendant would not be able to satisfy an arbitration award which might eventually be obtained against it (see *The Rena K* [1978] 1 Lloyd's Rep 545, cited in *The Evmar* at [23]). Chao JC reasoned that because the defendants could have allowed the action to proceed and not apply to stay the action, the question whether the parties would eventually abandon the *in rem* action and proceed with arbitration, and hence whether the defendants were able or unable to satisfy an arbitration award, did not arise at that stage (at [14]).

52     In my view, Chao JC's holding applies with even more force now in light of s 7 of the IAA. Section 7(1) specifically grants the court the power to order that "the property arrested be retained as security for the satisfaction of any award made on the arbitration", or that "equivalent security" be provided. The common law requirement that the arresting party must prove that the defendant would not be able to satisfy any eventual arbitration award has been supplanted. The court's jurisdiction to arrest a ship is no longer confined to providing security in respect of an action *in rem* (for the previous common law position, see *The Andria now renamed Vasso* [1984] 1 QB 477 at 490–491). An arresting party now may arrest a vessel as security for arbitration proceedings under the IAA. It follows that the existence of an arbitration agreement is now far less relevant to the court's exercise of its *in rem* jurisdiction to issue a warrant of arrest; the *same test* focused on the admiralty jurisdiction of the court (see *The Bunga*

*Melati 5* at [112]) applies regardless of whether the vessel is arrested to obtain security for Singapore court proceedings or arbitration proceedings.

53    Mr Toh however pointed out that the Court of Appeal in *The Vasiliy Golovnin* ([20] *supra*) at [40] appears to have taken the contrary view that "[i]t is *necessary* for a party who intends to *rely* on an arbitration agreement to disclose this to the court in an *ex parte* application" [emphasis in original]. It must first be noted that the Court of Appeal's observation was *not* made in the context of setting aside the warrant of arrest on the ground of material non-disclosure. In fact, the Court of Appeal's decision on material non-disclosure in *The Vasiliy Golovnin* was not based on the appellant's failure to disclose the arbitration clause (see *The Vasiliy Golovnin* at [106]). Instead, these observations were made in the context of the appellant's submissions that the court below had erred in determining the merits in striking out the writ when the dispute should rightly be referred to arbitration (*The Vasiliy Golovnin* at [29]). This submission was a complete non-starter because it was the respondent's prerogative to choose to strike out the *in rem* writ, rather than apply to stay the proceedings.

54    In any case, I do not think that the Court of Appeal intended to lay down any *rule* that a failure to disclose an intention to rely on an arbitration agreement would *always* constitute material non-disclosure such as to justify the setting aside of the warrant of arrest. It cannot be said that the existence of an arbitration agreement would *always* be a material fact. Instead, the Court of Appeal's observation must be read in the context of the reasons it gave for the relevance of the existence of an arbitration agreement to the court's decision to issue a warrant of arrest (see *The Vasiliy Golovnin* at [40]). I agree with the AR (see the AR's Judgment at [128]–[130]) that an assessment of materiality should be made on a case by case basis, keeping in mind the considerations stated in [40] of *The Vasiliy Golovnin* (*eg*, the need to avoid directly or indirectly pronouncing on the merits). However, as the AR correctly reasoned at [130] of his judgment, at the stage of obtaining a warrant of arrest, the court would generally not be pronouncing on the merits of the claim. The need for the court to be cognisant of any arbitration agreement to avoid the risk of trespassing onto the jurisdiction of the arbitral tribunal is thus usually not engaged at that stage.

55    To sum up, I am of the view that there is no definitive rule requiring the disclosure of an arbitration agreement for the purposes of obtaining a warrant of arrest. The materiality of an arbitration agreement must be assessed on a case by case basis. If the arbitration agreement cannot reasonably be considered relevant to the decision to issue a warrant of arrest, especially in light of s 7 of the IAA which expressly provides for the retention of property arrested or provision of alternative security to satisfy an arbitration award, the failure or omission to disclose the arbitration agreement should *not per se* constitute material non-disclosure. And, even

if the court finds that the existence of an arbitration clause is a material fact that should have been disclosed, consideration should always be given to the impact of the arresting party's default, and whether the court should nevertheless exercise its "overriding discretion" not to set aside the warrant of arrest (*The Vasiliy Golovnin* at [84], citing *The Fierbinti* [1994] 3 SLR(R) 574 at [41]).

### Grounds relied on by the defendant

56    Having set out the governing principles on the law of wrongful arrest, I will turn to consider the grounds advanced by the defendant for its claim for damages:

(a)    The plaintiff mis-portrayed its claim as a straightforward claim for unpaid bunkers when obtaining the warrant of arrest.

(b)    The plaintiff's case was conjured *ex post facto* after the insolvency of the OW Bunker group.

(c)    The plaintiff persisted with the arrest despite being confronted with the contractual chain of bunker supply contracts (plaintiff – OW Singapore – OW China – defendant).

(d)    The plaintiff wrongfully alleged in the arrest affidavit that OW Singapore, acting as the defendant's agent, had supplied "important commercial details" for the bunker supply when the commercial details had originated from the plaintiff and not OW Singapore.

(e)    The plaintiff did not disclose the arbitration clause at the *ex parte* application.

(f)    The plaintiff falsely asserted that it had previous course of dealings with the defendant through OW Singapore involving vessels *WMS Amsterdam* and *Tong Hai*.

### The plaintiff's basis for arresting the Vessel

57    As stated at [14] above, the arrest affidavit was sworn by Mr Phillips on 8 December 2014. It is clear from the arrest affidavit that the *sole basis* of the plaintiff's claim against the defendant is that the party who ordered the bunkers, OW Singapore, had acted as the defendant's agent in the transaction. This much is clear from para 6, which expressly states "the Plaintiff was contacted by Daria Kuznetsova, a bunker trader with OW Bunker Far East (Singapore) Pte Ltd ("the Defendant's agent")". The agency allegation is essentially repeated and somewhat embellished in paras 11, 13, 16 and 24 of the arrest affidavit.

58    Given that there was no direct dealing or communication between the defendant and the plaintiff *at any time prior* to the supply of the bunkers (see [13(c)] above), what then was the basis of the plaintiff's belief that OW Singapore had acted as the defendant's agent in ordering the bunkers?

59    As outlined at [14] above, from the arrest affidavit, it would appear that the plaintiff had two bases for its assertion of agency:

> (a)    OW Singapore's acceptance of the plaintiff's Bunker Sales Confirmation dated 25 September 2014, which in turn incorporated the GTC under which OW Singapore confirmed that the order was placed on behalf of the Vessel's registered owner, *ie*, the defendant.

> (b)    The alleged transmission of "important commercial detail of [*sic*] relating to the Vessel and the manner in which marine bunker fuel was to be supplied by the Plaintiff to the Vessel". According to the plaintiff, the transmission of the commercial details by OW Singapore to the plaintiff gave the "appearance" that OW Singapore was fully authorised by the defendant to order the bunkers on its behalf.

60    From my examination of the evidence before me, as briefly discussed at [15]–[17] above, it is clear that these two alleged bases are groundless, misleading and somewhat false. Before embarking on a closer scrutiny of the facts leading to my conclusion that the two bases do not support the plaintiff's case, it is perhaps apposite, as forcefully submitted by Mr Toh, to first examine the correspondence exchanged between the parties immediately preceding the arrest of the Vessel. The correspondence would reveal the information relating to the alleged agency which was available to the plaintiff *prior to the arrest of the vessel*, and that would assist in the inquiry as to the state of the plaintiff's knowledge then. As elaborated at [39] above, the material inquiry is to examine "*what the arresting party knew or must have known at the time of the arrest*".

### Information available to the plaintiff prior to the arrest of the Vessel

61    Shortly after the supply of the bunkers to the Vessel on 1 and 2 November 2014, an event caused the plaintiff to communicate directly with the defendant *for the first time* – the announcement of the insolvency of the parent company of OW Singapore, OW Bunker Trading A/S, on or about 7 November 2014, which was followed shortly by the commencement of winding-up proceedings against OW Singapore in Singapore on or about 13 November 2014. It is critical to examine the correspondence exchanged between the parties because it would amply demonstrate that the plaintiff must have known that it neither had a factual nor legal basis to assert that OW Singapore had acted as the defendant's agent in respect of the supply of the bunkers. More importantly, despite knowing the defendant's position prior to the arrest, no legitimate effort was made in the arrest affidavit to address the court as to why or how OW Singapore could conceivably have acted as the defendant's agent. Instead, as will be elaborated below, the plaintiff sought to give the false appearance that the defendant had authorised OW Singapore to order the bunkers on its behalf. As regards the point that the defendant had contracted with OW China, all that Mr Phillips said was that "any alleged involvement of OW China is

*irrelevant* to the Plaintiff's contractual claim against the Defendant" [emphasis added]. As is now clear from the striking out of the plaintiff's claim, the involvement of OW China was not only entirely relevant, it in fact operated as the effective "*knock out blow*" àla The Eagle Prestige.

62     The direct communication between the parties commenced with a letter of demand dated 12 November 2014 from the plaintiff to the defendant. It is pertinent to observe that in the letter, the legal basis of the plaintiff's claim was stated to be a "lien on the supplied vessel [which] stems (amongst other grounds) from the terms and conditions stipulated by us vis-à-vis both O.W. Bunker Far East (Singapore) Pte Ltd and the vessel owners". The plaintiff did not condescend to explain what "amongst other grounds" was meant to include. There is, however, a conspicuous absence of any assertion that OW Singapore had acted as the defendant's agent in respect of the supply of the bunkers. As mentioned at [57] above, the ground that OW Singapore had acted as the defendant's agent has since become the *only* basis for the plaintiff's claim and the issuance of the warrant of arrest. If this was in fact the plaintiff's belief and understanding all along, I would have expected this ground to be specifically highlighted, instead of being camouflaged (if at all) under the rubric of "amongst other grounds".

63     The plaintiff sent a reminder to the defendant on 14 December 2014. The letter of demand and the reminder letter contained some details of the claim which have a material bearing on the legitimacy of the arrest. First, it identified the invoice which the plaintiff is relying on – invoice no 1014090. Second, the amount owing under the invoice is stated to be US$1,768,000. Finally, it sought to charge interest at 5% per month from the due date of 14 November 2014. I will return to explain the significance of these details when the defendant's contract with OW China and the plaintiff's proof of debt against OW Singapore are examined below. As the defendant never had any dealings with the plaintiff before, a robust reaction from the defendant was hardly unexpected.

64     In the defendant's response by e-mail dated 17 November 2014, the defendant categorically informed the plaintiff that it had ordered the bunkers from OW China and consequently, it "has the contractual obligation to pay" OW China. The defendant warned the plaintiff that "any business interruption (such as a ship arrest) suffered, and/or any purported exercise of a lien" would be vigorously challenged since the plaintiff's letter of demand had specifically alluded to the purported existence of a lien.

65     On 17 November 2014, the plaintiff's solicitors, Rodyk and Davidson LLP ("Rodyk") entered the scene. Rodyk wrote to the defendant to allege that the defendant had bought, through OW Singapore (the defendant's alleged agent), 4,000mt of bunkers at US$442 per metric tonne from the plaintiff and that a sum of US$1,768,000 is due and owing from the defendant. This was the *first time* the plaintiff asserted that OW Singapore

had acted as the defendant's agent in the bunker supply. It is clear from the letter that the plaintiff had purported to rely on the signing of the Bunker Sales Confirmation by OW Singapore *as a warranty by OW Singapore* that it was authorised to order the bunkers on the defendant's behalf. Rodyk also asserted in the letter that "[t]he communication between you and your agent … show that you had authorised specifically your agent to conclude the sale on your behalf". This alleged "communication" was the ostensible basis of the plaintiff's belief that OW Singapore had acted as the defendant's agent. The letter further stated that "despite the delivery of [the plaintiff's] invoice and despite [the plaintiff's] reminder letters to [the defendant] of 12th and 14th November 2014", the defendant had failed to pay the amount due and owing under the plaintiff's invoice.

66     These assertions are either misleading or false. First, there was never any communication between the defendant and OW Singapore prior to the bunker supply. It is telling that no such correspondence was ever disclosed in any of the plaintiff's affidavits. Second, the plaintiff knew that its invoice was never delivered to the defendant prior to its 12 November 2014 letter of demand. It was instead delivered to its contracting party, OW Singapore. The fact that the invoice was unilaterally addressed to all and sundry – "To MASTER AND/OR OWNERS AND/OR AGENT AND/OR OPERATORS AND/OR CHARTERERS OF M/V XIN CHANG SHU" – does not change the undeniable fact that the invoice was to the plaintiff's explicit knowledge never actually delivered to the defendant for payment.

67     In a further letter of 20 November 2014, Rodyk reiterated the plaintiff's case that it "had dealt solely with [the defendant's] agent", OW Singapore. Implicitly, it acknowledged that it never dealt with the defendant. It is clear from the letters sent by the plaintiff (whether directly, or through its solicitors) that no specific allegation was ever made that the defendant had done anything to lead the plaintiff to believe that it had appointed OW Singapore to act as its agent for the bunker supply.

68     In response, the defendant's English solicitors, Stephenson Harwood ("Stephenson"), wrote to Rodyk on 25 November 2014 to reiterate the defendant's stance that it had contracted with OW China and not OW Singapore. More importantly, the reply made it clear that OW Singapore was never the defendant's agent. Stephenson also provided Rodyk with a copy of the contract between OW China and the defendant dated 26 September 2014 for the purchase of the same bunkers. A simple perusal and comparison of the contract between the defendant and OW China and the Contract would reveal significant differences in the terms. This dispels any notion that OW Singapore was acting as the defendant's agent, or at least casts serious doubts on the agency case theory. Apart from the obvious differences in the identities of the sellers and the dates of the contracts, the following differences are critical:

(a)   The price under the OW China/defendant contract was stated as *US$469 per metric tonne* which is to be contrasted with the price of *US$442 per metric tonne* as stipulated under the Contract.

(b)   Payment is due within *30 days* of the supply under the OW China/defendant contract instead of *14 days* under the Contract.

(c)   Default interest of 5% per month from the due date is payable under the Contract while there is no reference to any default interest under the OW China/defendant contract.

69     These salient differences would and should have alerted the plaintiff to the fact that OW Singapore had acted as principal and not as agent for the defendant in entering into the Contract. This becomes even clearer when the plaintiff's proof of debt against OW Singapore is examined below. At any rate, if the plaintiff was still minded to proceed with the arrest, it was at least incumbent on the plaintiff to address these obstacles which clearly laid in the way of its agency case theory. It must have been apparent to the plaintiff that it makes no sense for the defendant to order the bunkers from the plaintiff *via* the alleged agency of OW Singapore at a price of *US$442 per metric tonne* and at the same time enter into a *separate contract* to purchase the same quantity of bunkers from OW China at a higher price of *US$469 per metric tonne*.

70     On 24 November 2014, the defendant's Singapore solicitors, Rajah & Tann Singapore LLP ("R&T") wrote to Rodyk to re-emphasise that the "allegation that [OW Singapore] had acted as [the defendant's] agent in relation to the bunker supply is completely groundless". Based on the correspondence disclosed in the affidavits before me, there does not appear to be any response from Rodyk as to why the plaintiff believed that OW Singapore had acted as the defendant's agent in spite of the fact that the defendant had entered into a separate contract with OW China to purchase the same bunkers on entirely different terms.

71     Against this backdrop, it is now appropriate to examine the assertions and omissions in the arrest affidavit with a view to determining whether the plaintiff had crossed the threshold for an award of damages for wrongful arrest. By the time Mr Phillips filed the arrest affidavit, all the information disclosed in the exchange of correspondence described above was available to the plaintiff. How did the plaintiff address the agency issue when obtaining the warrant of arrest?

*Assertions and omissions in the arrest affidavit*

72     The plaintiff relied heavily on its own GTC to support its claim that OW Singapore had acted as the defendant's agent. The arrest affidavit is saturated with copious references to the plaintiff's GTC. In particular, the plaintiff referred to cll 3.2 and 10.11 of the plaintiff's GTC which state, *inter alia*, that the sale and delivery of the bunkers was "for the account of the

registered owners" and "all sales … are made to the registered owner", respectively. According to the plaintiff, OW Singapore had confirmed that it acted as the defendant's agent by signing the Bunker Sales Confirmation issued by the plaintiff, which incorporated the GTC.

73    The short answer to the plaintiff's misconceived references to its own GTC is that none of them can remotely assist the plaintiff to establish an agency relationship between OW Singapore and the defendant. As explicated at [16]–[17] above, it is trite law (an expression which I use very sparingly) that a person cannot hold itself out as an agent on behalf of a principal. Equally, a third party cannot unilaterally create an agency relationship when none existed by relying on its own terms without the knowledge or consent of the principal. In this case, it is clear beyond peradventure that at no time prior to the supply of the bunkers did the plaintiff deal with the defendant (see [13(c)] and [66] above). It has not been alleged in the exchange of correspondence prior to the arrest or in the arrest affidavit that the *defendant* did *anything* to lead the plaintiff to believe that OW Singapore was acting as its agent. The only suggestion that the defendant had acted to lead the plaintiff to believe that OW Singapore was its agent relates to the alleged transmission of "important commercial details", which I will now deal with.

74    It appears to me that the plaintiff was well aware of the need to establish some direct linkage between itself and the defendant in respect of the supply of the bunkers in order to justify the intended arrest of the Vessel. Here, the imperative to do so heightened because the plaintiff had, in its letter of demand dated 12 November 2014, alluded to a "lien" as the "legal basis" of its claim. Realising that such a lien for necessaries is not recognised under Singapore law (see *The Halcyon Isle* [1979–1980] SLR(R) 538), the plaintiff needed to construct or perhaps contrive a case based on agency for it to have any hope of arresting the Vessel in Singapore. How did the plaintiff seek to achieve this? In my view, it sought to do so in a most misleading manner in paras 8 and 17 of the arrest affidavit:

> 8      It will also be seen from the Purchase Order Confirmation that beneath the details that I have described above, *there are details given by the Defendant's agent on the commercial aspects of the supply.* The Defendant's agent the [*sic*] records the commercial details relating to the supply or [*sic*] marine bunker fuel to the Vessel, for example, that the marine bunker fuel is to be supplied by 2 barges (with technical specifications), details on Kavkaz port, the time within which the marine bunker fuel is to be delivered to the Vessel, the requirement that all documentation is to be sent at least 4 days before the estimated time of arrival of the Vessel in Kavkaz, that 5, 4, and 3 days advance notice of the estimated time of arrival of the barges is to be notified to the local agent of the Vessel with an email copy to the Plaintiff … *I respectfully request the Court to take note of these two aspects of the Purchase Order Confirmation …*

SINGAPORE LAW REPORTS

> 17    … I would also add that the Defendant for its part authorised the Defendant's agent to transmit important commercial detail of [*sic*] relating to the Vessel and the manner in which marine bunker fuel was to be supplied by the Plaintiff to the Vessel. *This gave the Plaintiff the appearance that the Defendant's agent was fully authorized by the Defendant to also conclude a contract on its behalf*, especially in [*sic*] when such important commercial details are given at the same time as the inquiry by the Defendant's agent with the Plaintiff on possible supply of marine bunker fuel to the Vessel and especially when such commercial details were carried through and finalised in the course of contractual negotiations …

> [emphasis added]

75    The alleged "important commercial details" which the plaintiff was seeking to rely on were, *inter alia*:

> (a)    that the bunkers would be delivered at the Kavkaz roads in the Black Sea Anchorage;

> (b)    the nomination of the local agent, Trans Taman Expo;

> (c)    the quantity and quality of the bunkers, *ie*, 4,000mt of 380 cst fuel oil;

> (d)    that 5/4/3 days followed by 48/24/12 hours ETA notices to be sent to the local agent;

> (e)    that the delivery date is between 13 and 17 October 2014 and the delivery time of the bunkers is between 30 to 60 hours, weather permitting;

> (f)    that the bunkers would be delivered by two barges; and

> (g)    that payment is to be made within ten days of supply.

76    As stated in paras 8 and 17 of the arrest affidavit, the plaintiff relied on OW Singapore's purchase order confirmation dated 30 September 2014, wherein the above details were stated, to ground its belief that the defendant had authorised OW Singapore as its agent to transmit "important commercial details" to the plaintiff. The allegation that OW Singapore had supplied the commercial details to the plaintiff was presented in the arrest affidavit as a critical building block to support the agency argument. At the *ex parte* hearing for the issuance of the warrant of arrest, the plaintiff's solicitor, Mr Khoo Eu Shen ("Mr Khoo"), specifically drew the court's attention to this allegation given its perceived importance to the plaintiff's agency case theory.

77    However, as pointed out at [15] above, this assertion is patently false as those commercial details in fact emanated from the plaintiff. The details were substantially lifted verbatim from an e-mail dated 24 September 2014 sent by the plaintiff to OW Singapore. This was admitted as much by Mr Teh during the appeal hearing, though he attempted to suggest that one

of the commercial details relating to the choice of two barges came from OW Singapore. This is also incorrect because the use of the two barges was the result of the plaintiff's own operational constraints. The plaintiff must have known that paras 8 and 17 of the arrest affidavit were false given that the information came from itself, not OW Singapore. At the very least, it was hopelessly reckless and, in my view, plainly inexcusable.

78      Although the plaintiff's case theory is entirely premised on its belief that OW Singapore had acted as the defendant's agent in ordering the bunkers from the plaintiff, interestingly, Mr Teh acknowledged during the appeal hearing that there is in fact no evidence before the court to even suggest that the defendant was aware of OW Singapore's involvement in the bunker transaction. Nevertheless, he maintained that the relationship between OW Singapore and the defendant, *if any*, should be investigated at the trial. The facts in the present case are therefore entirely different from *The Bunga Melati 5* where the Court of Appeal refused to strike out the claim because there was evidence before the court that an employee of the defendant/shipowner had informed the plaintiff that the party who ordered the bunkers was its agent. It bears mention that the bunkers were to be delivered to the Vessel at the port of Kavkaz, Russia. The bunker transaction had no connection with Singapore. On the face of all the disclosed documents and correspondence, there is nothing to suggest that the defendant was ever aware of OW Singapore's involvement, let alone that the defendant appointed or held out OW Singapore as its agent. That might well explain why the agency allegation was not even raised by the plaintiff in its initial two letters of demand to the defendant.

79      At the *ex parte* hearing before the assistant registrar on 9 December 2014 for leave to issue the warrant of arrest, it is clear from the minute sheet of the hearing that the plaintiff proceeded on the *assumption* that OW Singapore was the defendant's agent. No explanation was offered by Mr Khoo as to why and how OW Singapore could have acted as the defendant's agent in the purchase of the bunkers given that the objective evidence has revealed that the defendant had purchased the same bunkers from OW China on different terms. This was fully known to the plaintiff by then.

80      In referring to para 6 of the arrest affidavit, Mr Khoo informed the assistant registrar that the "Defendant agent had dealt with the Plaintiff in the past and were familiar with Plaintiff bunker sales confirmations and general Terms & Conditions". The impression from both para 6 of the arrest affidavit and Mr Khoo's elaboration as recorded in the minute sheet is that there has been a course of past dealings *between the plaintiff and the defendant* through the agency of OW Singapore and, therefore, the defendant ought to be familiar with the plaintiff's GTC. However, this is misleading or cavalier, to say the least, because the defendant never had any prior dealings with the plaintiff either directly or *via* OW Singapore.

Whatever prior dealings the plaintiff might have had with OW Singapore concerned the vessels *WMS Amsterdam* and *Tong Hai*, which the plaintiff knew have no connection whatsoever with the defendant.

81     Further, although Mr Khoo drew the assistant registrar's attention to the exchange of correspondence between the parties' respective solicitors, he described the defendant's position that it was contractually obliged to pay OW China for the bunkers under a separate contract as a "[n]ew allegation" which is "irrelevant to the [Plaintiff's] contractual claim". Mr Khoo also gave the court the impression that the defendant was simply denying that OW Singapore was its agent. However, the defendant's position was neither "new" nor "irrelevant". It was also not a bare denial of the alleged agency. Unless the plaintiff could offer a legitimate explanation to surmount the hurdles to its agency argument (and none was attempted by Mr Khoo or the plaintiff in the arrest affidavit), the defendant's position was in fact fatal to the plaintiff's case. Indeed, the plaintiff's case has since been disposed of summarily precisely on the bases raised by the defendant right from the start.

82     In light of the above analysis of the indisputable facts leading to the arrest of the Vessel, has the plaintiff crossed the threshold for an award of damages for wrongful arrest to be made against it? I am satisfied that the line is crossed. The *legal* foundation of the plaintiff's case, premised on its own GTC to create the agency relationship, is a complete legal non-starter. It is not a complex point of law at all. In the words of Ang J in *The Eagle Prestige* ([24] *supra*) at [73], the summary dismissal of the plaintiff's reliance on its own GTC to create the agency relationship would unequivocally constitute a "*knock out blow*" to its claim.

83     The *factual* foundation of the plaintiff's case theory is equally misconceived. Factually, the plaintiff's case was largely premised on the alleged transmission of "important commercial details" by the defendant to the plaintiff via OW Singapore, which has since been admitted to be false. Also, contrary to the plaintiff's assertion through Rodyk's letter of 17 November 2014, the plaintiff knew that there was in fact no communication between OW Singapore and the defendant and that its invoice was never delivered to the defendant for payment prior to the arrest of the Vessel. This case is therefore not simply a case with "*so little foundation*", or even a case with "*no foundation*" as was found to be the case in *The Vasiliy Golovnin* ([20] *supra*) at [146]. It was instead a case which the plaintiff knew or ought to have known was based on a *false foundation*. Further, it was plainly inadequate to simply inform the AR that the defendant's position was that it was contractually obliged to pay OW China for the bunkers under a separate contract. The plaintiff was well aware of the undisputed fact that the defendant had purchased the same bunkers from OW China not only on different terms but, most significantly, *at a higher price*. This fact effectively demolishes its agency case theory. It was a

significant fact which should have specifically been brought to the attention of the AR. As observed at [44] above, the mere exhibiting of the OW China/defendant contract in the arrest affidavit was manifestly insufficient to discharge the duty of full and frank disclosure given the critical importance of the different terms between the two contracts.

84    Accordingly, the malice threshold was crossed on both fronts – the plaintiff's case had "so little foundation", and there was at least reckless non-disclosure of material facts. My findings are not arrived at with the benefit of hindsight or based on information which only became available to the plaintiff after the arrest. Instead, they are squarely premised on information which was readily available to the plaintiff *prior* to the arrest.

85    There is therefore no reason why the plaintiff should not be answerable for the damages occasioned by the wrongful arrest of the Vessel. I would add that the courts have awarded damages under less egregious circumstances. In this regard, it is relevant to refer to the decision in *The AA V* ([34] *supra*), where Prakash J awarded damages for wrongful arrest under circumstances quite similar to the present case. In that case, the claim was also for a sum owing in respect of a supply of bunkers to the defendants' tug allegedly at the request of the defendants' agent. The defendants argued, *inter alia*, that they were not liable to the plaintiffs *in personam* as the latter had contracted with New Acmes for the sale of the bunkers and New Acmes were not the defendants' agent.

86    Prakash J found that the plaintiffs should have disclosed (a) the fact that the orders were originally made by New Acmes purporting to act as the defendants' agent; (b) why they believed the alleged agency representation even though the Portnet search subsequently undertaken showed another entity was the tug's general agent; and (c) the fact that 80% of the bunker supplied had been loaded onto the barge rather than the tug (at [46]).

87    Awarding damages for wrongful arrest, Prakash J reasoned (at [49]–[50]):

> 49    The defendants on the other hand submitted that there had been malice on the part of the plaintiffs particularly in relation to the non-disclosure of the material facts mentioned in [46] above. The plaintiffs knew at the time they applied for the warrant that their only contact had been with New Acmes and that the defendants themselves had done nothing to indicate that New Acmes were their agents. *The plaintiffs had only New Acmes' alleged representation of the relationship on which to rely. They were also experienced bunker suppliers and should have known that a person ordering bunkers for a vessel who is not the owner of the vessel himself need not necessarily be the owner's agent.* He could be the charterer's agent or a third party altogether. It is a common term of time charter contracts that the fuel for the chartered vessel would be paid for by the charterer and therefore a bunker supplier should make careful enquiries as to whom he is actually dealing with before making any supply to a vessel. Quite apart from the common knowledge in

the trade, the fact in this case which must have alerted the plaintiffs to the possibility that the fuel was not bought by the owners of the tug for its operation was that most of it went into another vessel altogether. The purpose of a tug is to tow a barge carrying cargo from one place to another. It is highly unusual, if not completely unheard of, for a tug to tow a barge behind it simply so that it should have a reserve fuel tank for its own voyage. What would be the purpose of such a long voyage for a general-purpose tug when no cargo is to be transported?

50      I accepted the defendants' submission that the plaintiffs' *non-disclosure of material facts was intentional and malicious*. Even if Mr Lui had made a representation to them that he was acting as agent for the defendants, *the plaintiffs had acted recklessly in attempting to arrest the ship without any further investigation as to whether the defendants were in fact the persons who were contractually liable to them*. All their dealings had been with New Acmes. The invoices had been sent to New Acmes and when they were chasing for payment the plaintiffs had chased New Acmes and their efforts had been rewarded by part-payment made by New Acmes. *The plaintiffs had had no contact with the defendants directly apart from the actual physical delivery of the fuel to the tug and barge and had no basis to believe that the defendants were the contracting purchaser other than Mr Lui's so-called representation*. There was information before them (*ie* the Portnet search) that that representation could have been false and they should either have carried out further investigations or at the least have disclosed the information to the court so that a proper assessment of the correctness of their claim could be made. Instead, they deliberately chose to leave out all information which would have caused doubt as to whether the defendants were the persons who would be liable in an action in personam.

[emphasis added]

88      There are significant factual similarities between *The AA V* and the present case, but in my view, the differences in fact enhance the justification for awarding damages for wrongful arrest in the present case:

(a)      The agency representation in *The AA V* was never made by the defendants, but only by the agent itself. Here, the plaintiff's case that there was a representation of agency by the agent itself is even weaker. It is based solely on OW Singapore's acceptance of the plaintiff's GTC, which unilaterally imposed the alleged agency. The plaintiff never addressed the fact that OW Singapore, in its purchase order confirmation, expressly stated that the bunkers were ordered under *its own account*.

(b)      In both cases, the plaintiff had no contact with the defendant and had no basis to believe that the defendant had contracted to purchase the bunkers from the plaintiff. In fact, in the present case, the plaintiff knew *prior to the arrest* that the defendant had contracted with another party, OW China for the same bunkers on different terms, and most significantly, at a higher price.

(c)    As observed by Prakash J at [49] of *The AA V*, as experienced bunker suppliers, the plaintiffs should have known that a person ordering bunkers for a vessel who is not the owner of the vessel need not necessarily be the owner's agent. Here, the evidence strongly suggests that the plaintiff did not believe that OW Singapore was ever the defendant's agent to begin with. The agency allegation was not mentioned in its initial letters of demand. In fact, the plaintiff must have been aware that OW Singapore had contracted with it as principal. In response to the court's query, Mr Teh informed the court that the plaintiff has filed a proof of debt against OW Singapore for the *same claim*. The proof of debt dated 30 January 2015 against OW Singapore was lodged with the provisional liquidators. Significantly, the proof of debt was based on the *same bunker supply* under the *same invoice* no 1014090 dated 2 November 2014, and was for the *same amount* of US$1,768,000. It is noteworthy that in the proof of debt, the plaintiff stated that the "marine bunker is sold and delivered on the credit of the vessel" and that it "may assert a maritime lien against the vessels". There is no mention of any alleged agency. The reason for this is clear – by filing the proof of debt against OW Singapore, the plaintiff is asserting that OW Singapore contracted as *principal*, and not as agent. This is entirely in line with the plaintiff's initial letter of demand dated 12 November 2014 which referred to the purported lien and made no mention of any agency. The plaintiff's filing of the proof of debt merely reinforces my finding that it never believed that OW Singapore was the defendant's agent in ordering the bunkers. In fact, it was aware at all material times that the converse was the truth.

(d)    From a Portnet search, the plaintiffs in *The AA V* knew that another entity was the tug's general agent, and not as alleged. Here, the plaintiff knew from the exchange of correspondence that the defendant had contracted to purchase the bunkers from another party, *ie*, OW China. Therefore, the defendant could not possibly be liable to the plaintiff under a different contract with OW Singapore.

89    To conclude, I find that the plaintiff knew or at least must have known at the time of the arrest that its claim was entirely without factual or legal basis. In the circumstances, the fact that it nevertheless proceeded to arrest the Vessel suggests malice. I also find that the plaintiff was, at the very least, grossly negligent and reckless in not sufficiently disclosing the defendant's position when applying for leave to issue the warrant of arrest. There was clearly material non-disclosure in that regard. The plaintiff's dismissive and cavalier attitude towards the defendant's position that it had purchased the bunkers from OW China on different terms, which it knew was effectively a "knock out blow" to its claim, is deserving of opprobrium.

90    For the reasons set out at [51]–[55] above, I do not find that the plaintiff's omission to state its intention to proceed to arbitration

constitutes material non-disclosure in this case. In any event, the plaintiff did disclose the arbitration clause in the arrest affidavit and this was brought to the assistant registrar's attention. Further, in my view, the intention to proceed to arbitration would not have made a difference to the assistant registrar's decision to grant leave to issue the warrant of arrest.

## Conclusion

91      In the result, the defendant's appeal in RA 226/2015 is allowed. The warrant of arrest is set aside and the plaintiff is ordered to pay the defendant damages to be assessed for the wrongful arrest of the Vessel from 10 to 12 December 2014. Costs of $10,000 inclusive of disbursements are awarded to the defendant for the hearings here and below. In the event that an application for assessment of damages for the wrongful arrest is filed by the defendant, I direct that the assessment hearing be fixed before me.

Reported by Pang Ru Xue Jamie.